# 25-0794-cv

# United States Court of Appeals

*for the*

# Second Circuit

SUE COSTELLO, Individual,

*Plaintiff-Appellant,*

– v. –

PARAMOUNT GLOBAL, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX

YEHUDAH L. BUCHWEITZ
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

-and-

CRYSTAL L. WEEKS
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000

*Attorneys for Defendant-Appellee*

i

## SUPPLEMENTAL APPENDIX
## TABLE OF CONTENTS

**Page**

Letter from Yehudah L. Buchweitz to the Honorable
Lorna G. Schofield, dated May 2, 2023.................. SA-1

Exhibit A to Buchweitz Letter -
General Provisions................................................. SA-4

Complaint, dated February 21, 2023 ......................... SA-11

Exhibit 1 to Complaint -
Disclosure Agreement............................................ SA-37

Exhibit 2 to Complaint -
Additional Terms to Executive Producer and
Performer Agreements, dated June 29, 2018 ......... SA-38

Exhibit 3 to Complaint -
Check ..................................................................... SA-53

Exhibit 4 to Complaint -
Los Angeles Police Department Investigative
Report ................................................................... SA-54

Opinion and Order of the Honorable Lorna G.
Schofield, dated February 1, 2024 ......................... SA-55

Notice of Motion, by Plaintiff, for an Order
Granting Reargument, dated February 13, 2024.... SA-65

Order of the Honorable Lorna G. Schofield, dated
February 15, 2024 ................................................. SA-72

Order of the Honorable Lorna G. Schofield, dated
April 8, 2024.......................................................... SA-79

Order of the Honorable Lorna G. Schofield, dated
April 10, 2024 ....................................................... SA-83

ii

Page

Order of the Honorable Valerie Figueredo, dated
June 12, 2024 ........................................................ SA-85

Transcript of Proceedings held before the
Honorable Valerie Figueredo, dated June 5, 2024 . SA-98

Order of the Honorable Valerie Figueredo, dated
August 5, 2024 ...................................................... SA-122

Order of the Honorable Valerie Figueredo, dated
June 12, 2024 ........................................................ SA-123

Report and Recommendation, dated
January 14, 2025 ................................................... SA-125

Opinion and Order of the Honorable Lorna G.
Schofield, dated March 12, 2025 .......................... SA-135

SA-1

## Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Yehudah L. Buchweitz**
+1 (212) 310-8256
Yehudah.Buchweitz@weil.com

May  2, 2023

The Honorable Lorna Schofield
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:  *Sue Costello v. Paramount Global*, Case No. 1:23-CV-01553-LGS

Dear Judge Schofield,

We represent defendant Paramount Global, f/k/a CBS Corp. ("CBS") in the above-referenced action and respectfully request that this dispute be submitted to arbitration, or, alternatively, dismissed for lack of subject matter jurisdiction and Plaintiff's failure to state a claim.

This case boils down to Plaintiff Sue Costello's ("Plaintiff") failure to perform under the agreement at issue ("Agreement") with CBS Television Studios ("CBS Studios"). After the Parties executed the Agreement, Plaintiff received a preliminary payment from CBS Studios. However, because Plaintiff never fulfilled her contractual obligations, she was not entitled to and did not receive further compensation. Regardless, the Agreement contains an express arbitration provision that should be honored.

Pursuant to Rule 5(A) of Your Honor's Special Rules & Practices in Civil Pro Se Cases, the undersigned counsel for CBS respectfully submits this letter in anticipation of filing its motion to compel arbitration, or in the alternative, to dismiss.

### I.        Motion to Compel Arbitration

The Court should compel arbitration pursuant to the Federal Arbitration Act ("FAA").  Under the FAA, an agreement to arbitrate a dispute in a written contract "shall be valid, irrevocable, and enforceable…." 9 U.S.C. § 2.  Also, courts must "move the parties to an arbitrable dispute…into arbitration as quickly and easily as possible." *Preston v. Ferrer*, 552 U.S. 346, 357 (2008).

The Agreement explicitly states that if the Parties cannot resolve any dispute informally, "then such Dispute will be submitted to final and binding arbitration at the Los Angeles office of JAMS, or its successor ('JAMS')." Ex. A at ¶ 30(a), incorporated by reference as an unattached part of the Agreement. *Wu v. Bitfloor, Inc.,* 460 F. Supp. 3d 418, 425 (S.D.N.Y. 2020)("A complaint is also deemed to include…materials incorporated in it by reference). Accordingly, we respectfully request that the Court compel arbitration of this dispute.

SA-2

The Honorable Lorna Schofield                                  **Weil, Gotshal & Manges LLP**
**May  2,** 2023
Page 2

   **I.**     **Motion to Dismiss**

     **A.  The Court should dismiss this action for lack of subject matter jurisdiction.**

The Court lacks subject matter jurisdiction in this case. *First*, Plaintiff cannot establish diversity jurisdiction because she does not allege that the amount in controversy exceeds $75,000. Instead, Plaintiff alleges that she was paid "15% upon signing" the Agreement, i.e., $21,296.25 (*see* ECF No. 1 at 12), without specifying her alleged harm or the amount of damages she seeks from CBS. ECF No. 1 at 12. Plaintiff would have been owed a payment of $66,000 had she delivered a draft of her script, but she never did. *See* ECF Nos. 1-2, Ex. 2 at 10. Her conclusory demand for $120 million for the alleged "malicious intent to cause emotional and financial distress" is insufficient to establish the amount in controversy. *See Bracken v. MH Pillars Inc.*, 290 F. Supp. 3d 258, 262 (S.D.N.Y. 2017) ("[T]he party invoking the jurisdiction… has the burden of proving . . . to a reasonable certainty" that the claim exceeds $75,000).

*Second*, Plaintiff cannot establish federal question jurisdiction.  Her claims are all based in state law except for her gender discrimination claim, which, as explained below, cannot serve as the basis for jurisdiction. Also, Plaintiff's claim cannot be rooted in the Fourteenth Amendment, as alleged, (*see* ECF No. 1 at 5), because CBS is not a public employer. *See Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).

     **B.  The Court should dismiss this action because Plaintiff's claims are barred by certain statutes of limitations and Plaintiff has failed to state a claim.**

Even if the Court had jurisdiction (which it does not), the Court should dismiss the claims for which Plaintiff fails to state a claim under Rules 12(b)(6) or 9(b) and dismiss the remaining claims, which are time-barred. According to the Complaint, CBS Studio's latest alleged misconduct occurred on June 30, 2019, when it allegedly "did not exercise the extension" of the Agreement. ECF No. 1 at 15. California law governs the Agreement.  Ex. A at ¶ 31(e).

     1.  <u>Breach of Contract & Breach of the Covenant of Good Faith and Fair Dealing</u>

Plaintiff has failed to state a claim for breach of contract and breach of the covenant of good faith and fair dealing. To state a claim of breach of contract, a plaintiff must plead "(1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to the plaintiff." *Reinhardt v. Gemini Motor Trans.*, 879 F. Supp. 2d 1138, 1143 (E.D. Cal. 2012). To state a claim for breach of the covenant of good faith and fair dealing, a plaintiff must plead: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Id.* at 1145.  Plaintiff has not alleged that she performed or fulfilled her contractual obligations, nor has she pled that her nonperformance was excused. *See* ECF No. 1 at 15.  CBS was not obligated to pay Plaintiff following her breach.  *See* ECF Nos. 1-2, Ex. 2 at 10.

     2.  <u>Tortious Interference</u>

Plaintiff's tortious interference claim is barred by the applicable two-year statute of limitations

SA-3

The Honorable Lorna Schofield
**May  2,** 2023
Page 3

**Weil, Gotshal & Manges LLP**

and because "a contracting party . . . cannot be held liable in tort for conspiracy to interfere with his or her own contract." *PM Grp, Inc. v. Stewart*, 154 Cal. App. 4th 55, 65 (2007); *see* Cal. Civ. Proc. § 339(1); ECF No. 1 at 22.

### 3.   Constructive Fraud and Fraudulent Inducement

Plaintiff's constructive fraud and fraudulent inducement claims are barred by the applicable three-year statute of limitations. Cal. Code Civ. Pro. § 338(d). Plaintiff also failed to meet Rule 9(b)'s heightened pleading standard, which requires Plaintiff to "state with particularity the circumstances constituting fraud . . ." *Parducci v. Overland Sols., Inc.,* 399 F. Supp. 3d 969, 977 (N.D. Cal. 2019). Rather than identify any specific misrepresentation by CBS, Plaintiff merely labels the Agreement as "fraudulent," which is insufficient to meet Rule 9(b)'s heightened pleading standard. *See id.*; ECF No. 1 at 22-23. Consequently, Plaintiff did not allege that CBS knew of any _specific_ falsity or had an intent to defraud. Plaintiff's constructive fraud claim also fails because she did not allege that the Parties had a "fiduciary or confidential relationship" or that CBS breached such fiduciary duty. *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1131 (2014).

### 4.   Malicious Intent to Cause Emotional and Financial Distress

This claim does not exist under California law, but even if interpreted as one for intentional infliction of emotional distress, it is barred by a two-year statute of limitations. Plaintiff also failed to allege "extreme and outrageous conduct." *McKenna v. Permanente Med. Grp., Inc.,* 894 F. Supp. 2d 1258, 1273 (E.D. Cal. 2012); Cal. Civ. Proc. Code § 335.1; ECF No. 1 at 23.

### 5.   Discrimination on the Basis of Gender

As Plaintiff fails to allege that she was ever an employee of CBS, she is not entitled to Title VII protections. *See Flores v. Elektra Records,* 124 Fed. Appx. 502, 502 (9th Cir. 2005) ("Title VII protects employees, not independent contractors"). In any event, Plaintiff did not exhaust her administrative remedies, nor can she because the statute of limitations has run. *Fort Bend Cnty., Texas v. Davis*, S. Ct. 1843, 1846 (2019). Plaintiff failed to allege any direct evidence of discrimination or circumstances giving rise to an inference of discrimination. *See Molina v. Los Angeles Cnty., Dep't of Mental Health*, 58 F. App'x 311, 315 (9th Cir. 2003); ECF No. 1 at 23.

For all the foregoing reasons, CBS respectfully requests that the Court compel arbitration or dismiss Plaintiff's claims.

Pursuant to Rule 5(A) of Your Honor's Special Rules & Practices in Civil Pro Se Cases, the undersigned counsel for CBS respectfully proposes that, in light of the conference scheduled for May 31, 2023, the deadline for filing CBS's motion, should one be necessary, be June 21, 2023, any response to be filed by July 21, 2023, and any reply to be filed by August 7, 2023.

Sincerely,
 /s/ Yehudah L. Buchweitz
Yehudah L. Buchweitz

SA-4

# EXHIBIT A

SA-5

GENERAL PROVISIONS — (W-D)

1.    Principal Services of Artist: During the Term, Artist will: a) report and be available to render services at all times and places Studio may from time to time designate; b) conscientiously and to the best of Artist's ability render all services customarily rendered by persons engaged in Artist's capacity hereunder in the television industry; and c) comply with all of Studio's instructions, rules and policies, including without limitation the CBS Non-Discrimination and Anti-Harassment Policy and the CBS Corporation Business Conduct Statement, in acknowledgment of Studio's complete and exclusive financial and creative control of the Program. The "Program" as used herein means the pilot, series, MFT and/or project, as applicable, as set forth and defined in the Agreement. "Agreement" as used herein means the agreement or deal memorandum to which these General Provisions are attached and/or incorporated by reference together with these General Provisions and all other attachments thereto, if any. The "Term" of this Agreement as used herein means the initial period and any extensions thereof as set forth in the Agreement.

2.    Limitations on Authority: Artist will not employ any person to serve in any capacity, nor contract for the purchase or renting of any article or material, nor make any agreement committing Studio to pay any sum of money for any reason whatsoever in connection with Artist's services hereunder, or otherwise, without the express prior written consent of a duly authorized officer of Studio.

3.    Publicity: Artist hereby grants Studio the exclusive right during the Term to issue and authorize publicity, paid advertisements, press notices and other information concerning the Agreement and/or Artist's involvement with the Program, and Artist will not issue any statements or other publicity concerning the Program or the Agreement without Studio's prior written consent. Artist hereby grants to Studio the exclusive and perpetual right to use and license others to use Artist's name, likeness, biography, voice and other sound effects in connection with publicity, promotion, advertising and marketing, including without limitation in connection with the Program and the rights granted by Artist hereunder.

4.    Rights:   a)   Rights To Program and Artist's Services: Artist acknowledges that all and any portion of Artist's services, writings, procedures, ideas and performances, of every kind rendered pursuant to this Agreement, and the results and proceeds thereof, including Artist's appearance hereunder as well as each and every work or procedure that Artist will write, perform, conceive or compose during the Term of this Agreement in the performance of services in connection with the Program (collectively, the "Material," which as used herein will also include, without limitation, titles, subtitles, plots, ideas, themes, stories or parts thereof and/or any other results or creations, originated, prepared, suggested or devised by Artist hereunder), will from the moment of creation constitute works made for hire for Studio, as that phrase is defined in the provisions of Sections 101 and 201 of the Copyright Act of 1976, Title 17, United States Code, including, without limitation, a work specifically commissioned by Studio for use as part of an audio-visual work and/or a supplementary work. Studio will have the sole and absolute right to copyright the Material and/or the Program as copyright author and proprietor thereof and to obtain renewals of such copyright and such other protection as Studio may deem necessary. Artist will execute, verify, acknowledge and deliver a certificate of ownership in such form as Studio may designate and any and all such other instruments and documents as Studio will consider necessary or advisable to evidence, establish, maintain or defend Studio's rights in and to the Material. In this connection, Artist hereby irrevocably appoints Studio as Artist's attorney-in-fact, with the right, but not the obligation, to execute, verify, acknowledge and deliver any and all such instruments and documents which Artist may fail or refuse to execute, verify, acknowledge or deliver. Such appointment will survive any incapacity of Artist. To the extent, if

any, that Artist retains any interest in the Material and/or the Program, and except as expressly set forth in this Agreement, Artist hereby irrevocably grants, assigns and transfers to Studio, free and clear of any and all claims for royalties or other compensation except as expressly set forth herein, all rights, including all copyrights, with respect to the Material and/or the Program, exclusively and perpetually, throughout the universe, in any and all media, now or hereafter known. The foregoing provision does not apply to all or any portion of the Material which constitutes an invention, as such term is defined in the provisions of Sections 2870 and 2872 of California Labor Code, and expressly does not apply to any invention that Artist develops entirely on his or her own time without using Studio's equipment, supplies, facilities or trade information except for those inventions that either:  (i) relate at the time of conception or reduction to practice of the invention to Studio's business or actual or demonstrably anticipated research or development of Studio; or (ii) result from any work performed by Artist for Studio.

b)    Studio's Right to Use Material: Studio will have the right, but not the duty, to use, adapt and change the Material, or any part thereof, and to combine the same with other works of Artist or others, to use the same on a program other than the Program herein designated, and to vend, copy, publish, reproduce, record, transmit, telecast by radio or television, perform, photograph with or without sound (including spoken words, dialogue and music synchronously recorded), and to communicate the same by any means now known or hereafter devised, either publicly or otherwise, and for profit or otherwise, throughout the world in perpetuity. Further, except as specifically provided otherwise herein, Studio will be entitled to the maximum benefits of the applicable guild agreement, if any, including, without limitation, the rights to distribute the Program for domestic telecasting and reuses, foreign exhibitions, theatrical and non-theatrical exhibition and exhibitions in supplemental markets and for all other exploitation now known or hereafter devised, subject only to payment of the applicable minimum compensation, if any, and to the minimum extent required, as specified in the applicable guild agreement. The foregoing will be deemed to comply with all requirements under such applicable guild agreement requiring Artist's express agreement to the grant of such maximum rights to Studio.  To the extent Artist's compensation hereunder exceeds the minimum payment required by any such guild agreement, Studio may, to the fullest extent permitted by such guild agreement, apply such payments in such order and in such amounts as Studio in its sole discretion will elect, to overtime payments, reuse payments, vacation pay or otherwise. If Artist is engaged as a writer subject to the jurisdiction of the Writers Guild of America (the "WGA") Minimum Basic Agreement ("MBA"), Studio will have all rights in and to the Material, which Studio is permitted to have and acquire by virtue of the MBA, and nothing in this Agreement will be construed to be more favorable to Artist than the minimum terms and conditions set forth in the MBA, except to the extent, if any, that the compensation provided Artist hereunder is in excess of the applicable minimum compensation provided for in the MBA and except if Artist is expressly granted more favorable terms herein. Without in any way limiting the provisions of the preceding sentence, it is understood that if the Material is (i) a story or story and teleplay for an established episodic series or serial, (ii) a teleplay based upon a story created and written by another person or based upon a story in the public domain or upon a story owned by or licensed to Studio, (iii) a rewrite or polish, or (iv) any other material in which Artist is not entitled to "separation of rights" (as that phrase is used in the MBA), then Studio will own all of the rights in the Material of any nature or description whatsoever, including, but not limited to, the right to use and reuse the Material in any field or medium whatsoever, it being understood that Artist will retain no interest of any character whatsoever in such Material except for Artist's right, if and when the same will accrue pursuant to the MBA, to receive additional payments for television reruns, foreign

-1-

SA-6

television exhibition, theatrical exhibition, supplemental markets exhibition and/or other specific uses of the Program or Material.

c)      Studio's Right to Make Changes; Waiver of "Moral Rights": Without limiting the generality of the foregoing, in all cases, Studio will have the right to make such revisions, deletions, abridgments, or other changes in the Material and to combine the same with other works of Artist or others as Studio in its sole discretion may deem desirable, it being understood that Artist hereby waives the benefits of any provision of law known as "droit moral," or any similar laws, and agrees not to institute, support, maintain or authorize any law or lawsuit on the ground that the Program or further programs, or other items produced hereunder in any way constitute an infringement of any of Artist's "droit moral" or a defamation or mutilation of any part thereof, or contain unauthorized variations, alterations, modifications, changes or foreign versions or translations. Studio agrees, however, that with respect to original Material, Studio will, pursuant to Article 16.B.3.j. of the MBA, consult with Artist regarding each set of revisions requested of Artist by Studio.

d)      Rights to Public Domain and Other Materials: Nothing in this Agreement will restrict Studio's use of public domain materials acquired by Studio from another source or sources or Studio's materials developed independently by or for Studio, whether or not such use may involve the subject matter of or a subject matter similar to the Material under this Agreement, or which may otherwise be submitted by Artist to Studio.

e)      Rights Inuring to Others: This Agreement will inure not only to Studio's benefit, but also to the benefit of all parties who may hereafter acquire the right from or through Studio to distribute, exhibit, advertise and/or exploit any of the results or proceeds of Artist's services and/or the Material (including the Program in which they appear). Studio may release the Program in which Artist's services or writings appear under any company name or trademark, trade name, etc., designated by Studio.

5.      Additional Compensation:      If Artist becomes entitled pursuant to the MBA to receive compensation in addition to the compensation provided for in this Agreement, Artist will receive such minimum additional compensation as may be required under the MBA, and not based upon the actual compensation paid to Artist under this Agreement. Further, in the event Studio engages Artist in any "additional capacity" (as that phrase is used in the MBA) any additional compensation paid by Studio to Artist in excess of the compensation paid to Artist for Artist's services as a writer will be deemed attributable to the additional services rendered by Artist.

6.      Method of Payment: Studio will make payment of all sums due Artist hereunder in the manner and within the time period prescribed by the MBA. If no method of payment is set forth in this Agreement, then the initial payment will be paid in installments as provided in the MBA; if the initial payment is to be paid in installments and if this Agreement does not provide to the contrary, Studio may, at its election, withhold payment of any portion of any such initial payment which is in excess of the applicable minimum compensation until completion and delivery of the Material in final form. Delivery to the Writers Guild of America any check payable to Artist hereunder for forwarding to Artist will constitute payment by Studio to Artist of the sum evidenced by such check.

7.      Credit: Studio will give Artist credit on the positive prints of each Program upon which Artist renders all required services in accordance with the provisions of Schedule "A" of the MBA and otherwise as Studio may, in its sole discretion, elect, and subject to network rules and regulations (if a network is involved), it being understood that Studio will not be obligated to give Artist any credit except to the extent that Artist will be entitled thereto pursuant to said Schedule "A." Anything herein to the contrary notwithstanding, Studio's obligation to make the payments with respect to television

reruns, foreign television exhibition, theatrical exhibition, supplemental markets exhibition and/or other exploitation of the Program, and the exercise of other rights referred to in this Agreement, is subject to the prior condition that Artist will be entitled to receive credit on the Program pursuant to the final credit determination made under the terms of Schedule "A" of the MBA. If Artist shares credit with any one or more other writers, Artist and such other writer(s) will be considered as a unit with respect to such payments. Any failure to give such credit will not constitute a breach of this Agreement, but Studio will make commercially reasonable efforts to prospectively correct credit error after receipt of a written notice of such error by Artist. Nothing herein contained will be construed to prevent so-called "trailer," "teaser" or other advertising in connection with the Program without mentioning the name of Artist.

8.      Pay or Play:   Studio's obligations will be satisfied by payment of the then-applicable compensation as set forth herein, and such payment will constitute complete consideration for the rights, warranties, representations and services guaranteed, furnished and/or to be granted hereunder. Notwithstanding the foregoing, Artist will not be paid the applicable compensation if Artist is unavailable to render services for the Program during the Term of this Agreement or if Artist does not faithfully and completely perform each and every material covenant hereunder. Nothing hereunder will obligate Studio to produce the Program, to utilize Artist's services hereunder or to produce broadcast or otherwise exploit any Material furnished by Artist hereunder.   In addition, nothing hereunder will limit Studio's rights or remedies in the event of a breach of this Agreement by Artist. Without limiting the generality of the foregoing, Studio will not be under any liability for any claim for loss of publicity or opportunity to enhance Artist's reputation notwithstanding the fact that Studio may abandon production or exploitation of the Program or the use of Artist's services in connection with the Program.

9.      Termination for Cause:    Studio will have the right to terminate this Agreement and Artist's services if in Studio's good faith belief, based on the facts then available to Studio, Artist has engaged in any of the following conduct:  a) fraud, misappropriation or embezzlement of funds; b) disregard of instructions, applicable company policies, regulations or procedures; or c) gross misconduct.   Termination under this provision will be effective immediately upon receipt of notice by Artist.

10.      Incapacity:   If Artist suffers an incapacity, Studio may suspend Artist's services during the duration of such incapacity and be relieved of its obligations to pay Artist for each day Artist is under such incapacity.   "Incapacity," as used herein, will include, without limitation, any physical or mental disability rendering Artist unable to perform the essential functions of Artist's obligations hereunder (with or without reasonable accommodation).     This Agreement will automatically terminate in the event of Artist's death, and, subject to applicable law, Studio may terminate this Agreement in the event Artist's incapacity extends beyond seven (7) consecutive days or two (2) weeks in the aggregate during the Term.

11.      Default:  a) Defined:  If Artist fails, refuses or neglects to perform any of Artist's obligations hereunder to the best of Artist's ability, for any reason other than incapacity, Artist will be in "default" of this Agreement.   Subject to applicable law, default will include, without limitation, Artist's participation in or recognition of a strike or labor dispute (unless provided otherwise in Artist's applicable collective bargaining agreement).   If Artist refuses or states that Artist will refuse to comply with any of Artist's obligations hereunder, such refusal or statement may be treated by Studio as an immediate default, regardless of whether or not the time for performance of such obligation or obligations has arrived. Studio may at any time request Artist to confirm in writing Artist's intentions and willingness to comply with Artist's obligations hereunder, either generally or with respect to any particular matter. If within twenty-four (24) hours from

-2-

150511

F:\NTVLEGAL\FORMS\WORD\GpWriter.dir.150511.docx

SA-7

delivery of such request at the address for notices set forth herein, Artist fails to deliver the requested confirmation to Studio, such failure may be treated by Studio as an immediate default.

b) Studio's Rights to Suspend or Terminate for Default: Studio may suspend this Agreement as to compensation while such default continues and during the week after Artist serves a written notice upon Studio stating that Artist is ready, willing and able to resume full performance. Studio may terminate this Agreement immediately at any time during the period Artist is in default or within a reasonable time thereafter. Studio's obligations or guarantees to pay Artist will be reduced by the number of days or programs affected by such default.

12. Force Majeure: a) Defined: "Force majeure events" include, without limitation, the passage and/or enforcement of a statute, law, ordinance, regulation, order, judgment or decree, whether legislative, executive, or judicial and whether or not valid; an act of God including, without limitation, earthquake, flood, or fire; epidemic; accident; explosion; casualty; lock-out, boycott or other labor controversy (including but not limited to threat of walkout, boycott, lock-out or strike unless provided otherwise in an applicable collective bargaining agreement); riot; civil disturbance; war or armed conflict (whether or not there has been an official declaration of war or official statement as to the existence of a state of war); invasion; occupation; intervention of military forces; an act of a public enemy; embargo; delay of a common carrier; changed economic conditions; inability without fault on Studio's part to obtain sufficient material, labor, transportation, power or other essential commodity required in the course of production of the Program; the death, illness, disfigurement, default or incapacity of a principal or continuing member of the cast or the director of the Program; broadcaster or station or sponsor reduction of any Program order or Program cancellation resulting from any of the above; and any events beyond Studio's control which restrict, prevent or interfere with the orderly or economically efficient production or distribution of the Program, or which otherwise adversely affect a substantial part of Studio's business.

b) Studio's Rights to Suspend or Terminate for Force Majeure: If a force majeure event occurs, Studio may suspend this Agreement, Artist's services under this Agreement and/or any of its obligations hereunder (including without limitation its obligation to pay compensation) while such event(s) continue and for such additional period of time as is necessary to permit Studio to commence or resume development and/or production. Studio may also elect, from time to time during the continuance of such force majeure event(s) or within a reasonable time thereafter, to continue such suspension or to terminate this Agreement. Such suspensions may occur more than once during any force majeure event. At Studio's election, Studio's obligations or guarantees to pay Artist may be reduced by the number of days or programs affected by such force majeure events.

13. Effect of Suspension: If Studio exercises its suspension rights under Paragraph 10, 11 and/or 12 above, Studio may elect to extend the Term and/or postpone any option exercise or other date(s) by a period of time equal to all or any portion of the period of time of such suspension ("the Suspension Period(s)"). Such elections will be exercised by Studio at any time during the then unexpired portion of the Term of this Agreement (or within two [2] weeks after the end of the Suspension Period, if later) and whether or not such dates for exercising such options have theretofore passed. However, if Studio does not elect to so extend the Term, any guaranteed compensation or program guarantees will be proportionately reduced for all or any portion of the Suspension Period(s) not so extended. If Artist's services are exclusive to Studio, Artist will not furnish services for any other person or program during such Suspension Period(s), except if the suspension is due to a force majeure event and Studio therefore is not compensating Artist, Artist may render services for a third party during such Suspension Period, subject to Studio's twenty-four (24)-hour right of recall (i.e., Artist must be available to Studio within

twenty-four [24] hours of Studio's recall of Artist). During any Suspension Period, no rights of Studio or obligations of Artist under this Agreement will be affected, except as expressly provided herein.

14. Effect of Termination: If this Agreement is terminated, whether by lapse of time, mutual consent, operation of law, exercise of a right of termination or otherwise, such termination: a) will terminate Studio's obligation to pay Artist any monies which have not accrued and become payable at the time of termination; b) will not serve to waive any other rights Studio may have, at law or otherwise, and will not affect any right herein granted, or warranty or indemnity herein made by Studio or Artist; c) will relieve Studio of any further obligations with respect to any subsequent program for which Artist has not completed his or her services; and d) will not affect or interfere with Studio's rights in and to the results and proceeds of Artist's services previously rendered, which rights will continue in full force and effect.

15. Recordings: All recordings and all rights therein, as between Artist and Studio, will be the sole property of Studio. The terms "recording" and "recordings" as used herein, will mean and include any recording or recordings made by tape, wire, film, disc or other similar or dissimilar method of recording aural or visual portions of television programs, whether now known or hereafter developed, and specifically including the television film (as defined in the MBA) which constitutes the Program hereunder, and all prints and copies thereof.

16. Assignment: Artist's services hereunder are unique and personal, and neither Artist's services nor Artist's rights and/or obligations hereunder may be assigned by Artist in whole or in part without the prior written consent of a duly authorized officer of Studio. Studio may assign this Agreement and/or its rights and/or obligations hereunder in whole or in part to any party, and this Agreement may be reassigned by any assignee thereof; provided, however, that Studio will remain secondarily liable hereunder except in accordance with the MBA or in the event such assignee is a major, mini-major or major independent motion picture production or distribution company, a television or cable network or any other similarly financially responsible party.

17. Deductions: Subject to applicable law, Artist and Studio agree that Studio will deduct and withhold from Artist's compensation under this Agreement (and Artist agrees to execute any additional documentation that may be required in connection therewith) the following: a) monies Studio pays to or on behalf of Artist over and above monies which Studio is obligated to pay under this Agreement (which Studio may deduct from compensation that Artist accrues thereafter under this Agreement or otherwise); and b) union dues, deductions and assessments and other deductions permitted or required by law or by an applicable collective bargaining agreement.

18. Warranties: a) No Violation of Law: Artist hereby warrants and represents that Artist will not violate any law, regulation or contractual obligation by entering into this Agreement, and Artist is free to enter into this Agreement, is not subject to any obligation or impediment and has not made or will not make any grant or assignment which can, will or might prevent or interfere with the full performance of his or her exclusive obligations hereunder, or conflict with or impair the complete enjoyment of the rights and privileges granted Studio hereunder. Except with respect to claims relating to the payment of residuals pursuant to this Agreement or any previous agreement(s) with Studio and/or audit claims pursuant to the contingent compensation definition, if any, applicable to this Agreement or any previous agreement(s) with Studio, Artist further warrants and represents that as of the date of this Agreement Artist does not have a claim that Studio is or was in breach of any existing obligations arising under any previous agreement(s) with Studio and that Artist has not made any claims against Studio in connection with matters occurring prior to the date of this Agreement. Artist further warrants and represents that all Material

-3-

F:\NTVLEGAL\FORMS\WORD\GpWriter.dir.150511.docx

150511

written or composed by Artist hereunder will be Artist's original work, that such Material, and Studio's use thereof, will not infringe upon or violate the right of privacy of, or constitute a libel or slander against, or violate any common law rights or any other rights of any person or entity and that there are no encumbrances, litigation (pending or threatened), liens, conditions or restrictions whatsoever upon or affecting such Material.

b)    Independent Advice; Absence of Duress:  Studio encourages Artist to seek the independent advice of an attorney regarding this Agreement and all the provisions hereto.  Artist represents and warrants that Artist has executed this Agreement without fraud, duress or undue influence.

19.    Indemnities:  Artist hereby agrees to indemnify and hold harmless Studio, Studio's successors, transferees, assignees and licensees, and the respective agents, associates, officers, directors and employees of each, including but not limited to the sponsors, if any, of the Program and any broadcasting networks and stations over which the Program is broadcast, from and against any and all damages, costs, expenses, liabilities, claims and causes of action (including without limitation reasonable attorneys' fees and costs in the defense and disposition of such matters) in any way arising by reason of the breach of any warranty or representation hereunder or any other provision in this Agreement.

20.    Delivery of Employment Documents:    Studio's engagement of Artist hereunder is subject to Artist completing, executing and delivering to Studio all documents required by the Immigration Reform and Control Act of 1986 ("IRCA"), including, without limitation, an executed Form I-9 pursuant to IRCA Section 274a.2.

21.    Remedies; Limitations on Remedies:  Artist's services and the rights herein granted to Studio are of a unique character of such value that the loss of these services could not adequately be compensated in damages in an action at law, and a breach by Artist of any material provision hereunder will cause irreparable injury.  Artist, therefore, expressly agrees that Studio will be entitled to equitable relief by way of temporary restraining order, preliminary or permanent injunction or otherwise to prevent the breach of this Agreement and to secure its enforcement.  However, the sole right of Artist as to any breach or alleged breach by Studio will be the recovery of money damages and in no event will Artist be entitled to equitable or injunctive relief, and the rights herein granted by Artist will not terminate by reason of such breach or alleged breach.  Each of Studio's several rights, remedies and options hereunder will be cumulative, and no one of them is exclusive of the others or of any right, remedy or priority allowed by law or in equity, and the pursuit of one remedy will not be deemed a waiver of any other remedy.

22.    Union/Guild Membership:  Artist warrants that during the Term of this Agreement and during such time as it may be lawful for Studio to require Artist to do so, Artist will remain or become and remain a member in good standing or "financial core" member of the properly designated labor organization or organizations, as defined and determined under the applicable law, representing persons rendering services of the type that are required to be rendered by Artist hereunder (e.g., AFTRA, SAG, DGA, IATSE, and/or WGA), under collective bargaining agreements to which Studio is signatory.

23.    Curing Provision:  Artist will not bring or make any claim that Studio has breached any of the provisions hereunder unless Artist has first made a written demand upon Studio to cure such failure, and Studio has not satisfied the obligation within two (2) weeks of receipt of such demand.  The written demand will specify the provision claimed to be breached, the reasons for such claim, the date such obligation or performance was to have been satisfied and any other identifying specifics.

24.    Limitation of Actions:    Except where prohibited by applicable law, no action, arbitration or other proceeding at law or in equity will be brought by Artist or Studio under this Agreement or otherwise unless commenced within twelve (12) months from the date the cause of action alleged in said action, arbitration or other proceeding is alleged to have arisen.  The foregoing sentence will not serve to extend, delay or suspend the running of any period of time provided for by any applicable statute of limitations or rule of delay or laches which would otherwise apply to such action, arbitration or other proceeding.

25.    Exclusivity:  Except as expressly provided to the contrary in the Agreement, Artist's services will be rendered on a full-time, in-person basis, as, when and where required by Studio, and Artist will be exclusive to Studio in all media during the Term and will not engage in outside activities or render outside services of any kind or nature that would or might interfere with Artist's services under this Agreement.  If Artist's outside activities or services would, in Studio's opinion, interfere with Artist's services to Studio, then in addition to any and all other rights that Studio may have hereunder, at law or in equity, Studio will have the right, but not the obligation, to suspend and/or extend the Term for the duration of any such interference.

26.    Consultant Services:  If applicable, except as expressly provided to the contrary in the Agreement, consultant services will include without limitation, as and if requested by Studio, giving comments (written, if requested) on those scripts requested, attending network/broadcaster and other important meetings and rendering advice and general consultation with respect to staffing, casting and the overall development and direction of the Program.  Artist may not elect to provide producing services after electing to render consultant services; Artist may not render any services if Artist has not provided complete services for the previous production year; an election hereunder will be made prior to the production year for which it applies and will be for no less than an entire production year.  Studio's obligation to pay consultant fees will cease if the Program permanently ceases production.  Studio will have no obligation to pay consultant fees for any production years that are not ordered and produced or for any episode for which Artist was unable or unwilling to provide services.  If Studio notifies Artist in writing that Artist is failing to render reasonable, customary consulting services, then, unless Artist cures such failure within 48 hours of Studio's notice, Studio will have no further obligation to Artist with respect to consultant services.

27.    Executive Services:  Without limiting any of Studio's other rights or remedies hereunder, in the event that Artist becomes an executive for a network (including without limitation a cable network) or a major, mini-major, major independent or other motion picture and/or television production and/or distribution company or otherwise accepts a full-time position that, in the sole judgment of Studio, materially impacts Artist's ability to render services hereunder, Artist will be deemed unavailable to render services hereunder, and Studio will have no further obligation to pay Artist for services hereunder (other than, for avoidance of doubt, previously accrued and unpaid amounts and/or previously vested contingent compensation, if any).

28.    Compliance with Section 409A:

a)    To the extent applicable, it is intended that the compensation arrangements under this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A").  This Agreement will be construed in a manner to give effect to such intention.

b)    In no event whatsoever (including, but not limited to, as a result of this paragraph or otherwise) will Studio or any of its related entities, assignees or licensees be liable for any tax, interest or penalties or liability for any damages related thereto that may be imposed on Artist under Section 409A (collectively,

-4-

F:\NTVLEGAL\FORMS\WORD\GpWriter.dir.150511.docx

SA-9

"409A Liabilities"). Artist acknowledges that Artist's failure to submit invoices and related documents promptly following the time that Artist has a legally binding right to the payments set forth herein may subject Artist to 409A Liabilities. Neither Studio nor any of its related entities, assignees or licensees will have any obligation to indemnify or otherwise hold Artist harmless from any or all such 409A Liabilities. Artist acknowledges that Artist has been advised to obtain independent legal, tax or other counsel in connection with Section 409A.

c) If any expense reimbursements or in-kind benefits provided to Artist under any provision of this Agreement (in all cases, whether provided to Artist before or after Artist's termination of service) result in in-kind benefits or expense reimbursements to Artist that are (i) taxable to Artist for federal income tax purposes and (ii) subject to Section 409A, such in-kind benefits or expense reimbursements will be provided or made to Artist in accordance with Section 409A and the conditions set forth in Treasury Regulation § 1.409A-3(i)(1)(iv) (which are incorporated herein by reference).

d) Artist's right to any payment that constitutes "deferred compensation" (within the meaning of Section 409A) will not be subject to borrowing, assignment, sale, transfer, pledge, encumbrance, attachment or any similar claim by creditors, to the extent necessary to avoid any 409A Liabilities.

e) Each payment made pursuant to any provision of this Agreement will be considered a separate payment and not one of a series of payments for purposes of Section 409A.

29. Communications Act: Artist warrants and represents that Artist will not pay or agree to pay any money, service or other valuable consideration as defined in Section 507 of the Federal Communications Act of 1934, as amended, for the inclusion of any matter in any Program, and that Artist has not accepted and will not accept or agree to accept any money, service or other valuable consideration (other than amounts payable hereunder) for the inclusion of any matter in any Program.

30. Dispute Resolution: Except as provided otherwise in any arbitration, mediation or other alternative dispute resolution provision set forth in the contingent compensation definition applicable to this Agreement, if any (in which case such other provision will govern with respect to controversies, claims or disputes arising out of or relating to any contingent compensation under this Agreement), and except for claims for workers' compensation, unemployment insurance, or any matter within the exclusive jurisdiction of the California Labor Commissioner or the National Labor Relations Board, any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, the determination of the scope or applicability of this agreement to arbitrate, the allocation of the arbitrator's fee and arbitration service fees among the parties, and the arbitrability of such controversies, claims or disputes, including but not limited to any claim of waiver ("Dispute"), except as set forth in subparagraphs c) and d) below, will be resolved according to the procedures set forth in subparagraph a) below, which will constitute the sole dispute resolution mechanism hereunder to the extent such mechanism is not governed by an applicable collective bargaining agreement:

a) Arbitration: In the event the parties hereto are unable to resolve any Dispute informally, then such Dispute will be submitted to final and binding arbitration at the Los Angeles office of JAMS, or its successor ("JAMS"). The arbitration will be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except

as modified herein, in effect at the time the request for arbitration is made (the "Arbitration Rules"). The Arbitration Rules are available for review at www.jamsadr.com/rules-clauses and Artist and Studio acknowledge that the Arbitration Rules are publicly available. If and only if required by applicable law, Studio will pay the arbitrator's fee and arbitration service fees. The arbitration will be conducted before a single neutral arbitrator appointed in accordance with the Arbitration Rules. Unless the parties agree otherwise, the neutral arbitrator will be a former or retired judge or justice of any California state or federal court with substantial experience in matters involving the entertainment industry. The arbitrator will follow California law in adjudicating the Dispute. The arbitrator is permitted to award those remedies at law or in equity which are requested by the parties, allowed by law, and not precluded by any other provision of this Agreement, unless such remedy is non-waivable pursuant to applicable law. Except where otherwise prohibited by applicable law, the parties waive the right to seek punitive damages and the arbitrator will have no authority to award such damages. The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award. The arbitrator's award will be final and binding except to the extent that limited judicial review is permitted by applicable law. Each party will remain responsible for its own attorneys' fees. All arbitration proceedings will be closed to the public and confidential, and all records relating thereto will be permanently sealed. Neither party to this Agreement will disclose the content, testimony, evidence or results of the arbitration, except as necessary to comply with legal, statutory or regulatory requirements. Before making any such disclosure, a party to this Agreement will give written notice to the other and will afford the other a reasonable opportunity to protect its interests. If either party refuses to perform any or all of its obligations under the final arbitration award within thirty (30) days of such award being rendered, then the other party may confirm or enforce the final award in any court of competent jurisdiction in Los Angeles County. All parties consent to the personal jurisdiction of the state and federal courts located in Los Angeles County for purposes of confirming or enforcing any arbitration award. This clause will not preclude the parties from seeking provisional remedies in aid of arbitration from a court of competent jurisdiction in Los Angeles County.

b) Waiver of Jury Trial: Artist and Studio acknowledge that this provision constitutes a waiver of Artist's and Studio's rights to a civil court action or a jury trial concerning matters covered by this provision; only an arbitrator, not a judge or jury, will decide the Dispute.

c) Injunctive Relief: Notwithstanding the foregoing, either party will be entitled to seek injunctive relief (unless precluded by any other provision of this Agreement, including without limitation the paragraph entitled "Remedies; Limitations on Remedies" above) in the state and federal courts of Los Angeles County, pending final resolution of the underlying Dispute through arbitration.

d) Other Matters: Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a court of competent jurisdiction in Los Angeles County applying California law.

31. Miscellaneous:

a) No Implied Waiver: No failure on the part of Studio to exercise and no delay in exercising, and no course of dealing with respect to any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement

-5-

SA-10

preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

b)  Counterparts:  This Agreement may be executed in two or more counterparts (and by different parties on separate counterparts), each of which will be an original, but all of which together will constitute one and the same instrument.

c)  Multiple Parties:  If Artist consists of more than one person, the references in this Agreement to Artist will be deemed to both such individuals ("Team"), and the liability of each member of Team hereunder will be joint and several. All payments specified herein will be in full satisfaction of the services of each member of Team and, unless this Agreement specifically provides otherwise, all payments specified herein will be made to each member of Team on the basis of fifty percent (50%) of the gross amounts herein provided less applicable withholdings and deductions. If either member of Team is incapable of or refuses to perform services in connection with this Agreement for a period of two (2) consecutive or three (3) weeks in the aggregate, or will default, Studio will have the option to (i) require the other member of Team to continue alone, (ii) require the other member of Team to continue with a third person he/she approves, or (iii) to invoke any rights Studio may have against the failing or defaulting party as to both members of Team. If only one member of Team proceeds under option (i) or (ii) above, said continuing Team member will be entitled to compensation in the amount equal to the greater of ½ of the compensation payable to Team or scale.

d)  Severability/No Violation of Law:  This Agreement has several distinct provisions. If any part, term or provision of this Agreement is deemed invalid or unenforceable, any such invalid or unenforceable part, term or provision will be automatically deemed amended to give the fullest effect possible to the original intent of the affected provision (and if not capable of being so amended, only the provision so affected will be deemed stricken or severed), and any and all of the other terms of this Agreement, as so amended, or in the absence of the affected provision, will remain in full force and effect to the fullest extent permitted by law.

e)  Choice of Law:  This Agreement will be governed by the laws of the State of California applicable to contracts entered into and to be wholly performed within such state.

f)  Headings:  Paragraph or other headings or captions herein are solely for convenience of reference and are not part of, nor are they intended to govern or aid in the construction of, any provision hereof.

g)  Additional Documents.  Artist will promptly execute and deliver without additional consideration any supplemental or additional documents which Studio may deem necessary or desirable to carry out the intents and purposes of this Agreement. Artist hereby irrevocably appoints Studio as Artist's attorney-in-fact, with the right, but not the obligation, to execute, verify, acknowledge and deliver any and all such documents which Artist may fail or refuse to execute, verify, acknowledge or deliver. Such appointment will survive any incapacity of Artist.

h)  Notices:  All notices to be given hereunder must be in writing by personal delivery, mail, e-mail or facsimile, at the respective addresses set forth in this Agreement (which, in the case of notices to Studio, must be sent Attention: Senior Vice President, Business Affairs, with a copy to Senior Vice President, Legal) or to such other addresses as are given in writing in accordance with this provision. All notices from Studio must be given in writing by the Business Affairs or Legal Affairs Department. Notice will be deemed given on the date sent. If the last date by which a notice may be given falls on a weekend or a holiday observed by Studio or legal holiday, such notice may be validly given on the next day thereafter that is not a weekend or holiday. Failure to provide courtesy copies to any addressee set forth in this Agreement will not be deemed a breach of this Agreement.

i)  Conflicts:  In the event of any conflict between the Agreement and any collective bargaining agreement applicable hereto, such collective bargaining agreement will control.

32.  Fees of Attorneys or Agents:  The fees, expenses and commissions of any attorney, accountant, agent or manager engaged by Artist will be borne solely by Artist.

33.  Entire Agreement:  This Agreement cancels and supersedes all prior negotiations and understandings between Studio and Artist relating hereto. No officer, employee or representative of Studio has any authority to make any representation or promise not contained in this Agreement, and Artist expressly represents and warrants that Artist has not executed this Agreement in reliance on any such representation or promise.

34.  Amendment Must Be In Writing; Oral Agreements Not Binding:  No amendment, modification, extension, release, discharge or waiver of this Agreement, or of any provision hereof, will be valid or binding unless in writing signed, in the case of Studio, by a duly authorized officer of Studio, or in the case of Artist, by Artist. No oral agreement will be binding on Studio unless and until reduced to writing and signed by a duly authorized officer of Studio.

END

150511

F:\NTVLEGAL\FORMS\WORD\GpWriter.dir.150511.docx

SA-11

**FEDERAL COURT FOR THE STATE OF NEW YORK**

**FOR THE COUNTY OF NEW YORK**

| | |
|---|---|
| **SUE COSTELLO, Individual** | Case No: <br> Assigned: <br> Dept: |
| Plaintiff, | |
| **PARAMOUNT GLOBAL, INC** | **MOTION FOR DAMAGES AND** <br> **DEMAND FOR JURY TRIAL** |
| Defendants. | **1. Material Breach Of Written Contract** |

**2. Breach of the of the Implied Covenant of Good Faith and Fair Dealing.**

**3. Tortious Interference.**

**4. Constructive (Contract) Fraud.**

**5. Fraudulent Inducement**

**6. Malicious intent to cause emotional and financial distress.**

**7. Discrimination on the Basis of Sex**

1

COMPLAINT

**STATEMENT OF THE CASE**

Plaintiff Sue Costello ("Costello") files her Complaint against Defendant Paramount Global Inc., formally Viacom/CBS Corporation, and brings the following actions for Breach of Written Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Tortious Interference, Constructive (Contract) Fraud, Fraudulent Inducement, Malicious Intent to Cause Emotional and Financial Distress, and Discrimination on the Basis of Sex - Under the 14th Amendment of the United States Constitution - against Paramount Global Inc. Formerly, Viacom/CBS Corporation.  Sue Costello alleges and states as follows:

1.      In July 2017, Sue Costello met with Les Moonves, Head of CBS Corporation, to do business with what she believed to be a reputable company. Moonves wanted a strong female-driven show and Costello had one. What Costello was not aware of was that 1) CBS was about to embark on a vicious merger 2) Les Moonves would go to court to try and block this merger, and 3) that Mr. Moonves was about to be taken down by a #MeToo scandal.

2.      Following the meeting with Les Moonves, things got nefarious. CBS executives began to force Costello to submit to a variety of confusing schemes and arrangements. Their predatory conduct escalated into violent behavior, including shoving Costello and physically stealing several documents from her that contained the outline for her television idea. Costello expressed reservations about the unprofessional conduct and continued to protect herself as she felt her television idea was at stake.  CBS ultimately agreed to a deal for Costello to write, executive produce and star in a TV Show, based on Costello's idea that they had stolen in the pitch meeting.  Costello negotiated a contract with the Head Counsel of CBS that protected her Intellectual Property in every way.

3.      Costello was sent the contract, signed by CBS's Head Legal Counsel, marked urgent. Then very quickly, CBS paid Costello a signing fee in the form of check with no mention of CBS or memo, in the amount of $21,296.25 through GEP services LLC via Bank of America.   The money cemented the legal contract. The contract did not protect Costello's Intellectual Property. Just weeks after signing the deal the Les Moonves #MeToo scandal broke

2

COMPLAINT

and CBS's Head Counsel began setting up roadblocks preventing Costello the enjoyment of her television contract. CBS's Head General Council went so far as to falsely accuse Costello in an email of making allegations against Les Moonves on a phone call with him. He then tried to force her into the internal investigation that CBS was conducting around the scandal, rather than abiding by the terms of the contract. When Costello rebuked the investigation and wished to proceed with the terms of her contract, it only enraged CBS and the abuse escalated. Two of CBS's top executives 1) The Head Legal Counsel and 2) Head of Programming- the only two men involved with the negotiation and subsequent television deal- threatened that Costello's employment depended on her absolute compliance. They lied, bullied and intimidated Costello in an effort to convince her to send her script to them instead of to Head of Comedy Development for CBS Studios, which the contract clearly states. Costello thought for sure that the newly appointed CEO's for CBS and Viacom, as well as her Union would help her with the harassment and blocking of her contract and reported it, only to be contacted again, by CBS's Head Counsel and intimidated even more. Costello tried to get an attorney to represent her to no avail. The attorneys were not concerned with the breach of contract but instead, suggested that they would only represent her if it were a sexual case because Costello could get a lot of money.

4.       In 2022 The New York Attorney General's Office Lead Investigator for Investor Protection contacted Costello in 2022, after they had subpoenaed internal emails from CBS as part of a securities investigation and wanted to question her about them. Costello requested a pre-interview via Zoom to get clarity. The NY District Attorney office and the AG's Senior Enforcement Counsel were a part of this Zoom meeting. Costello noticed that they were only focusing on a small window of time, the fall of 2017 and wanted to speak to her about what CBS had done to her, what she was looking for, and if she had any evidence to provide. Sensing that CBS had laid the groundwork through these emails marking Costello as part of Les Moonves sex scandal, "what she was looking for" and that the AG's office was going along with it, Costello agreed to meet in person to protect herself.

5.       Costello submitted audio evidence that she never made any sexual allegations against Les Moonves and wanted to move forward with her television contact, an LAPD police report proving the robbery and her television deal. This evidence proved that Costello had nothing to do with the sexual scandal. Nevertheless the lead investigator for the NY AG's office ignored the proof of CBS's crimes and subjected Costello to grueling three-hour interrogation, asking

Costello if she initially approached Les Moonves because she knew the #MeToo movement was going to happen.  Then said "C'mon Sue money now is worth more than money later" She sleazily implied that Costello was some kind of clairvoyant, conniving mastermind looking for a payout…rather than a proven talent doing business with a man who had already given her two prior TV deals and a third one that was breached. Then the investigator showed Costello the subpoenaed emails that CBS executives had fraudulently induced her into a television deal they never intended to honor to get her script. An email from Thom Sherman, head of programming, who copied the Head of Security at CBS Corporation in an effort to make it appear as if Costello was trying to get a payoff and demand a deal due to something sexually inappropriate with Les Moonves An email from Les Moonves stating "I feel bad, tell them how much I like her". Costello pointed out that this proof backed up her evidence that they had fraudulently induced her into her contract and that they had planned to frame her into the #MeToo narrative.

6.      The Lead Investigator, admitted, "I've been waiting a long time to meet you Ms. Costello. You caught them.  It's like you were figuring it out as it happened and wrote it all down." She acknowledged that she knew that Costello was legit before she walked into the room.  Had Costello made any error, this interrogation would have been successful in CBS's attempt to make It look like Costello demanded her TV deal as a way to extort them for sexual assault, stolen her TV Show and covered their crimes.

**PARTIES**

1.      Plaintiff Sue Costello is an individual and resident of Massachusetts, residing in Quincy, MA.

2.      Defendant Paramount Global Inc. is a Delaware corporation with its principal place of business at One Astor Plaza, 1515 Broadway, New York, New York 10036 and is doing business in New York City, in the State of New York.

3.      Defendant Paramount Global Inc. is an American diversified multinational mass media and entertainment conglomerate corporate formed through the merger of CBS Corporation and Viacom on December 4, 2019 and then to Paramount Global Inc. in 2022.  Plaintiff is informed and believes and thereon alleges that Paramount Corporation was a Delaware corporation with its principal place of business in New York, New York which was duly registered to conduct business in the State of California and which was doing business in the County of Los Angeles, State of California. Plaintiff is informed and believes and thereon alleges that when CBS

4

COMPLAINT

Corporation merged with Viacom on December 4, 2019, Defendant Paramount formally, Viacom/CBS engaged with Miss Costello concerning the contract after the merger and subsumed all of CBS Corporation's liabilities and responsibilities under the Agreement.

## JURISDICTION AND VENUE

4.     This case is being filed in New York Federal Court under the 14th Amendment Federal Question discrimination on the basis of Sex as well as the federal question of Diversity of Jurisdiction . CBS receives federal money for educational programming as well as Federal tax credits. This Court has personal/diversity jurisdiction over Defendant because the wrongful acts described herein were committed while Defendants were in California and the Plaintiff lived in New York and Paramount's corporate head quarters are in NY.

5.     This Court has subject matter jurisdiction over this unlimited civil case pursuant to US Constitution 14th amendment. Title V11

6.     The fraud was committed while the Plaintiff and Defendants were in different states with malicious intent to cause harm, additionally because Miss Costello is a woman. This qualifies Costello for protection under the Constitution and Federal Law, therefore Venue is proper in this Court

## FACTUAL ALLEGATIONS

7.     On 7/25/2017, Sue Costello met with Leslie Moonves, the Chairman and CEO of CBS Corporation. Costello emailed Moonves after reading his comments in the press about looking for a woman with a distinct point of view for a CBS television show, as she had been working on a pro-female concept in that vein.

8.     Moonves had given Costello her first two Television deals back in the late 1990s while he was the head of CBS. The first deal resulted in a starring role in a pilot called *Paulie Dodge*. That pilot never made it to the air, but based on her performance in it, Moonves cast Costello in a pilot called *Queens*, replacing actress Illeana Douglas. *Queens* never made it to air and based on her performance in the pilot and no longer under contract with CBS, Costello was offered her self-titled show *Costello* on the FOX Network.

5

COMPLAINT

9.      Costello read in the press that Les Moonves was looking for a female driven show and emailed him for a meeting a meeting to discuss it, he agreed.

10.     Costello and Moonves met in his CBS office at 4024 Radford Ave, Studio City, CA 91604, alone, for over an hour. During the meeting, Costello told Moonves about her TV show idea and Moonves said, "You have to do your show at my Network and don't sign any other deals."

11.     Costello returned to New York City and after read in the press that Thom Sherman and the head of Programming at CBS and Kelly Kahl the head of CBS entertainment were being pressured at a press event about the sexist culture at CBS and lack of female driven shows. She emailed Moonves and agreed to do her show with him.

12.     On 8/14/2017 Costello received the following email from Peter Golden, Head of Casting for CBS, who had also been involved in Costello's first two deals at CBS. "Hi Sue, I was just beginning my career as head of casting at CBS when you had your deal here, so you may not remember our paths crossing.  I've always been a huge fan, and I was talking to Les Moonves who was very excited about getting you back in the CBS family.  To that end, I would love to sit down with you.  Please give my office a call (818-655-****, and my assistant Stephanie will set you up to come in (I'll have our head of comedy development, Julie Pernworth, in the meeting as well).  Hope to see you soon.  Best, Peter Golden."

13.     Golden's assistant called Costello and asked when she would be in LA next so that she could set up the pitch meeting. Costello responded, Les is excited to get me back in the family and wants me and my show if you want me to pitch it to you only, you guys can make the arrangements for the trip."

14.     Golden called back soon after and said that they "might" fly Costello out to Los Angeles or he would have Julie Pernworth the head of comedy development meet with her next time Pernworth was in NYC.  Costello said, "Ok Thanks" and hung up.

15.     After about 6 weeks of not hearing any response from Golden, Costello emailed Moonves and told him that she hadn't heard back from Golden.

6

COMPLAINT

16.    After sending the email, on 9/19/2017 Golden called stating, "We're not going to fly you out; we don't even fly people with development deals out." Costello said, "Thank you for getting back to me," and hung up.

17.    On 9/19/2017 Costello emailed Moonves again, sensing that something was missing between what Les wanted and what Peter was doing. " Hi Les!  I hope you are good, I just spoke to Peter. I thought you wanted me back in the CBS family?  Am I missing something here? Thanks! Sue"

18.     Immediately after the email was sent, Golden called back incessantly, Costello did not pick up.

19.    The next morning, on 9/20/2017, Amy Herzig, the head of casting for CBS in NYC, called Costello. She had a cordial relationship with Herzig from some of her earlier career deals. On the phone, Herzig said, "I understand we are trying to get you to LA, can you come in on Monday and meet with me?" Confused because Peter had just said they were not going to fly her out, Costello agreed to the meeting.

20.    Costello met with Herzig in New York City on 9/25/2017. Almost immediately, Herzig said, "Sue, Peter has been trying to get in touch with you all weekend, and you NEED to call him back," To which Costello responded, " No, Peter and I spoke on Tuesday afternoon about LA he said he wasn't going to fly me out, I understood and hung up.  Then he called back over and over and over and I didn't pick up.  Then Wednesday, the next morning, you called me to come here today.  Herzig threw her hands up said, "I'm not getting involved with this."  Costello said "Good because Peter is lying to you, I never heard from him again after he called incessantly Tuesday night." Herzig then apologized to Costello and told her that she was afraid to lose her health insurance and not be invited into the meetings with the men if she didn't play along. To which Costello replied, that's what I intend to change." And the meeting ended.

21.    The next day on 9/26/2017, Golden called Costello and told her that CBS **WAS** going to fly her out to LA to pitch her T.V. idea.

7
COMPLAINT

SA-18

22.    Golden stated on the call that Costello was required to sign their standard form contract to protect CBS from any copyright claims if they already had similar ideas to her in development before they could hear the pitch.

23.    The contract was never sent.

24.    On 10/6/2017 Costello emailed Moonves to ask if he would be in the meeting. He responded, "Sue, Good luck with the meeting. Unfortunately I'm not going to be there but all the right people will be." Costello also emailed Golden, asking him to send CBS's contract that he had mentioned, for her to review. Golden called Costello and said that she actually did NOT have to sign CBS's required contract after all and that she should bring the full scope of her idea, thus leaving it unprotected.

25.    Realizing that she needed to protect her Intellectual Property, Costello had an attorney draw up a letter of protection for it. (EXHIBIT A)

26.    Everyone present for the pitch would be presented with two documents to sign, the letter of protection and a print out of Costello's idea aka her Intellectual Property.  The legal page needed to be signed and the IP initialed so that it was clear that the top page protected the second page. With out both there would be no way for Costello to prove that the legal page protected Costello's concept, hence making it easy to steal.

27.    **On 10/11/2017, Costello was flown to Los Angeles, paid for by CBS.**

28.    On 10/12/2017, Costello met with five of the top executives of CBS Corporation to pitch her idea. The Head of CBS Studios, David Stapf; Head of Programming for CBS, Thom Sherman; Head of Comedy Development for CBS Studios, Kate Adler; Head of Comedy Development for CBS Network Julie Perworth; and Peter Golden, Head of Casting for CBS Network.

29.    After some small talk, Pernworth asked Costello to pitch her idea. Before telling them her idea unprotected, she revealed the letter of protection with the idea attached for them sign. After doing so, Peter Golden stood up along with the other CBS executives and yelled for Costello to go wait in the lobby.

COMPLAINT

SA-19

30.     Costello got up and started walking with her papers in hand, toward the door. As she passed, Golden **grabbed the papers out of Costello's hand, shoved her into the hallway, and shut the door behind her.**

31.     Approximately, 5 to 10 minutes later, Golden came into the lobby and stood over Costello suddenly shoving CBS's copyright contract that he hadn't been able to provide until now, in her face. He threatened that she would have to leave if she didn't sign it.  Forcing Costello to surrender the rights to her intellectual property. Costello said "Get that thing out of my face, I'm not signing it."  Golden went back into the office.

32.     A few minutes later Pernworth came into the Lobby and said, "I'm sorry Sue" acknowledging the transgressions that had just occurred.

33.     Soon after, Golden came into the lobby and threatened Costello that if she didn't sign their contract she would have to leave and come back another day. Costello was not going to be intimidated and bullied to sign away her rights so she had no choice but to leave.

34.     After Costello left the CBS building, Golden called Costello, again incessantly. When she finally picked up, he told her to come back the next day and they would sign her letter of protection with a small change and sent it for her to review.

35.     Costello sent the protection letter change to her IP attorney, who told her to go back and protect her idea.  Costello went back to CBS-Radford on 10/13/2017 and carried with her a fresh copy of the two pages.

36. After waiting longer than expected, Golden met Costello in the lobby and rushed her down the hall towards the office, looking at his watch repeatedly.  "We don't have much time", he said.

37.     Upon sitting down in the second meeting, Costello observed that her idea was NOT attached to the amended, signed, legal page. This second meeting was just another ploy to confuse Costello to sign only the legal page leaving her unable to prove that it was to protect her idea they had stolen it and had no intention of ever giving it back. Costello brought out the copy of her idea that she had brought and made the executives sighted above in line #30, minus David Stapf, who was not present the second day, initial her idea to protect the one they had stolen.

COMPLAINT

38.    Costello pitched the concept of her TV Show, which revolves around Costello being a powerful, woman, negotiator. During the pitch Thom Sherman audibly said, "Oh this is clever"

39.    On Monday, 10/16/2017, 3 days later, Peter Golden and Julie Pernworth called Costello and told her that they were going to pass on the idea.

40.    Costello emailed Les Moonves and told him that Peter pushed her and had stolen her idea and never gave it back.

41.    On Friday 10/27/2017 Moonves responded, "Sue, I am sorry the experience here did not end up well. I was trying to help. As you know, I am not involved day to day in this process anymore and therefore it was passed to Peter and Julie. Unfortunately, they have to decide if it's something they want to proceed with. As I said, I'm sorry it was a bad experience for you and that you feel you wasted your time. Regarding those other things you mentioned about inappropriate behavior, I obviously have no knowledge of them. This sounds terrible. Would you like to speak to someone in Human Resources? I was only trying to help Sue. I am sorry this was a bad experience. Best, Les"

42.    Sherman, who had said in the pitch, 'Oh this is clever"; called a few days after the email exchange Moonves.  Once late at night, where Costello did not pick up and then again first thing in the morning, when Costello did pick up. Sherman claimed that he didn't see anything happen in the 10/12/2017 pitch meeting when Peter Golden Stole her idea and shoved her out the door.

43.    Costello hung up with Sherman, and emailed Les Moonves because she felt Thom Sherman's behavior intimidating and denying what happened was a threat to shut her up.

44.    Costello heard nothing back from Moonves so she followed up a second time about Sherman's intimidation and the fact that his employees still had her idea. On 11/13/2017, Sherman, emailed Costello "This is why I called last week. Interested in what you have in mind. Let me know what you're thinking."

45. Costello continued to press as she felt her Television Idea was at stake.

46.    On 11/15/2017, approximately about a month after the meetings in New York and Los Angeles, Sherman emailed Costello again -"Obviously you are super passionate about all this.

10

COMPLAINT

SA-21

Based on what I originally heard from you, I didn't think the show was right for us, despite that passion and your admirable intentions. In your email below, you say there are other parts of the pitch I didn't see. Perhaps you could email me those other parts, so I have all the information necessary to make a fully informed decision"

47.    Costello sensing that he was trying to get even more of her idea from her, re iterated the pitch that they heard in the room and what was on the paper that they still had in their possession.

48. Then, on 12/13/2017, a month after he just claimed that they were passing on her concept, Sherman offered Costello a television deal: "Having heard the pitch directly and reading the email, re-pitch. It's so clearly YOUR voice that you must write this yourself. Let's make a script deal for you to write it. If down the road you're interested in adding a show runner/partner you've found, we can discuss. Let me know who your agent and/or lawyer are. I'll have Business Affairs reach out to them to start talking."

49.    On 1/12/2018, Sherman emailed again to confirm that the deal offer was being prepared; "Morning Sue. I checked in with my Business Affairs yesterday, and they were finalizing a proposal. I would expect you'll hear from them today or at latest early next week." Here he clearly lies that Business Affairs would contact Costello.

50.    On 1/16/2018, Jonathan Anschell- Executive Vice President and General Council for CBS emailed Costello. "Hi, Sue –Thom Sherman passed your contact information along. My department has been drafting the offer paperwork for you, and we had a quick question to help get everything finalized and sent off to you for your consideration. Do you utilize a loan-out corporation to furnish your professional services? If so, we'd be happy to incorporate those details into the documentation to help move the process along. In either case, we should have the paperwork to you by close of business tomorrow. Thanks very much."

51.    Costello received an offer to write the script on 1/16/2018.

52.    Once the offer came in Costello tried to get an agent or an attorney to represent her but saw that the conflict of interest with entertainment attorneys and their allegiances to the Networks and studios instead of their clients had only gotten worse since the days of *Costello.*

11

COMPLAINT

She told CBS's Jonathan Anschell that she was going to negotiate the deal herself; and Anschell agreed to negotiate directly with Costello.

53.     Costello called Geoff Bates, the Business Agent at The Writers Guild East to reaffirm that standard MBA allows a Network or Studio to hold her script for 5 years, essentially allowing them to burying or to chop it up and steal it would leave her without the rights to her Intellectual Property again.  To protect her Intellectual Property completely, Costello negotiated the right to buy her script back at the purchase price if CBS didn't develop the show in a timely manner and she recover all copyright and be free to sell it some where else.

54.     On 6/29/2018 the television agreement with Costello was signed by Mr. Anschell on behalf of CBS Corporation, Anschell had actual authority to bind CBS Corporation to the terms of the contract, and by signing the agreement, he so bound the company.

55.     The first week of July 2018, Costello received the deal with Jonathan Anschell's signature on it. Costello reiterated the terms on the phone with Anschell. She said I get 15% when I sign this. He said "No actually you get all the money when you send the script." Costello corrected him that her deal stated that she got 15% upon signing **and asked if there was any rush on the deal. Mr. Anschell said "No," yet he had sent an extremely urgent overnight envelope to return the signed deal to him in Los Angeles.**  Costello signed the deal and sent it back in the overnight envelope the first week in July. (EXHIBIT B) She received the 15% in the form of a check for the amount of $21,296.25 through GEP services LLC via Bank of America (EXHIBIT C) within days. The money solidified the deal, and the result is a legally binding television contract.

56.     The contract includes not only the Agreement for her to Executive produce, write and star in a Pilot and Series in the terms dated June 29, 2018 a binding side letter where Costello negotiated points above and beyond the WGA MBA in an effort to combat the continuing attempts to steal her IP.

57.     Costello's side letter states that **her compensation can be no less favorable than any other Executive Producer or Performer. That she is third in command creatively under the Studio and the Network. And that if CBS passed on her script, she could immediately buy**

**it right back for the purchase price and that they would sign over all copy-write to Ms. Costello**.

58.    Also, In the event CBS Corporation did not exercise its option for her services as a Performer, Ms. Costello would still receive $25,000 per episode as cast change compensation for the length of the series. **Regardless, under the terms of the Agreement, the lead character in the series would still be based on Costello and her idea. This would be her television show**.

59.    On 7/27/2018 just a few weeks after Costello's television contact was signed. The New Yorker published an article by Ronan Farrow in which dozens of women accused Les Moonves of harassment, intimidation, and sexual assault.

60.    In September of 2018, Costello called Anschell and asked why she hadn't heard anything from them to move forward with her script and if he knew the article was coming out before he signed her deal.

61.    Anschell screamed, "What do you want? We have deals with other women."  Costello said that she wanted to keep to her contract and send her script to the head of comedy development, Kate Adler.

62.     Anschell hung up and instead of moving the deal through the proper channels, sent the following email on 9/16/2018 Jonathan Anschell sent Costello to CBS's internal investigation. " Hi Sue, thank you for taking time for our call last week and for your email to Joe Ianniello earlier today which he forwarded to me for response. As I am sure you have read, the CBS Board of directors has hired two law firms to conduct an independent investigation of matters related to the recent New Yorker articles about the company. In light of the recent references and allegations you've made regarding your meeting with Les Moonves the New Yorker articles and the timing of our agreements with you we have provided the investigators with copies of your agreements and related correspondence, as well as your recent emails.

63. Anschell lied Costello did not have allegations against Moonves.  The head Council for CBS, Anschell, would have been contacted by Ronan Farrow for comment before the article was published in the New Yorker. On Sept 18th Anschell lied to Costello again " Sue as I explained on our call last week, we were not aware of the New Yorker's reporting or any subsequent

13

COMPLAINT

allegations at the time we closed your paperwork which was a month before the first New Yorker piece about CBS was published."

64.     On 9/25/2018 she received this email from the attorneys conducting the CBS internal investigation  "Dear Ms. Costello, On behalf of Nancy Kestenbaum of Covington & Burling LLP ("Covington") and Mary Jo White of Debevoise & Plimpton ("Debevoise"), I am writing because as you may have heard, the CBS Board of Directors retained our law firms – Covington and Debevoise – to conduct an independent investigation into allegations of sexual misconduct at CBS and other issues. We believe that you may have relevant information, and we would like to speak with you if you are willing to do so. We will take steps to protect your identity to the full extent provided by law, if you request that. Please let us know if there are days and times that would be convenient for you to talk with us."

65.     Costello's progress was now being impeded by an investigation that she had nothing to do with. Costello went to the WGA for help to no avail. They told her to send her script to Thom Sherman the head of programming instead of the Head of Comedy development at CBS Studios as her contract stated.

66.     Costello called Thom Sherman's office to try to get to the bottom of what was going on. On 10/24/2018 Costello received an email in which Sherman had copied Thomas Cruthers, The Senior Vice president of Corporate Services and Chief security officer at CBS Corporation, which said, "Sue, am out and about on business, so I missed your call. What can I do for you? Best regards"

67.     Costello responded and asked who Tom Cruthers was. Sherman responded later that same night at 10:56 pm with, "Hah, I was cc'ing myself, but my auto email thingy put Tom's name in "by accident…" then set up a call with Costello and himself to straighten things out. In hindsight it is now clear that this was a further attempt to frame Costello.

68.     Later that week, Sherman did call but unexpectedly had Anschell also on the line. Costello did not want to surprised, over powered and intimidated again by the only two men at the company who seemed to know about her deal, so she hung up.

14
COMPLAINT

69.     On 12/20/2022 Anschell emailed Costello "you may direct the script to me or Thom Sherman's office and we will ensure that it gets the appropriate review. "

70.     On Dec 20th Costello responded "Hi Jonathan for the 50th it is not customary to send a script to an attorney or the head of programming" The deal clearly states that they script be sent to the head of Comedy development at CBS studios.

71.     Costello then went to Joe Ianniello, the newly appointed interim CEO at CBS and Robert Bakish the Newly appointed CEO of Viacom told them that she needed help, That Anschell and Sherman were blocking her from moving forward with her deal only to have Anschell contact her with more lies and intimidations and then stonewalled her until the deal expired. When they did not exercise the extension on 6/ 30//2019, they intentionally breached the contract and proved that they had no intention of ever honoring the deal.   Costello continued to try to get to the bottom of what was going on, trying to get an attorney to help her. The attorneys were only conserved with cases involving sexual assault & harassment allegations.

72.      In June of 2020 Costello called the LAPD in North Hollywood to report the robbery of her Intellectual Property. (EXHIBIT D).

73.     On 7/24/2020 *Detective Craig Kojima, Ser North Hollywood Detectives, Robbery Unit 11640 Burbank Blvd, North Hollywood, CA 91601 serial Number 32559 Los Angeles Police Department* emailed and asked Costello to submit proof of the robbery and clear outline of what took place he responded that same day Rec'd.  I will look into it and get back to you on Monday.  Thank you"

74.     He emailed on 8/13/2022 "Ms Costello I am working on your case. We are coming up on Statute because this is a 2nd degree robbery vs a 1st degree robbery.  The statute for 2nd degree is 3 yrs.  Fortunately, I still have nearly 2 more months to work your case.  I will try to keep you informed.  However, I am the sole robbery detective in North Hollywood and sometimes it does get a little busy.  Rest assure, your case is being work on and I will get it submitted to the DA's office before it runs out of statute.  Thank you"

75.     On 9/24/2020 Costello received this email from Kujumi "Ms Costello I apologize but I was on a day off yesterday so I wasn't able to respond to this email until now.  It took me some time to make contact with the CBS employees and Mr. Golden so I also apologize for the delay.

15

COMPLAINT

I submitted the case to the DA's Office earlier this week. I am waiting for their response. They can file charges, decline to file charge or ask me to conduct further investigation. As far as the assault/battery charges, it is part of the robbery as force or fear is required to commit the robbery. However, the DA's office could file battery charge but it is a misdemeanor. The statute of limitations for a misdemeanor battery is one year and we are out of statute for a battery.

76.    On 10/26/2020 Costello received the following email from Kujumi Ms Costello "I just received the disposition of your case from the Los Angeles County District Attorney's Office. I'm sorry to inform you that the DA's Office declined to file charges on Mr. Golden. They did not feel they had sufficient evidence to prove the case beyond a reasonable doubt. I'm very sorry but the standard of proof is very high for a criminal case. A civil suit has a lower standard of proof and is based upon the preponderance of the evidence. I wish you the best of luck"

77.    On 10/26/2022 Costello emailed Kujumi "Craig- they need to ask for more evidence. I'm never stopping on this and it's going to come back and bite them so hard on the ass. Especially if they are inclined to brush it under the rug. Please inform them that I wrote this- feel free to forward this email or send me their email address directly. Thank you, Sue Costello

78.    Costello went to internal affairs at LAPD to investigate what happened (on 11/12/2021) and Charles Schlund responded Ms. Costello, I've generated CF 20-003330 to address your concerns. With a receipt attached. Regards, Det. Schlund

79.    11/24/2020 received this email Ms. Costello; the case is currently being assigned to an investigator. If you contact us in another week or two, I can provide you with the name and number of the investigator. Regards, Det. Schlund

80.    Then on 2/23/2021 Costello received this email, Ms. Costello; the case is currently with North Hollywood Area Sergeant Matthew Barrick, Serial No. 34383. You can reach him at 34383@lapd.online or at (818) 754-8418. Regards, Det. Schlund

81.    Costello never heard back from Internal Affairs.

**82.    Costello then went to the LA District Attorney Jodi Taska and head deputy John Morris. They all took her calls and then blew her off.** DA Case number 40975460

83.    On 3/14/2022, Costello received the following email from Shamiso Maswoswe, "Hello Ms. Costello, I hope you are well.  I am the Chief of the Investor Protection Bureau of the New York Attorney General's Office.  We are conducting an investigation into CBS and allegations involving Les Moonves. We understand that you may have information that would be relevant to our investigation, and we would like to speak to you at your convenience.  If you could let us know a good time and a good phone number to give you a call back this week – we would appreciate it."

84.    Costello responded and agreed to be interviewed but requested a pre-interview to have a few questions answered before the formal interview.

85.    The pre-interview took place via Zoom with Shimosa Maswoswe, Gabriel Tapalaga, Matthew Woodruff, The AG's Senior Enforcement Counsel at Office of the Attorney General of the State of New York and Kwame Anthony in NYC and Costello in her apartment in Quincy, Mass.

86.    Matthew Woodruff, Senior Enforcement Counsel at Office of the Attorney General of the State of New York interrupted the interview to ask Costello if she had proof that Les Moonves had told her that he wasn't going to be at CBS long during their meeting in July 2017. Maswoswe interrupted and said, "Your testimony is evidence, but the real proof would be better" Then Maswoswe asked Costello to submit it and any other proof that she thought might be relevant.

87.    After the zoom meeting in March, on 3/182022 an online folder was sent from the NY AG's office to Costello to upload her evidence. **The evidence Costello uploaded included her LAPD robbery police report, audio of Costello asking Jonathan Anschell why they were blocking her from moving forward and clearing stating that she did not have allegations against Les Moonves and an email from Costello to Les Moonves where she referred to him saying in his office that he wouldn't be there long and her breached television contract.** Shimosa confirmed receipt of the evidence through email on 3/18/2022

88.     On 4/5/2022, Costello and Maswoswe met at 1 Liberty Place NYC in the Robert Kennedy Media Room; for three hours, from 10 am to 1 pm.

17
COMPLAINT

SA-28

89.    **At the start of the meeting,** in an apparent effort to demonstrate that Costello's was using her sexual appeal as part of her effort to reach out Moonves, Maswoswe showed Costello copies of her headshots that Costello had sent to Les Moonves.  Costello said, "Those are industry standard". Maswoswe said, "Headshots," Costello said, "yes"

90.    Then Maswoswe asked Costello if at the time of the 7/27/2017 Moonves meeting she knew that the #MeToo movement was going to happen and if that was why she approached Mr. Moonves.  Costello said, "No, I went to Les Moonves because of his comments in the press prior to our meeting about wanting a pro-woman TV show and because had a long professional history with him" Ms. Maswoswe acted shocked and repeated, "He said that in the press? About wanting a pro woman show?"  Costello said "yes".

91.    Maswoswe then referred to an email from Costello to CBS during her negotiations that read, "I'm very good at breaking the story."  Maswoswe asked Costello if that meant that she was threatening to go to the press.  Costello responded, "No, it's a writing term referring to creating my sitcom."

92.    Next, **Maswoswe claimed to have found through Google, an internal document from CBS outlining Costello's entire relationship with them dating all the way back to the 90's up until the pitch meeting in 2017.  She never showed Costello the document.**

93.    Maswoswe continued to push her agenda, ignoring all the evidence to the contrary and despite Costello's conflicting answers to what Maswoswe was implying. Maswoswe, for instance, asked if Costello "went to CBS to threaten them", Ms. Costello responded "No, I never went back to LA after the pitch meeting". Costello did tell her of an email from Thom Sherman, Head of Programming, CC'ing the Head of Security, Thomas Cruthers, and how she reached out to Sherman asking why Mr. Cruthers was copied and he pretended it was a mistake. Costello pointed out that they were laying the ground -work to frame her to cover that they had robbed my intellectual property and me. Once they got my script make it looked I was extorting them and throw me into their #MeToo narrative.

94.    Maswoswe then showed Costello two emails that the NY AG's office subpoenaed as part of their investigation. The first was an email exchange between Les Moonves, Jonathan Anschell, and Gil Swartz, CBS Chief communications executive conspiring to make the deal

COMPLAINT

behind the backs of the proper channels in the company. Then a second email from Les Moonves to the other men saying, "I feel BAD, tell them how much I like her."

95.    Costello pointed out that this explained how Anschell's over-eagerness to negotiate with Costello directly and illustrates that he seized this opportunity to further his fraudulent inducement into the contract and exploitation of Costello's Intellectual Property.    She reminded Maswoswe CBS still had her property hence the Police Report that she had provided as evidence. Hearing this, Maswoswe quickly asked if Costello had submitted a Police Report, even though Maswoswe was the person who had requested it, provided the folder, and confirmed receipt of The Police Report.

96.    Maswoswe last sentiment to Costello was, "C'mon Sue, money now is worth more than money later." Costello responded, " I didn't take any money" and the meeting ended.

97.    As she showed Costello to the door Maswoswe said, "I've been waiting a long time to meet you Miss Costello, you did catch them and it's like you were figuring it out as it happened and wrote it all down." Maswoswe acknowledged that she sought Costello out and understood everything about Costello and what CBS had done with her television deal before she walked in the room and still tried to force her into a #MeToo narrative.

98.    Then Maswoswe asked Costello why CBS was so afraid of her and Costello responded because of my deal. They were hiding it from the shareholders like they did other deals and I caught them. I had nothing to do with sex with Les Moonves it has to do with the stock market, which is what you are investigating.

99.    The New York Attorney General was investigating Human Rights Violations, the Overall Culture and Internal Investigation process at CBS as well. Both CBS's internal investigation and The NY AG's office knew about the fraud with Costello's deal and not only did nothing about it but joined in on the attempted framing of Costello to the #MeToo narrative.

100.    After the meeting Costello filed a complaint about the way she was treated in the New York Attorney General Office to Letitia James, the DOJ and The Commission on Human Rights.

101.    Costello wasn't aware of the full scope of the apparent wrongdoing concerning women's rights and protections regarding CBS or the fraudulent inducement and cover up until the

19
COMPLAINT

meeting at the AG office. In 1969, the EOC was created because of discrimination in Hollywood and because the Unions that are governed by the Federal Government, were actively working to keep women out.  The government never investigated these civil rights violations in 1969, and failure to enforce title VII has allowed gender inequality to continue unabated for decades. Costello wants to change that.

## FIRST CAUSE OF ACTION

## MATERIAL BREACH OF CONTRACT

### (Against Defendant)

1. Plaintiff adopts and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

2. The Agreement is a valid and enforceable contact between Plaintiff and Defendant.

3. Plaintiff had full intent to perform her obligations under the contract.

4. Defendant materially breached its obligations under the Agreement by refusing to work with Ms. Costello for the development, writing, performance, and production of the pilot and series as outlined in the contract.

5. As a direct and proximate result of this material breach, Defendant prevented Plaintiff from receiving the benefit of the Agreement, causing Plaintiff to suffer damages. **CBS knew that CBS Studios had a binding contract with Ms. Costello and that any breach of the contract would cause Ms. Costello significant harm**.

6. Defendant's material breach was a substantial factor in causing Plaintiff's damages.

7. Plaintiff respectfully requests that judgment be entered against Defendant for the damages she has suffered from the breach of its obligation under the Agreement.

COMPLAINT

## SECOND CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant)

1.  Plaintiff adopts and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

2.  The Agreement is a valid and enforceable contact between Plaintiff and Defendant.

3.  The Agreement includes an implied covenant of good faith and fair dealing.

4.  The implied covenant of good faith and fair dealing prevents the parties from doing anything to unfairly interfere with the right of any other party to receive the benefits of the contract. The parties must be faithful in their contractual duties and obligations with honesty of purpose without any intention to mislead or to take unfair advantage of another.

5.  Plaintiff acted in good faith and was ready and willing to perform her obligations under the contract, including abiding by the covenant of good faith and fair dealing by acting reasonably and with proper motive, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

6.  Specifically, and without limitation, Defendant materially breached the covenant of good faith and fair dealing by refusing to work with Costello in the development, writing, performance, and production of the pilot and series as outlined in the contract.

7.  As a direct and proximate result of this material breach, Defendant prevented Plaintiff from receiving the benefit of the Agreement, causing Plaintiff to suffer damages.

8.  Defendant's material breach was a substantial factor in causing Plaintiff's damages.

9.  Plaintiff respectfully requests that judgment be entered against Defendant for the damages she has suffered from the covenant of good faith and fair dealing.

## THIRD CAUSE OF ACTION
## TORTIOUS INTERFERENCE

21
COMPLAINT

**(Against Defendant)**

1. 1.    Plaintiff adopts and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

2.    The Agreement is a valid and enforceable contact between Plaintiff and Defendant.

3.    The Agreement was made with a third party entity and CBS executives blocked Costello from the enjoyment of her and contract and that relationship.

4. Executives at CBS Corporation acted intentionally and with malice, without any privilege or justification, and in willful and conscious disregard of Miss Costello's rights by blocking her ability to move forward with delivering her script to CBS Studios as it is clearly stated in the signed contract. This interfered with Miss Costello's advantageous business relationship of CBS Studios. The interference caused financial harm to Miss Costello.

5.    As a direct and proximate result of this tortuous interference, Defendant purposefully prevented Plaintiff from enjoying the benefit of her Agreement. This caused Plaintiff to suffer damages.

6.    Defendant's tortious interference was a substantial factor in causing Plaintiff's damages.

7.    Plaintiff respectfully requests that judgment be entered against Defendant for the damages she has suffered from their tortious interference of the Agreement.

## FOURTH CAUSE OF ACTION

## CONTRUCTIVE FRUAD

**(Against Defendant)**

1.    Plaintiff adopts and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

2.    The Agreement is a valid and enforceable contact between Plaintiff and Defendant.

3.    CBS Corporation never intended to honor the contract.

4.  Executives at CBS Corporation made a fraudulent deal with a promise of future performance required by the contracts with Miss Costello and On June 29, 2018 the Agreement was signed by Mr. Anschell, on behalf of CBS Corporation, Mr. Anschell had actual and apparent authority to

bind CBS Corporation to the terms of the contract, and by signing the agreement, Mr. Anschell so bound the company.

5.    As a direct and proximate result of this contractual fraud, Defendant prevented Plaintiff from receiving the benefit of the Agreement, causing Plaintiff to suffer damages.

6.    Defendant's contractual fraud was a substantial factor in causing Plaintiff's damages.

7.    Plaintiff respectfully requests that judgment be entered against Defendant for the permanent damages she has suffered from the contractual fraud of the Agreement.

### FIFTH CAUSE OF ACTION
### FRAUDULENT INDUCEMENT

1.    Plaintiff adopts and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

2.    The Agreement is a valid and enforceable contact between Plaintiff and Defendant.

3.    Executives at CBS Corporation fraudulently induced Costello into signing her contract.

### SIXTH CAUSEOFACTION MALICIOUS INTENT
### TO CAUSE EMOTIONAL AND  FINACIAL DISTRESS

1.    Plaintiff adopts and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

2.    The Agreement is a valid and enforceable contact between Plaintiff and Defendant.

3.    CBS corporation executives intentionally stopped Costello's career and trapped her in a contract with non compete, confidentiality and many other crippling clauses knowing full well that it was fraudulent.

### SEVENTH CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF SEX

1.    Plaintiff adopts and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

2.    The Agreement is a valid and enforceable contact between Plaintiff and Defendant.

COMPLAINT

3.      The Agreement was made for Costello's female driven show. CBS Corporation was in the press and being investigated for discrimination against women during this time.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff Sue Costello prays for judgment as follows:**

(a)      The Court enter a judgment against Defendant, in favor of Plaintiff, for all causes of action; including compensatory damages from her contract and it's potential.

(b)       Defendants intentional, malicious, behavior is proof that if Costello tries to sell her script elsewhere, they will surely continue to interfere. The court require the defendant to return Costello's original property and put in writing that she retains full copy right of her idea and script.

(c)      The Court enter an award for damages for the malicious intent to inflict emotional and financial distress on Costello and the insurmountable damage done to her time, professional career and reputation in the amount one hundred and twenty million dollars.

(d)      For Plaintiff's costs in bringing this action;

(e)      For Plaintiff's pre- and post-judgment interest;

(f)      For such other and further relief, to which Plaintiff is entitled in law or equity, as this Court deems just and proper.

This the 21st day of February, 2023.

*Sue Costello*

Signatory

## DEMAND FOR JURY TRIAL

Plaintiff Sue Costello hereby demands a trial by jury on all claims.

24

COMPLAINT

DATE: February 21st, 2023.

Respectfully Submitted,

*Sue Costello*

Signatory

25

COMPLAINT

SA-36

COMPLAINT



...CLOSURE AGREEMENT

...reement (the "Agreement") is made effective this 12th day of

...e Costello (the "Owner") and CBS Inc. [*Studios*] (the "Recipient") in

closure of certain ideas and concepts (the "Material" as summarized in

...ne Owner.

...nt hereby acknowledges that the Material is the property of the Owner and

...Material confidential and make no use of the Material without the Owner's

...All intellectual property rights in the Material will remain the property of the

...ial may be disclosed only to pertinent CBS employees, who are subject to this

...e purposes of discussing development of the Material as a television

...ther disclosure of the Material may be made without the Owner's prior written

...eement shall be construed under the laws of the State of New York. Recipient

breaches the Agreement, Owner shall be entitled to ~~injunctive relief and~~ to other available remedies.

*in addition acknowledges and agrees that CBS's exploitation ...l that it has independently acquired or developed shall not constitute a breach of this Agreement.*

CBS, Inc. by _____ *Studios*

SA-38

**◉CBS**

**CBS TELEVISION**
CBS STUDIO CENTER, 4024 RADFORD AVENUE
STUDIO CITY, CALIFORNIA 91604-2101

(818) 655-1631
FAX: (818) 760-9073
jonathan.anschell@cbs.com

**JONATHAN H. ANSCHELL**
EXECUTIVE VICE PRESIDENT AND GENERAL COUNSEL

June 29, 2018

Ms. Sue Costello
3148 35th Street, Apt. 5
Astoria, New York 11106

Re:    Additional Terms to Executive Producer and Performer Agreements –
       Confidential and Non-Precedential

Dear Sue:

On a confidential, non-precedential basis, this side letter shall supplement the terms set forth in the Executive Producer and Performer agreements between you and CBS Television Studios, a division of CBS Studios Inc. ("Studio"), as follows:

1. With respect to your Executive Producer services, you shall have creative decision-making authority, subject to the input and approval of Studio and any network or other licensee.

2. Your compensation shall be no less favorable than any other Executive Producer or Performer employed on the Pilot and/or Series.

3. Studio agrees that, in the event Studio elects to "pass" on your script without producing a pilot, you shall immediately be permitted to offer your script to other potential buyers, subject to Studio's right to reimbursement of the Writing Fee paid to you, not to exceed $165,000.

4. If the revisions contemplated under your Executive Producer agreement are not requested by Studio, any unpaid portion of the Writing Fee shall become due and payable.

5. If, in your capacity as Executive Producer, you are required by Studio to travel, you will be provided with business class air (or first class, if business class is not available), premium lodging and per diem. If, your capacity as Executive Producer, you are required by Studio to relocate, you shall receive reimbursement of relocation expenses, not to exceed $10,000. For avoidance of

Ms. Sue Costello
June 29, 2018
Page 2

doubt, these expenses are intended to be co-extensive with, and not in addition to, any travel or relocation expenses or reimbursements paid or furnished in connection with your Performer services as provided under your Performer Agreement.

6. For any spin-off, remake, sequel or other derivative work produced by Studio based on the Pilot and/or Series, you shall receive first opportunity to elect to render Executive Producer services. Upon receipt of such election, Studio shall engage in good faith negotiations with you regarding such services, within then-existing customary parameters for similar derivative works.

7. Notwithstanding the exclusivity obligations set forth in your Executive Producer and Performer Agreements, it is understood and agreed that you may pursue opportunities for personal appearances (including stand-up comedy appearances) ~~that are complimentary to the promotion of the Pilot and/or Series~~ *SC* and do not interfere with the production of the Pilot and/or Series, subject to CBS's approval, which shall not be unreasonably withheld or delayed.

8. CBS agrees that, in the event your script is ordered to Pilot and/or Series, you shall be cast in the lead role. If, in any season of the Series, CBS does not exercise its option for your services as a performer, you shall receive $25,000 per episode as cast change compensation. *for the life of the series* Ⓢ

Please sign where indicated below to confirm your agreement to these terms.

Very truly yours,

Jonathan H. Anschell

Accepted and Agreed:

Sue Costello

*9. Notwithstanding the provisions of Paragraph 10 of the performer Agreement, CBS acknoledges that the lead character in the Pilot/Series will be Based on your personal history and characteristics and the Performer agreement does not convey exclusive rights to those elements*



## AGREEMENT
### For Pilot and Series

DATE:    June 29, 2018

PERFORMER: **SUE COSTELLO**          PROJECT:    **UNTITLED COSTELLO PROJECT**
                                     ROLE:       **LEAD**

Phone:    917-687-1029
Fax:
Email:    **suezkadoozie@gmail.com**

With a courtesy copy to:

This will confirm the terms of the agreement ("Agreement") between Sue Costello ("Performer") and CBS Television Studios, a division of CBS Studios Inc. ("Studio") concerning Performer's services in the below-referenced pilot and series ("Pilot" and "Series"), contingent on Studio's order of the Pilot and/or Series. Studio's obligations are subject to Performer's execution of this Agreement, verification of employment eligibility, budget approval and finalization of network license fee negotiation, and contingent on Studio's order of the Pilot and/or Series, applicable.

1.    PROJECT (currently entitled):  Untitled Costello Project

    a)    Length: half-hour
    b)    Role (currently unnamed):    Lead

2.    TEST DATES: **n/a**

3.    PILOT SERVICES OPTION DATE: **n/a**

4.    PILOT:  Start of production on a date to be determined by Studio. $50,000 ("Pilot Fee"), pay or play payable pursuant to Studio's standard payment schedule (but in no event less favorable than any other Series regular performer on the Pilot), for twenty five (25) consecutive work days (two (2)) of such work days may be non-consecutive within the normal course of production to accommodate distant location shooting) plus travel days (if any), plus a reasonable number of rehearsal and wardrobe days, plus (subject to professional availability) two (2) non-consecutive days for looping, retakes, reshoots, added scenes and other similar services.  If Studio requires Performer's services for additional days beyond those provided for in the previous sentence, then pro rata thereafter.  The foregoing work period includes payment for Saturdays, Sundays and Holidays or a 6th and 7th day.

5.    SERIES OPTION:  Exercisable on or before June 30, 2019, upon written notice.  Studio shall have the election to extend the Series Option date through December 31, 2019 by written notice given to Performer on or before June 30, 2019 and payment of an additional $100,000 to Performer within a reasonable time thereafter.  During the period commencing as of the date hereof and continuing through the Series Option date (the "Series Option Period"), Performer will be exclusive to Studio in episodic television (including network, cable and streaming) to the maximum extent permitted under the Guild Agreement (as defined below) and as required by the applicable licensee, provided, however, that Studio shall be in first position for Performer's services during production of the Pilot and/or Series.  Without limiting the foregoing, during the Series Option Period, Performer will not render any services in connection with a pilot, continuing role in a series and/or other term agreement for any third party in television, and any and all services for third parties during the Series Option Period will be subordinate to Performer's obligations herein.

6.    IF SERIES OPTION IS EXERCISED:

    a)    Series Term:  Shall commence on a date designated by Studio and shall continue until completion of all Series episodes in the initial group of episodes produced (the "initial order").  Studio shall

180204

Page -2-

have an exclusive and irrevocable option to require Performer's services in connection with all additional episodes produced beyond the initial order, if any, for the first production year of the Series, exercisable on or before the later of completion of all episodes produced in the initial order or fourteen (14) days after Studio's unconditional acceptance of a back order. Thereafter, Studio shall have five (5) consecutive annual options if a Fall start or six (6) consecutive annual options if a Summer or Mid-season start. Annual option(s) exercisable, if at all, on written notice by June 30th preceding the applicable Series year. Notwithstanding the foregoing or anything else to the contrary in this Agreement (including any attachments hereto), in no event will Studio require, nor will this Agreement be construed to require, Performer to render services hereunder beyond seven (7) years from the date of this Agreement.

b)   Work Time: Studio will be entitled, without additional compensation, to the maximum amount of work and production time permitted under the Guild Agreement within which to produce each episode or series of episodes. For each year in which Performer's compensation exceeds the "money breaks" set forth in Article 14(B) of the Guild Agreement (if applicable), Studio shall have one (1) calendar year within which to complete all Series programs for the respective production year and shall have no obligation to pay any additional compensation to Performer for additional work time, overall production periods and/or options. Performer's compensation shall also include payment for up to two (2) non-consecutive days per episode for looping, retakes, reshoots, added scenes and other similar services.

c)   Series Episodic Fees:
First Series Year ..................................................................$50,000
Second Series Year...............................................................$60,000
Third Series Year...................................................................$63,000
Fourth Series Year.................................................................$69,300
Fifth Series Year....................................................................$76,230
Sixth Series Year...................................................................$83,853
Seventh Series Year (if Summer or Mid-season start)..................$92,238

d)   Compilation Programs: If Performer appears recognizably in one or more compilation program(s) (i.e., a program episode comprised primarily of material from Series episodes and each referred to herein as a "Compilation Program"), Performer's compensation for each Compilation Program will be an amount equal to Performer's episodic fee for the applicable Series year up to a maximum of $25,000 and such Compilation Program shall not be applied against the minimum number of episodes guaranteed to Performer hereunder. If, however, Studio requires Performer to render additional acting services in connection with the production of any Compilation Program (e.g., voice-over or original on-screen scenes), Performer's fee for such acting services shall be subject to good faith negotiation by the parties.

e)   Residuals: Except as otherwise provided herein, minimum under the Guild Agreement.

f)   Merchandising: Performer grants to Studio the exclusive right in perpetuity throughout the universe to use and license and to grant others the right to use and license Performer's voice and/or likeness for all in-character merchandising (excluding merchandising directly relating to alcohol, tobacco, firearms, embarrassing personal hygiene products, and prescription pharmaceuticals). In the event Studio or Studio's licensee(s) utilize Performer's in-character voice and/or likeness in connection with merchandising, Performer will receive 5% of Studio's Net Receipts reducible by other performers entitled to receive a royalty on the same item for such merchandising to 2½% of Studio's Net Receipts. Net Receipts shall be computed in accordance with Studio's customary accounting practices, including deduction of any merchandising royalties payable to third party participants and deduction of a distribution fee of 50% of gross receipts (inclusive of all fees) plus reasonable outside legal expenses.

g)   Promotion:

i)   Studio shall have the right to use, and to authorize others to use in any and all media now known or hereafter devised, throughout the universe in perpetuity, Performer's name, voice and/or likeness in connection with promotion, advertising and marketing of the Series and

Case 1:23-cv-01553-LGS-VF    Document 29    Filed 12/04/23    Page 32 of 44
Error! Reference source not found.
Page -3-

any exploitation thereof (including commercial tie-ins and "institutional advertising"). In connection with the exercise of the above-referenced rights or otherwise, Studio shall not have the right to require Performer to render services or to use Performer's name, voice or likeness as a personal endorsement of a product or service without first obtaining Performer's consent.

ii)  Performer shall render all reasonably required promotional services, as follows:

(a) It is of the essence to this Agreement that Performer appears at and participates in the following activities each Series year as required by the licensee and/or Studio (as applicable): (A) the "up front" presentations; (B) at least one photography session upon two weeks' notice to Performer; (C) Comic-Con; (D) the Television Critics Association press tours; (E) the annual Studio Summer Press Party; and (F) the Los Angeles International Screenings.

(b) At the reasonable request of Studio or any licensee(s) (subject to Performer's professional availability if outside of production periods), Performer will participate in all publicity and promotional activities (e.g., major media events and network affiliate functions), including but not limited to: (A) a reasonable number of tours and public appearances; (B) photography sessions on location or elsewhere; (C) promotional announcements which any licensee and/or any sponsor may desire to produce; (D) a minimum of two half-days of telephone interviews with television writers; (E) online, interactive and social media activities (e.g., blogs, Facebook, Twitter, etc.); (F) pre-launch shows which might take place at the beginning of each broadcast season to promote such licensee's lineup (including, without limitation, customary promotions for affiliates); and (G) press tours at the start of each broadcast season and other press interviews.

iii)  In the event that Performer is required to travel more than seventy-five miles to participate/appear in connection with any of the aforementioned events, then Performer shall be provided with one (1) round-trip air transportation (in business class, or in first class if business class is not available), reasonable first class accommodations if available (room and tax only), first class ground transportation shared only with above-the-line personnel, except exclusive between Performer's home and airport and Performer will receive a per diem of $60 in lieu of meals and other expenses.

7.  SERIES GUARANTEE (if the Series Option is exercised):

a)  First Series Year:

i)  Initial Order: All episodes produced with a minimum of six (6) episodes for an initial order of six (6) episodes or less, or a minimum of seven (7) episodes for an initial order of seven (7) episodes or more; provided, however, that if Studio does not exercise its back order option, the guarantee shall apply to the initial order only. For purposes of clarification, the foregoing applicable minimums include the Pilot.

ii)  Back Order: All episodes produced.

b)  Second Series Year: All episodes produced, minimum guarantee of thirteen (13) if a Fall start, or seven (7) if a Summer or Mid-season start.

c)  Third and subsequent Series years: All episodes produced with a minimum of thirteen (13) episodes.

d)  If the number of episodes produced is below the minimum guarantee as a result of an event of force majeure, a labor dispute of any guild or union, or for any other reason beyond the control of Studio, then the minimum guarantee will be the number of episodes produced, but in no event less than six (6) for an order of six (6) or less episodes (including the Pilot) or seven (7) episodes for an order of seven (7) or more episodes (including the Pilot) (as applicable).

SA-43

Case 1:23-cv-01553-LGS-VF     Document 29     Filed 12/04/23 Reference source not found.

Page -4-

e)   On a one-hour Series, each one-hour segment of a multi-hour program shall constitute a separate episode for purposes of the guarantee and compensation.  Half-hour increments will be payable on a pro rata basis.  On a half-hour Series, each half-hour segment of an hour program shall constitute a separate episode for purposes of the guarantee and compensation.  Additional increments shall be payable on a pro rata basis.

f)   Nothing in this Agreement shall limit Studio's right to utilize Performer in more than the guaranteed number of episodes.

8.   SCREEN CREDIT:  On the Pilot (if actor credits are included) and each Series episode in which Performer recognizably appears, Performer will be accorded screen credit on a separate card among the other Series regular performers in the main or opening titles in first position and in substantially similar size of type as the other Series regular performers excluding "marquee" stars (to be determined in good faith by Studio). All other matters regarding credit shall be at Studio's discretion.  In addition, Studio shall have the right from time-to-time (as permitted by the Guild Agreement) to reposition said credit to the end titles with the other Series regulars on an episode broadcast as the second episode of a back-to-back episode. Notwithstanding the foregoing, in the event Studio does not exercise its Series Option on Performer, Studio may, in its sole discretion position Performer's Pilot credit among the guest performers.  Studio's inadvertent failure to accord credit as set forth herein will not be construed as a breach of this Agreement, but in the event of such failure to accord Performer appropriate credit (as set forth herein), upon written notification of such failure by Performer and Studio's confirmation thereof, Studio will use reasonable efforts to cure such failure on a prospective basis.

9.   EXCLUSIVITY:  Performer will be exclusive to Studio in episodic television (including broadcast, cable and streaming) to the maximum extent as permitted under the Guild Agreement and as required by the applicable licensee during the option period and Series Term.

Notwithstanding anything stated in this Agreement, Performer's services to third parties shall not: (i) be rendered during production periods; (ii) interfere with Performer's first priority obligations to Studio; (iii) denigrate the Series or licensee(s); or (iv) portray or parody Performer's role or the Series.  For purposes of clarity and without limiting the foregoing, in no event shall Performer use or grant any third party the right to use Performer's name, voice or likeness in or in connection with any exploitation based on, or related to or trading off of the Series or Performer's role therein.

10.   OWNERSHIP:  Performer grants to Studio all rights in Performer's name, likeness, and/or voice in connection with the role, all rights in Performer's services hereunder and all results and proceeds thereof. Performer grants such rights and all material furnished, suggested or performed by Performer hereunder, or material owned or controlled by Performer and incorporated or used in the Pilot or Series, as a "work made for hire" under United States copyright law. Studio owns all rights in the role (including the name and any distinctive characteristics), the Pilot, each episode of the Series and all elements thereof and shall have the right to exploit the Pilot and Series and any elements thereof, in all media now known or hereafter devised, throughout the universe, in perpetuity.

11.   PAY OR PLAY:  Studio shall not be obligated to utilize the services of Performer to produce or to broadcast any television program or to make any use whatsoever of the results and proceeds of Performer's services. Studio shall have the right to terminate Performer's services at any time, and in such event or in the event that Studio elects not to use Performer's services pursuant to this paragraph, Studio shall have fully discharged its obligations hereunder by paying to Performer the applicable compensation specified herein. Studio shall have no liability for any other claim(s) of any nature, including, without limiting the generality of the foregoing, consequential or special damages as a result of Studio's exercise of its rights pursuant to this paragraph.

12.   SOUNDTRACKS:  Studio and/or its licensee(s) will have the right to use Performer's voice from the soundtrack(s) of program(s) on all configurations of sound recordings now known or hereafter devised.  If such use is made, Performer will receive applicable scale, if any.

13.   PUBLICITY/CONFIDENTIALITY: Performer agrees that all terms of this Agreement are and will remain confidential and will not be disclosed to any third party other than Performer's professional representatives except to the extent permitted or required by law.  All publicity with respect to this Agreement and the Pilot/Series (excluding normal, incidental, non-derogatory, non-confidential, personal publicity relating

solely to Performer's involvement with the Pilot and/or Series which does not include any financial information) will be under the sole control of Studio, and Performer will not issue or consent to and/or authorize the issuance of any publicity without the express prior written approval of Studio. Performer understands that Performer may have access to and/or acquire knowledge of confidential and proprietary information or material relating to Studio and other types of information or material which is not publicly known, including without limitation confidential information or material relating to the Pilot/Series such as photographs, video, scripts, plot lines, story arcs, upcoming episodes, season finales, character information and other elements of the Pilot/Series, and Performer agrees not to disclose any such information or material to the public or to any third party other than to the extent required by law, unless authorized by Studio.

14.  DRESSING ROOM: First class, private dressing room with customary first class amenities for Performer's exclusive personal use. If in a trailer, such dressing facility shall not be less than one unit of a so-called "double banger" (or comparable).

15.  GUILD AGREEMENT: This Agreement shall be subject to the SAG-AFTRA Television Agreement (the "Guild Agreement"). Performer's compensation herein shall include payment in full for all of Performer's services in connection with the Pilot and/or Series episodes including, without limitation, travel days, overtime, Saturday, Sunday and Holidays or a 6th and 7th day, rehearsal time and wardrobe. Performer acknowledges that, to the maximum extent allowable in the Guild Agreement, this paragraph satisfies any provisions of the Guild Agreement requiring Performer's specific agreement in Performer's individual contract, with regard to Performer's agreement to perform services and appear in (and Studio's right to exploit) additional material without additional compensation, including without limitation, material expanding upon or related to the Pilot and/or Series intended for initial exploitation in New Media, standard openings, closings, bridges, lead-ins and lead-outs, still photographs and/or soundtracks containing Performer's voice and/or likeness in another program of the Series, cover art for books and phonorecords, trailers, "The Making of" or "Behind the Scenes" type programs, or the exploitation thereof, as well as promotional announcements and that Studio may reuse any or all of the foregoing to the fullest extent permitted by the Guild Agreement and without additional bargaining or compensation. Performer hereby agrees that Studio shall have the right to use clips of Performer's voice and/or likeness in new media with payment of the applicable minimum compensation, if any, as required by the Guild Agreement. To the full extent permitted by the Guild Agreement, the initial compensation payable with respect to the Pilot and Series shall constitute payment in advance for a second run of the Pilot and/or applicable Series episode(s) at the applicable minimum amount specified in the Guild Agreement (as applicable after determination by Studio) and payment in advance for all foreign telecasts of the Pilot and/or applicable Series episode(s) at the applicable minimum amount specified in the Guild Agreement. For purposes of the Guild Agreement, the "salary" payable hereunder shall be the difference between the applicable initial compensation and such advance, but in no event less than the applicable minimum amount required by paragraph 18 of the Guild Agreement.

16.  ASSIGNMENT: Studio may assign this Agreement in whole or in part; provided that no such assignment shall relieve Studio of its obligations hereunder, except as permitted under the Guild Agreement. Performer will not assign or otherwise transfer this Agreement or any of Performer's rights or obligations hereunder.

17.  STUDIO REMEDIES: Performer's services are unique and of peculiar value. In the event of a breach by Performer, Studio will be caused irreparable injury, which cannot adequately be compensated by money damages. Accordingly, Studio shall be entitled to seek injunctive relief in addition to its other rights to enforce the terms hereof. In no event will any breach of this Agreement by Studio entitle Performer to injunctive or other equitable relief; Performer's remedies shall be limited to an action at law for money damages, if any, and in no event shall Performer be entitled to terminate or rescind this Agreement or any of Studio's rights hereunder or to enjoin or restrain the production, distribution or exploitation of the Pilot or any Series episodes, or any rights therein. Studio may at any time demand written assurance from Performer that Performer will fully perform any or all services hereunder, and Performer shall provide such written assurance by such means or methods of delivery as Studio may specify (including, without limitation, delivery by fax to such fax numbers as Studio may specify), without regard to the notice provisions in this Agreement, within twenty-four (24) hours (unless Studio specifies some other time frame) after Studio's request therefor. Performer's failure to provide such assurance in accordance with the terms of Studio's request therefor shall be a material breach of this Agreement.

18.  PASSPORT/VISA/WORK PERMIT: Performer shall maintain a valid passport, visa and any work permit which may be required of Performer for the jurisdiction in which the Pilot or Series is produced during

Page -7-

### SPECIAL PROVISIONS RIDER

This Rider is attached to and forms a part of the agreement (the "Agreement") dated June 22 between CBS Television Studios, a division of CBS Studios Inc. ("Studio") and Sue Costello ("Performer").

1.    Airfare, Accommodations and Per Diem:

    (i)    Test: n/a

    (ii)    Pilot: Provided Performer's principal residence is outside the Pilot production area, Studio will provide Performer with the following as required in connection with production of the Pilot: First class ground transportation (between airports, hotels and sets shared only with other above-the-line personnel, except exclusive between Performer's home and airport) and/or reimbursement of a pre-approved rental car (including customary insurance and required parking) at Studio's election, first class hotel accommodations (if available) and a $60 per diem as well as one (1) round-trip airfare (pursuant to subparagraph (v) below) between Los Angeles and the Pilot production base location.

    (iii)    Distant Location Travel: If Studio requires Performer to travel to a distant location outside the Pilot/Series production area during the production of the Pilot or Series, Studio will provide Performer with the following: First class ground transportation (to and from airports, hotels and sets shared only with other above-the-line personnel) and/or a reimbursement of a pre-approved rental car (including customary insurance and required parking) at Studio's election, first class hotel accommodations if available, and one (1) round-trip airfare (pursuant to subparagraph (v) below) between the Pilot/Series production base and such distant location, as well as a $60 per diem.

    (iv)    Performer's Permanent Relocation (for each Series year on which the Series Option is exercised and as required by the Guild Agreement): If Performer's principal residence is outside the Series production area and Studio requires Performer to relocate for production of the Series, Performer will receive a relocation fee of $10,000. Additionally, on an as-used basis for Performer's initial relocation only, Studio will provide Performer with one (1) round-trip airfare (pursuant to subparagraph (v) below) between Performer's principal residence and the Series production base location. Notwithstanding the foregoing, in any Series Year in which Performer is not a "Schedule F" player pursuant to the Guild Agreement, then in lieu of the foregoing, Performer's air travel will be as required by the Guild Agreement.

    (v)    Air Travel: In the event Studio requires Performer to travel by air, such air transportation will be provided pursuant to the requirements in the Guild Agreement and on an as-used basis, but in no instance less than business class (if available).

4.    Indemnity: Except to the extent covered by Performer's indemnities hereunder or arising out of or resulting from the negligence or willful misconduct of Performer or the breach by Performer of any representation, warranty or agreement hereunder, Studio will defend and indemnify Performer from and against all liabilities, claims and expenses (including reasonable outside attorneys' fees) arising out of or resulting from Studio's development, production, distribution or exploitation of the Pilot and/or Series or any element thereof.

5.    Biography: If Performer supplies Studio with Performer's written biography prior to commencement of principal photography of the Pilot (or sooner if Studio so requests) then Studio, in its sole discretion, will refer to such biographical information for Studio's publicity purposes.

6.    Theatrical Exhibition: (i) If the Pilot or a Series episode is exhibited in theaters in the U.S. prior to its initial television broadcast (excluding sneak previews, test and media screenings, film festivals and charity, educational and similar exhibitions), Studio shall pay Performer 100% of the Pilot Fee or applicable Series episodic fee (whichever is applicable) provided for herein, to exhibit the Pilot or such Series episode theatrically throughout the world in perpetuity; or (ii) If the Pilot or a Series episode is exhibited in theaters in the U.S. subsequent to its initial television broadcast (excluding sneak previews, test and media screenings, film festivals and charity, educational and similar exhibitions), Studio shall pay Performer 50% of the Pilot Fee or applicable Series episodic fee (whichever is applicable) provided for herein for such

Case 1:23-cv-01553-LGS-VF     Document 29     Filed 12/04/23     Error! Reference source not found.

Page -8-

theatrical exhibition in perpetuity.  It is expressly understood and agreed that Performer will not receive more than 100% of the Pilot Fee or applicable Series episodic fee provided for herein for perpetual worldwide theatrical exhibition of the Pilot or any Series episode.  The foregoing amounts will become payable, if at all, provided Performer appears recognizably in the Pilot and/or applicable Series episode and within thirty (30) days of Studio's receipt of first monies for the applicable theatrical release.

# ◉ CBS TELEVISION STUDIOS
## AGREEMENT
### CBS Television Studios, a division of CBS Studios Inc.

| | | |
|---|---|---|
| **To:** SUE COSTELLO | **Date:** | June 29, 2018 |
| **From:** CBS TELEVISION STUDIOS | **Project #:** | |
| **Artist:** Sue Costello – Writer / Executive Producer | **Project:** | **Untitled Sue Costello Project** |

This agreement (this "Agreement") confirms the terms of the agreement between CBS Television Studios, a division of CBS Studios Inc. ("Studio") and Sue Costello ("Artist") (suezkadoozie@gmail.com:) in connection with a half-hour "blind" commitment for a pilot script for a potential pilot and/or series currently untitled, as follows:

**Script Fee:**    Subject to Artist's execution of Studio's Script Acquisition Agreement, Certificate of Authorship and Separated Rights Agreement, $165,000 ("Writing Fee") for Studio's acquisition of all rights in Artist's pre-existing half-hour pilot script (the "Script"), which amount will also be deemed to include compensation for a rewrite, two (2) sets of revisions, a polish and all other required re-write services (all of which will be delivered pursuant to the timetable(s) of the applicable network or other initial licensee). Such Writing Fee will be payable as follows:

   15% upon acquisition and commencement of services;
   40% upon delivery of first draft teleplay;
   15% upon delivery of first set of revisions;
   15% upon delivery of second set of revisions; and
   15% upon delivery of polish.

   **In order to effectuate WGA delivery and payment, each of the above writing steps must be delivered to Studio's Head of Comedy Development.**

**Pilot Services:**    If (i) Studio produces a pilot based directly on the Script (the "Pilot") and (ii) Artist is the sole writer of such Pilot, then Artist will be locked as a Executive Producer or Producer at $60,000; 50% if a presentation, with the balance paid if Artist's services are required to complete the presentation for exhibition by the initial licensee (which amount will be deemed to cover any additional services required of Artist for such completion) and/or if the presentation is exhibited as part of the Series (as defined below) by the initial licensee; otherwise Pilot services at Studio's option (exercisable by written notice on or before the date of commencement of principal photography). Notwithstanding the foregoing, Artist's Pilot producing compensation will be paid at the rate of 50% until such time as Artist executes this Agreement. Following Studio's receipt of this Agreement executed by Artist, the accrued but unpaid balance of Artist's Pilot producing compensation for services rendered will be paid. Unless provided otherwise, the term "Pilot" as used in this Agreement means a pilot or presentation (or, if applicable, initial episode if no pilot or presentation).

**Series Production Bonus:**    If Studio produces the Series (as defined below), $25,000 if Artist receives Sole Credit (as defined below) and provided Artist actually performs complete Executive Producer or Producer services on the Pilot; $12,500 if Artist receives Shared Credit (as defined below), based on the production of six (6) episodes (excluding the Pilot) during the first production year of the Series. Such series production bonus will be payable on a pro-rata basis episodically following completion of principal photography of each episode, commencing upon the later of completion of principal photography of the sixth episode (excluding the Pilot) or Artist's execution of this Agreement.

**Series Services:**    First Production Year (Executive Producer): If (i) Studio produces a series based directly on the Pilot (the "Series"), (ii) Artist actually performs complete services on the Pilot and

51914862

Page 2

| To:    SUE COSTELLO | Date:    June 29, 2018 |
|---|---|
| Sue Costello – Writer / Executive Producer | Project: Untitled Sue Costello Project |

(iii) Artist receives Sole Credit, then Artist will be locked as an Executive Producer for all episodes produced (no minimum) for the first production year at $50,000 per episode; otherwise first production year services at Studio's option (exercisable by written notice on or before June 15 if a Fall Start (as customarily defined by Studio) or December 31 if other than a Fall Start preceding the first production year or, if for any form of television other than standard season ABC, CBS, The CW, NBC or FBC primetime series television, such other date(s) preceding the first production year as may be required by the applicable licensee).

Second Production Year (Executive Producer): If (i) Artist actually performs complete Executive Producer services for all episodes produced for the first production year (e.g., Artist was not "pay-or-played" off of the first production year) and (ii) Artist receives Sole Credit, then, subject to the approval of the applicable network or other initial licensee, Artist will be locked as an Executive Producer for all episodes produced (no minimum) for the second production year at $60,000 per episode; otherwise second production year services at Studio's option (exercisable by written notice on or before June 15 preceding the second production year or, if for any form of television other than standard season ABC, CBS, The CW, NBC or FBC primetime series television, such other date(s) preceding the second production year as may be required by the applicable licensee).

The episodic fees payable to Artist hereunder include compensation for Artist's services as a "writer also employed in additional capacities," as defined in Article 14 of the WGA Basic Agreement. In addition, if and as required by Studio, Artist will render writing services in connection with episodic scripts and/or New Media Productions (as defined in the WGA Basic Agreement) pertaining to the Series. Any such additional services will be paid at the applicable WGA minimum rate (if no such rate exists, then Artist's fee will be negotiated in good faith) and will be rendered pursuant to Studio's standard freelance writer agreement (which Artist agrees to execute and deliver to Studio). In addition, Studio will have the option, exercisable in Studio's sole discretion during any production year hereunder in order to comply with Article 67 of the WGA Basic Agreement ("Article 67") as it relates to Studio's option(s) and exclusivity, to increase any of the fees for such additional services and/or episodic fees set forth herein within the applicable 12 month period and by an amount sufficient to meet the threshold as set forth in Article 67. Further, notwithstanding that this Agreement is being entered into prior to the effective date of Article 14.K.2 of the WGA Basic Agreement (i.e., May 2, 2018), Studio agrees that the terms and conditions set forth in Article 14.K.2 will apply to Artist's engagement hereunder.

The episodic producing fees set forth in this Agreement apply to any Series episode with a standard length for the platform of the initial licensee of such Series episode (e.g., for a broadcast network, a broadcast length of 30 minutes for a half-hour episodic series and 60 minutes for a one-hour episodic series) as well as any Series episode(s) of up to and including 15 minutes longer than the applicable standard length; for Series episodes with lengths in excess thereof, Artist's per-episode fee will be increased on a pro-rata basis based upon the applicable standard length. If Studio produces one or more "compilation programs" (i.e., a Series episode comprising primarily material from other Series episodes), notwithstanding anything to the contrary in this Agreement, no compensation will be due Artist in connection therewith, except as required by Article 15.B.10.e. of the WGA Agreement. If, however, Studio requires Artist to render services in connection with the production of any such compilation program, Artist's fee for such services will be subject to good faith negotiation by the parties consistent with Studio's then-current customary parameters.

Notwithstanding the foregoing, Artist's per-episode compensation will be paid at the rate of applicable WGA scale until such time as Artist executes this Agreement. Following

5191486.2

SA-49

Page 3

| To: | SUE COSTELLO | Date: | June 29, 2018 |
|---|---|---|---|
| Sue Costello – Writer / Executive Producer | | Project: | Untitled Sue Costello Project |

Studio's receipt of this Agreement executed by Artist, the accrued but unpaid balance of Artist's per-episode compensation for services rendered will be paid.

Consultant Services:

If Artist actually performs complete Executive Producer or Producer/Producer services for all episodes produced for the first two (2) production years of the Series, Artist will be locked as a non-exclusive consultant for all episodes produced (no minimum) for the same number of production years that Artist actually performed complete Executive Producer or Producer/Producer services on the Series at $10,000 per episode (no annual increases), provided the Series continues in production and Artist actually performs complete services in the preceding production year. All consultant services will be rendered on a non-exclusive but real, meaningful, in-person.

All of the foregoing services will commence on dates designated by Studio and will continue through completion of all services in connection with the applicable production year.

**Royalty:**  $6,000 per episode produced (excluding the Pilot) if Artist receives Sole Credit, reduced to $3,000 per episode produced (excluding the Pilot) if Artist receives Shared Credit. All royalties payable hereunder will be credited against any corresponding sequel royalties and/or residuals payable under the WGA Agreement and vice versa.

**Contingent Compensation:**  10% of Defined Receipts (as defined below) if Artist receives Sole Credit; reduced to 5% of Defined Receipts if Artist receives Shared Credit.

Defined Receipts will be defined, computed, accounted for and paid in accordance with the Defined Receipts definition (the "Definition") attached hereto, subject to the following (capitalized terms used in the bullet point provisions below will have the meanings set forth in the Definition; provided, however, that if the same subject matter is addressed in this Contingent Compensation paragraph and in the Definition, the former will govern in the event of any inconsistencies):

- The administrative fee (i.e., overhead) on Production Costs (Paragraph I.F.20) will be fifteen percent (15%).

- The television Distribution Fees set forth in Paragraphs I.D.3 and I.D.4 will be twenty percent (20%).

- Interest on Production Costs will be charged at one hundred and twenty five percent (125%) of the prime rate established by Bank of America, but in no event more than such prime rate plus two percent (2%), as set forth in Paragraph I.F.18.

- If the Pilot/Series is licensed for initial run on CBS and there is no independent third party co-producer, Artist acknowledges and agrees to the imputed license fee structure and perpetual network license term pursuant to Attachment "A" hereto. If the Pilot/Series is licensed for initial run on The CW, and either (i) there is no independent third party co-producer or (ii) Studio is a co-producer with Warner Bros. (or any affiliated entity thereof), Artist acknowledges and agrees to the license fee structure and perpetual network license term pursuant to Attachment "B" hereto. If the Pilot/Series is licensed for initial run on The CW and Studio is a co-producer with an independent third party other than Warner Bros. (or any affiliated entity thereof), Artist acknowledges and agrees that the license fees will be the actual license fees (for first run and for repeat broadcasts/exhibitions) paid by The CW to Studio and the license term will be the license term agreed to by The CW and Studio. If the

5191486.2

SA-50

Page 4

| To: | SUE COSTELLO | Date: | June 29, 2018 |
| Sue Costello – Writer / Executive Producer | | Project: Untitled Sue Costello Project | |

Pilot/Series is licensed for initial run on CBS All Access (which term as used herein will include such service as it may be renamed, modified, upgraded, replaced or succeeded) and there is no independent third party co-producer, Artist and Lender acknowledge and agree to the imputed license fee structure and license term pursuant to Attachment "C" hereto. If the Pilot/Series is licensed for initial run on Showtime and there is no independent third party co-producer, Artist acknowledges and agrees that the imputed license fee for Showtime's right to broadcast the Pilot/Series on all Showtime Services (as defined below) in perpetuity will be seventy percent (70%) of the production costs approved by Showtime. "Showtime Services" will be defined as the "Showtime", "The Movie Channel" and "FLIX" pay services and such pay services' successors, and any and all other pay services owned, operated, managed or controlled by Showtime or its affiliates and such other pay services' successors (and all channels of all of the foregoing). If the Pilot/Series is licensed for initial run on any other network under common ownership with Studio and there is no independent third party co-producer, Artist acknowledges and agrees to Studio's then-current imputed license fee structure (for such network) and perpetual network license term. The foregoing respective license fee provisions will cover all exploitation rights (e.g., transmission, exhibition, promotion) granted pursuant to such license.

Vesting: ¼ on actual performance and completion of Pilot writing services; ¼ on actual performance and completion of Pilot producing services; ¼ on actual performance and completion of exclusive Executive Producer or Producer services in connection with all episodes produced in the first production year; and ¼ on actual performance and completion of exclusive Producer services in connection with all episodes produced in the second production year.

**Credit:** Subject to the policies and approvals of the applicable network or other initial licensee and the provisions of any applicable guild and/or collective bargaining agreement:

Writing: Per WGA.

As used in this Agreement, "Sole Credit" is defined as sole "Written by" credit on the Pilot and sole "Created by" credit on the Series. **"Shared Credit" is defined as the same writing credits required for Sole Credit, but at least one of which is shared with another writer.**

Producing: "Executive Producer" on a separate card, on the Pilot (if exhibited as part of the Series, and each episode of the Series upon which Artist actually performs complete services, Studio reserves the right to accord others any form of producer credit. Notwithstanding the foregoing, Studio will have the right to reposition said credit to the end titles on any episode of the Series (including the Pilot) if other Executive Producer credits for such episode also appear in the end titles.

Consulting: "Consultant" in the end titles of each episode of the Series upon which Artist actually performs complete consultant services. Studio reserves the right to accord others any form of consultant credit.

All other matters regarding credit are at Studio's sole discretion. No failure to accord proper credit hereunder will constitute a breach of this Agreement, but Studio will make commercially reasonable efforts to cure any such failure on a prospective basis after receipt of written notice of such failure.

**Separated Rights:** If the WGA determines that Artist is entitled to any separated rights in the material written hereunder, then: (a) if the Writing Fee paid to Artist is equal to or in excess of the

5191486.2

Page 5

| To: | SUE COSTELLO | Date: | June 29, 2018 |
|---|---|---|---|
| Sue Costello – Writer / Executive Producer | | Project: Untitled Sue Costello Project | |

applicable WGA upset price, then Artist hereby assigns to Studio all such separated rights, inclusive of reserved rights, as defined in the WGA Agreement, and in connection therewith agrees to execute a separate agreement for a separate consideration of One Hundred Dollars ($100.00); or (b) if the Writing Fee paid to Artist is less than the WGA upset price or Studio otherwise does not acquire separated rights pursuant to the immediately preceding subparagraph (a), then the parties acknowledge that they have bargained with respect to the acquisition of theatrical rights, publication rights, merchandising rights, interactive rights, dramatic rights and radio rights (and any combination of such rights) and that Studio has acquired each such right subject only to payment of the applicable WGA minimum and only to the extent Studio actually exploits such rights. If Artist shares separation of rights, any and all of the foregoing payments will be reduced in proportion to Artist's percentage share. Artist agrees to execute any separate documents required by Studio in the conveyance of said rights pursuant to this paragraph. For avoidance of doubt, this provision shall apply only to separated rights in the Script or other material written under this Agreement, not to any preexisting works written or created by Artist.

**Compensation Adjustment:** All compensation set forth herein is for a scripted project produced for primetime on CBS, ABC, FBC, NBC or HBO or for Netflix or Amazon. Compensation for a scripted project produced for primetime on The CW, CBS All Access, other U.S. pay cable or for Hulu will be at seventy-five percent (75%) and compensation for a scripted project produced for primetime on U.S. basic cable or for any other U.S. subscription video-on-demand service will be at sixty-six percent (66%) of the compensation set forth herein. Compensation for a scripted project produced for any other medium or, as applicable, for other than primetime, or for any non-scripted project will be subject to reduction(s) to be negotiated in good faith within Studio's then-current customary parameters. Notwithstanding the foregoing, if Artist's compensation is reduced pursuant to this paragraph, Artist's percentage of contingent compensation will not be reduced pursuant to this paragraph.

**Exclusivity:** Artist is exclusive to Studio in episodic television (inclusive of broadcast, cable and streaming) (a) if Artist is engaged on the Pilot, from Pilot pre-production through delivery of the Pilot to the network/initial licensee and (b) upon a Series production order through the term of this Agreement on a non-interfering basis) per Studio's standard provisions set forth in the attached General Provisions and no services to third parties shall interfere with Artist's obligations to Studio.

**Results & Proceeds:** As more fully set forth in the General Provisions attached hereto, Studio will solely and exclusively own all rights of every kind in and to the results and proceeds of the services rendered hereunder (which will constitute works made for hire under U.S. copyright law), including, without limitation, all rights of copyright (and all renewals and extensions thereof), and Studio will have the unfettered right to exploit such rights in any and all media, whether now known or hereafter devised, throughout the universe in perpetuity in all languages. If for any reason any of the results and proceeds are not deemed to be a work made for hire, Artist hereby assigns to Studio exclusively all rights, title and interest thereto in any and all media, whether now known or hereafter devised, throughout the universe in perpetuity in all languages.

**PH&W:** Studio will pay directly (and deduct from Artist's compensation any required employee contributions).

**Publicity/Confidentiality:** Artist agrees that all terms of this Agreement are and will remain confidential and will not be disclosed to any third party other than Artist's professional representatives or to the extent required by law. All publicity with respect to this Agreement and the Pilot/Series will be under the sole control of Studio, and Artist will not issue or consent to and/or authorize the issuance of any publicity without the express prior written approval of

51914862

SA-52

Page 6

| To: | SUE COSTELLO | Date: | June 29, 2018 |
|---|---|---|---|
| Sue Costello – Writer / Executive Producer | | Project: Untitled Sue Costello Project | |

Studio. Artist understand that Artist may have access to and/or acquire knowledge of confidential and proprietary information or material relating to Studio and other types of information or material which is not publicly known, including without limitation confidential information or material relating to the Pilot/Series such as photographs, video, scripts, plot lines, story arcs, upcoming episodes, season finales, character information and other elements of the Pilot/Series, and Artist agrees not to disclose any such information or material to the public or to any third party other than to the extent required by law, unless authorized by Studio.

**Passport/Visa/Work Permit:** Artist will maintain a valid passport, visa and any work permit which may be required of Artist for the jurisdiction in which the Pilot and/or Series is produced during production of the Pilot and/or Series in such jurisdiction, which is a condition subsequent to Studio's obligations hereunder.

**Employment Information:** Sue Costello

**General Provisions:** Studio's standard General Provisions are attached hereto and hereby made a part of this Agreement. If the same subject matter is addressed in both the provisions of this Agreement and the General Provisions, the former will govern in the event of any inconsistencies.

**Miscellaneous:** Except as otherwise provided herein, payment of all compensation under this Agreement is subject to Artist's execution and delivery to Studio of this Agreement and Studio's standard Certificate of Authorship and Separated Rights Agreement.

This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and cannot be modified or supplemented orally, and no other statements are relied on in executing this Agreement.

AGREED TO AND ACCEPTED:

CBS TELEVISION STUDIOS, A DIVISION OF CBS STUDIOS INC.

By: _____

_____
SUE COSTELLO ("Artist")

Its: Jonathan H. Anschell
Executive Vice President
And General Counsel

5191486.2



SA-54

**Los Angeles Police Department**
**INVESTIGATIVE REPORT**

UCR CODE
CC: _____

REPORT OF:
ROBBERY

INC # 20072700230S
INVEST DIV NHWD
DR #
DOB 04-02-69
AGE 52
WT 105
HT 503
DESC
PHONE 917-687-1029

VICTIM

LAST NAME, FIRST, MIDDLE (OR NAME OF BUSINESS)
COSTELLO, SUE
SEX F   W

ADDRESS
R- 3148 35th ST. APT5. QUEENS NY 11106
ZIP 11106
CELL PHONE

B-

E-MAIL ADDRESS

OCCUPATION
ACTRESS

PRINTS BY PREL INV.  Y   N
ATTEMPT  Y
OBTAINED  N

DR. LIC. NO. (IF NONE, OTHER ID & NO.)
887347240   NY

FOREIGN LANGUAGE SPOKEN

SAME AS V'S   RES.   BUS.
91604
R.D. 1583
BUS.

☐ ATM   NO

POINT OF EXIT

LOCATION OF OCCURRENCE
4024 RADFORD AVE.

DATE & TIME REPORTED TO PD
07-27-20   1400

DATE & TIME OF OCCURRENCE
10-12-17 APPROX 1100

TYPE PROPERTY STOLEN/LOST/DAMAGED   03.04.00 GIVEN
INTELLECTUAL PROPERTY
STOLEN/LOST $175,000
RECOVERED $ 0
EST. DAMAGED ARSON/VAND $ —

KE, TYPE, COLOR, LIC. NO.

NOTIFICATION(S) (PERSON & DIVISION)
DET III STONE 34372/NHWD

CONNECTED REPORT(S) (TYPE & DR #)

S. IF SHORT FORM, DESCRIBE SUSPECT'S ACTIONS IN BRIEF PHRASES, INCLUDING WEAPON USED. DO NOT REPEAT ABOVE INFO BUT CLARIFY THE MISSING ITEMS ARE POTENTIALLY IDENTIFIABLE, ITEMIZE AND DESCRIBE ALL ITEMS MISSING IN THIS INCIDENT IN THE NARRATIVE.

6, SUSP TOLD VICT TO WAIT IN LOBBY. VICT HAD INTELLECTUAL PROP IN HAND, SUSP
ND GRABBED VICT'S PROP. VICT PUSHED OUT OF ROOM, WITH PROP TAKEN.

TRANSIT-RELATED INCIDENT ☐

MANDATORY MARSY'S RIGHTS CARD PROVIDED TO THE VICTIM ☒

MOTIVATED BY HATRED/PREJUDICE ☐
DOMESTIC VIOLENCE ☐

SERIAL NO.
42691

DIV./DETAIL
NHWD
DESK

PERSON REPORTING

SIGNATURE

OR RECEIVED BY PHONE ☒

NOTE: IF SHORT FORM AND VICTIM/PR ARE NOT THE SAME, ENTER PR INFORMATION IN INVOLVED PERSONS SECTION.

...OT CONSTITUTE VALID IDENTIFICATION
...EFERENCE. INSTRUCCIONES EN ESPAÑOL AL REVERSO.
...a detective for follow-up investigation based upon specific facts obtained during the initial investigation.
...esence of these facts can predict whether a detailed follow-up investigation would likely result in the arrest
...(s) or the recovery of property in a manner that is cost-effective to you, the taxpayer. Significant decreases
...ossible for detectives to personally discuss each and every case with all crime victims. A detective will not
...the detective requires additional information.

...NFORMATION: If you have specific facts to provide which might assist in the investigation of your case, please
...hrough Friday, between 8:00 A.M. and 9:30 A.M., or between 2:30 P.M. and 4:00 P.M., at telephone number where you
...f the detective is not available when you call, please leave a message and include the telephone number where you

...ish to purchase a copy of the complete report, phone (213) 486-8130 to obtain the purchase price.
...to the Los Angeles Police Department to Records and Identification Division, Box 30158, L...
...report or the following information with your request: 1) Name and address of victim; 2)...
...3) Date and location of occurrence. NOTE: Requests not accompanied by proper pay...
...m the DR number may be obtained by writing to Records...
... paragraph). Specify that y...

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
    SUE COSTELLO,                                          :
                                    Plaintiff,             :
                                                           :          23 Civ. 1553 (LGS)
                     -against-                             :
                                                           :          **<u>OPINION AND ORDER</u>**
    PARAMOUNT GLOBAL, INC.,                                :
                                    Defendant.             :
                                                           :
-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

Pro se Plaintiff Sue Costello ("Plaintiff") brings this action against Defendant Paramount

Global, Inc., f/k/a CBS Corporation ("Defendant"), alleging causes of action for breach of

contract, breach of the covenant of good faith and fair dealing, tortious interference with a

business relationship, constructive fraud, fraudulent inducement, malicious intent to cause

emotional and financial distress, and discrimination on the basis of sex.  Defendant moves to

compel arbitration of these claims pursuant to an agreement between the parties.  For the

following reasons, Defendant's motion is granted.

## I.     BACKGROUND

The following facts are taken from the Complaint and the parties' submissions on this

motion.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (stating that, in

deciding arbitrability, the court considers "all relevant, admissible evidence" in the pleadings and

from discovery). [1]

Throughout 2017, Plaintiff met with CBS executives to discuss her idea for a television

series pilot.  These discussions culminated in an offer by Defendant for Plaintiff to write the

script.  On June 22, 2018, Defendant emailed Plaintiff a draft of a proposed agreement, along

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes and citations are omitted.

with CBS Studios' standard General Provisions, which the proposed agreement incorporated. The General Provisions include an arbitration clause requiring that "any and all controversies, claims or disputes arising out of or related to [the] Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, . . . will be resolved" through final and binding arbitration. On June 29, 2018, Plaintiff and Defendant entered into the agreement (the "Agreement").

Plaintiff received the first payment upon signing the contract, but never delivered a script to CBS. During the fall of 2018, Plaintiff's relationship with Defendant deteriorated. The Complaint links this fallout to the sexual harassment scandal that emerged around CBS's then-CEO, Les Moonves, for which Plaintiff was eventually interviewed by the New York Attorney General's Office.

## II.   STANDARD

In deciding a motion to compel arbitration, courts apply a "standard similar to the one applicable to a motion for summary judgment." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019). Courts must consider "all relevant, admissible evidence submitted by the parties" and must draw "all reasonable inferences in favor of the non-moving party." *Id.*

The Federal Arbitration Act ("FAA") "embodies a national policy favoring arbitration." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019). The "purpose underlying arbitration [is] to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation." *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 378 (2d Cir. 2023). In light of this purpose, "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010); *accord WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 399

2

SA-57

(S.D.N.Y. 2018).  However, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute."  *Granite Rock Co.*, 561 U.S. at 297.  In other words, "[t]he threshold question facing any court considering a motion to compel arbitration is whether the parties have . . . agreed to arbitrate."  *Alemayehu*, 934 F.3d at 250.  Where they have, "a court must hold a party to its arbitration contract just as the court would to any other kind."  *Morgan v. Sundance*, 596 U.S. 411, 418 (2022).

## III.   DISCUSSION[2]

### A.  Arbitrability

"The Second Circuit has established a two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002); *accord Auad Servs., LLC v. Publishers Circulation Fulfillment, Inc.*, No. 21 Civ. 10219, 2022 WL 7152450, at *2 (S.D.N.Y. Sept. 21, 2022).  "[T]he party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate."  *Levy v. Credit Plus, Inc.*, No. 21 Civ. 5541, 2023 WL 2644352, at *6 (S.D.N.Y. Mar. 27, 2023).

---

[2] A court must have subject matter jurisdiction over a dispute before adjudicating its arbitrability or ruling on a motion to compel arbitration.  *Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 21-22 (2d Cir. 2023).  Here, the Complaint provides a sufficient basis for the Court's exercise of diversity jurisdiction.  *See* 28 U.S.C. § 1332.  The Complaint alleges, and Defendant does not dispute, that the parties are diverse.  The Complaint, liberally construed, alleges damages of $66,000 (the additional amount Plaintiff would have been paid under the Agreement) plus an amount in excess of $9,000 on the cause of action that asserts intentional infliction of emotional distress.  *See Barnes v. City of New York*, 68 F.4th 123, 127 (2d Cir. 2023) ("[P]ro se submissions are reviewed with special solicitude and must be construed liberally and interpreted to raise the strongest arguments that they suggest.").  This is sufficient to meet the amount-in-controversy requirement.

3

SA-58

The first prong of the test is satisfied because the parties agree that they entered into the Agreement, which contains a compulsory arbitration provision. Defendant asserts that Plaintiff signed a valid and binding arbitration agreement, which is attached to the Complaint. Plaintiff concurs in the Complaint, alleging that "[t]he Agreement is a valid and enforceable cont[r]act between Plaintiff and Defendant." This is sufficient to demonstrate the parties entered into the Agreement. The Agreement incorporates by reference the General Provisions, which include an arbitration clause.

The second prong of the test is satisfied because the Complaint asserts claims that are within the scope of the arbitration agreement. The Agreement's arbitration provision broadly covers "any and all controversies, claims or disputes arising out of or related to [the] Agreement . . . ." *See Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (noting that the phrase "any claim or controversy arising out of or relating to the agreement" is "the paradigm of a broad clause"); *accord SingularDTV GmbH v. LeBeau*, No. 21 Civ. 10130, 2022 WL 6771081, at *5 (S.D.N.Y. Oct. 11, 2022). The Complaint asserts claims for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, constructive fraud, fraudulent inducement, malicious intent to cause emotional and financial distress, and sex discrimination. All of these claims arise out of or are related to the Agreement, as they implicate Defendant's alleged obligations under the Agreement or the purportedly unscrupulous practices that Defendant engaged in during the formation and execution of the Agreement. Because the parties agreed to arbitrate their disputes and because the claims raised in this lawsuit are within the scope of the parties' arbitration agreement, the claims here must be arbitrated.

4

### B.  Special Circumstances

Notwithstanding the arbitrability of her claims, Plaintiff argues that she should not be bound by the arbitration agreement.  Plaintiff's argument is that the Agreement is void because Defendant "intentionally intimidated, deceived and coerced the Plaintiff into signing the contract, with the intention of asking her to break the law, make false allegations and take a bribe" related to the sexual harassment investigation into Les Moonves.  She alleges that "[f]ailure by the Defendant to perform and comply with the contractual terms of the agreement" is proof of Defendant's fraudulent conduct.  Plaintiff also avers that the arbitration clause is procedurally and substantively unconscionable and invalid on those grounds.

"Whether one can be bound by an arbitration clause is usually determined by looking at generally accepted principles of contract law."  *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (collecting cases); *Levy*, 2023 WL 2644352, at *6.  Pursuant to these principles, "a party is bound by an arbitration clause in a contract [that he signs], unless he can show special circumstances that would relieve him of such an obligation."  *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 249 (2d Cir. 1991); *accord Lebovits v. Cavalry Portfolio Servs., LLC*, No. 20 Civ. 1116, 2021 WL 1198967, at *5 (S.D.N.Y. Mar. 29, 2021).  Special circumstances may include duress or coercion.  *See Fenton v. Criterion Worldwide*, No. 18 Civ. 10224, 2020 WL 1489795, at *6 (S.D.N.Y. Mar. 27, 2020); *Levy*, 2023 WL 2644352, at *6.  In the context of evaluating whether "special circumstances" sufficient to warrant relief from an arbitration agreement exist, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

5

### 1. Fraud, Coercion and Duress

The argument that the arbitration provision is unenforceable because the Agreement was procured by fraud, coercion and duress is itself subject to mandatory arbitration and does not defeat the agreement to arbitrate. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010); *accord Cohen v. Westlake Flooring Servs. Inc.*, No. 22 Civ. 7182, 2023 WL 2971772, at *2 (S.D.N.Y. Apr. 17, 2023). However, "[i]t is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration." *ACE Cap. Re Overseas Ltd.*, 307 F.3d at 29; *accord Catz v. Precision Glob. Consulting*, No. 19 Civ. 7499, 2021 WL 1600097, at *8 (S.D.N.Y. Apr. 23, 2021). Where a party argues that the contract as a whole -- and not just the arbitration provision -- was the product of fraudulent inducement, or asserts another defense that would make the contract voidable, then those issues must be arbitrated. *ACE Cap. Re Overseas Ltd.*, 307 F.3d at 29; *accord Silent Gliss Inc. v. Silent Gliss Int'l Ltd.*, No. 22 Civ. 522, 2023 WL 1863362, at *3 (E.D.N.Y. Feb. 9, 2023).

Plaintiff argues that "Defendant intentionally intimidated, deceived and coerced the Plaintiff into signing the contract" as a whole and not the arbitration provision specifically. The arbitration provision broadly covers "any and all controversies, claims or disputes arising out of or related to [the] Agreement . . . ." Pursuant to this provision, whether the Agreement is void because of fraud, coercion or duress must be resolved in arbitration.

6

### 2. Unconscionability

The arbitration provision is not unenforceable because of unconscionability. "In general, a provision will be deemed unenforceable on unconscionability grounds only where it is both procedurally and substantively unconscionable when made." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (New York law). "In other words, a contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Id.*

The record does not support a finding of either procedural or substantive unconscionability. Nothing in the parties' submissions demonstrates an "absence of meaningful choice" in Plaintiff's decision to enter the Agreement. Even to the degree that Defendant presented the Agreement on a take-it-or-leave-it basis, Plaintiff was not without discretion over whether to accept the terms. *See Ragone*, 595 F.3d at 121 ("[T]he FAA certainly does not preclude the enforcement of employment contracts which make employment conditional upon an employee's acceptance of mandatory arbitration."); *accord Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 409 (S.D.N.Y. 2021) ("A 'take it or leave it' contract does not render an arbitration clause unconscionable."). The Complaint describes Plaintiff's consultations with an attorney to protect her idea and prepare a letter of protection. Though Plaintiff ultimately opted not to work with an attorney once she received an offer from Defendant, instead deciding "to negotiate the deal herself," she was not prevented from consulting an attorney and affirmatively decided not to. *See, e.g.*, *Reeves v. Safeguard Props. Mgmt., LLC*, No. 19 Civ. 10210, 2021 WL 2403538, at *5 (S.D.N.Y. June 10, 2021) (holding that procedural unconscionability may exist in a contract where a party is "prevented from consulting an attorney before signing it"); *Lang v. Barclays Servs. Corp.*, No. 17 Civ. 8094, 2019 WL 13368588, at *6 (S.D.N.Y. Mar. 19, 2019) (rejecting a

7

claim of procedural unconscionability where plaintiff was not "dissuaded from consulting an attorney").

Nor is the Agreement substantively unconscionable. The terms are not "grossly unreasonable" or "outrageous" as they bind both parties to the same requirement -- dispute resolution via arbitration. *See McDougall v. Samsung Elecs. Am., Inc.*, No. 23 Civ. 168, 2023 WL 6445838, at *6 (S.D.N.Y. Oct. 3, 2023). Because the Agreement is neither procedurally nor substantively unconscionable, it may not be invalidated on unconscionability grounds.

### 3. Ending Forced Arbitration Act

Plaintiff's argument that the arbitration clause of the Agreement is invalid under the recently enacted Ending Forced Arbitration Act ("EFAA") is also unpersuasive. The EFAA applies to claims that accrued on or after March 3, 2022, the date of its enactment; it does not apply retroactively. *See* Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, § 3 ("This Act . . . shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act."); *accord Delo v. Paul Taylor Dance Found., Inc.*, No. 22 Civ. 9416, 2023 WL 4883337, at *4 (S.D.N.Y. Aug. 1, 2023). As the events at issue here occurred prior to March 3, 2022, the resulting claims are not subject to the EFAA.

The EFAA's non-retroactivity is sufficient to render the statute immaterial to this matter. Even if the EFAA did apply, it would not change the outcome here. The EFAA provides that "at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a). By its terms, the statute is limited

8

to claims alleging sexual harassment or sexual assault.  A complaint must plead a viable sexual harassment or sexual assault claim in order for the EFAA to invalidate a contested arbitration agreement.  *See Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 585 (S.D.N.Y. 2023) (holding that "the EFAA [is] inapplicable where there has not been an allegation that such conduct violated a law prohibiting sexual harassment").

A claim of sexual harassment in the workplace can be based on two theories, quid pro quo harassment or a hostile work environment.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Delo*, 2023 WL 4883337, at *4.  The Complaint here -- including Count VII, the sex discrimination claim -- does not assert a claim, or facts that would support a claim, for either theory of sexual harassment or for sexual assault.  To the contrary, the Complaint describes an "investigation into allegations of sexual misconduct at CBS," but makes clear that Plaintiff vigorously resisted investigators' efforts to link her claim of theft of intellectual property to "their #MeToo narrative."

Plaintiff's appeal to The Forced Arbitration Injustice Repeal Act currently pending before the Senate is also unavailing.  That bill has not been passed by either house of Congress, nor has it been signed by the President, prerequisites to enacting a statute.  *See* Forced Arbitration Injustice Repeal Act, S. 1376, 118th Cong. (2023).  The consideration of proposed legislation by the Senate is not enough to confer it with the status of law.

IV. CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration of Plaintiff's claims is  **GRANTED**, and the case is **STAYED**.

It is further **ORDERED** that the parties shall submit a joint letter regarding the status of the arbitration every sixty days, with the first submission due on **April 2, 2024.**  The parties shall

9

SA-64

inform the Court promptly of any resolution of the arbitration proceedings or any other event that would affect the stay of this matter.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 20.

Dated: February 1, 2024
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

10

SA-65

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

SUE COSTELLO                                        Civil Action No. 1:23-cv-1553-LGS

       Plaintiff

     Vs.                                              Honorable Lorna G. Schofield

PARAMOUNT GLOBAL

       Defendant

## <u>NOTICE OF MOTION TO REARGUE</u>

PLEASE TAKE NOTICE THAT, on February 13th 2024, Plaintiff respectfully moves this Court to reargue, under Rule 500.24, the Defendant's prior motion to Arbitrate and seeks an Order to vacate the Court's Opinion and Order entered on 2/2/2024 By The Honorable Judge Lorna Schofield, which compels the Plaintiff and Defendant to arbitrate and issue a new order denying the prior motion to compel arbitration by Defendant:

Yehudah L. Buchweitz */s/ Yehudah L. Buchweitz*

Jeremy C. Cain

WEIL, GOTSHAL & MANGES LLP 767 Fifth Avenue

New York, NY 10153

Telephone: (212) 310-8000 Facsimile: (212) 310-8007 Yehudah.buchweitz@weil.com

Jeremy.cain@weil.com

*Attorneys for Paramount Global* Dated: New York, New York June 14, 2023

SA-66

### CERTIFICATE OF SERVICE

I hereby certify that on February 13th 2023, true and correct copies of the foregoing

Notice of Motion to reargue, were electronically filed with the Pro Se office via email,

which will issue an electronic notification of filing to the Defendants.

Dated: New York, New York February 13th 2023


Respectfully submitted,

Sue Costello Plaintiff

120 Quincy Shore Drive Apt 4

Quincy Mass, 02171

/s/ *Sue Costello* 2/13/2024

SA-67

**ARGUMENT**

Plaintiff alleges sexual harassment against the Defendant (See Plaintiff's Complaint). The Federal Arbitration Act (FAA) changed law and ended forced arbitration in ALL sexual harassment and assault disputes. Therefore, the Court is in violation and should not have granted the Defendant's prior motion.

It must be stated for the record that Your Honor told the Plaintiff on a conference call, with the lawyer for Paramount present, and prior to Defendant making it's arbitration motion, that she could not argue Federal Law to oppose the motion. However, the court never issued an order preventing the Plaintiff from making that argument.

Your honor stated that Federal Law doesn't cover this case. Plaintiff took contemporaneous notes of this verbal directive by Your Honor. However, this direction is simply not true or just. The Plaintiff has subsequently learned, since opposing Paramount's motion, of the case of Johnson v. Everyrealm, 1:22-cv-06669- PAE. This case was decided by Judge PAUL ENGELMAYER, who is also a Judge in the Southern District of New York – the same court as this case. Judge Engelmayer decided the case by stating that the language of the of the FAA makes an arbitration invalid "with respect to a case which is filed under Federal, Tribal, or State law and relates to a sexual harassment dispute."

SA-68

With all due respect to Your Honor and this honorable court, The Plaintiff cannot for the life her understand why the Court directed her to not argue in her Federal Case using Federal law when opposing the Defendant's prior motion.  The whole purpose of the Federal Lawsuit is to protect the Plaintiff from being forced to arbitrate. This is especially troubling when, the FAA law is clear that Paramount cannot legally force the Plaintiff to arbitrate.

In addition, there is the Johnson Case in this court that applies directly to this case and the question of whether the Court can compel the Plaintiff to arbitrate when she has alleged sexual harassment against Paramount. It's almost impossible to comprehend how the Plaintiff can be forced by the Court to go to arbitration when a Judge of the same Court ruled under what appears to be the same facts and circumstances that the arbitration clause is invalid.

It is important to also note that Paramount/CBS already has an established past of sexual harassment.  The Company has a past with further framing and abusing women in arbitration i.e. The actress Eliza Dushku was forced into arbitration with CBS and CBS tried to frame her during the arbitration, as the predator asking for sex, as opposed to her being a victim of sexual harassment. By doing this they further sexually harassed her. This is what the Defendants were doing with the Plaintiff by trying to force her to make sexual claims against Les Moonves and framing her as an assault victim looking for a payout, instead of allowing her to move forward with her contract.

SA-69

The framing of Eliza Dushku did not work and instead incriminated Paramount/CBS and they ended up paying her a confidential pay out of 9.5 million dollars and hid the payout from the shareholders, Much like the Defendants are trying to do with the Plaintiff's television deal. https://deadline.com/2018/12/les-moonves-oversaw-eliza-dushku-settlement-bull-michael-weatherly-cbs-1202520620/

This payout was discovered during CBS's internal investigation, which was leaked to the NY Times. Eliza Dushku broke her NDA and went to Congress to lobby for HR 4445. The Plaintiff's states that it is dead obvious to any rational person that forced arbitration is a legalized from of an NDA and confidential payoffs are legal hush money to cover crimes.

The New York Attorney General was supposedly investigating CBS's internal investigation and Human Rights violations at CBS and they never did https://www.nytimes.com/2018/09/28/business/media/cbs-new-york-prosecutors.html.  The "so-called" internal investigation must come to light, as it will demonstrate the pattern of abuse and/or harassment that Paramount has been aware of and attempted to cover up.

Additionally, the reality that the Court directed Plaintiff to refrain from making a specific legal argument when Plaintiff opposed Defendant's prior motion to compel arbitration, when by all appearances Plaintiff had a valid and compelling argument, show that something is unjust, and begs the question if the Court is being fair. This is especially true being that the Plaintiff is a Pro Se litigant and that the Court by law is supposed to make sure the rights of people who are not lawyers are protected.

SA-70

Finally, here are examples of how the Defendant has sexually harassed the Plaintiff:

- "Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment."  The Defendant tried to force the Plaintiff to make false allegations against Les Moonves in order for her television contract to move forward.

- "Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; " The Defendant blocked the Plaintiff from moving forward with her television show when she refused to break the law.

- "Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating hostile or sexually offensive work environment." The Defendant continually sexually harassed the Plaintiff by framing her into their internal investigation and leaked it to the NY Times, which caused Rachel Abrams to meet with and harass the Plaintiff as if she were a sexual assault victim of Les Moonves.  The defendant also submitted false documents to the NY Attorney General's office, which led to the Plaintiff being sexually shamed, intimidated and harassed for 3 hours as if she were the Predator extorting the Defendant just like Eliza Dushku.  The Plaintiff was framed as sexual victim to advert anyone from seeing what they did with her contract. The same as they did with Eliza Dushku's payout. The Plaintiff was never allowed to enjoy the benefits of her contract.

SA-71

SA-72

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

SUE COSTELLO                                          Civil Action No. 1:23-cv-1553-LGS

        Plaintiff

        Vs.                                          Honorable Lorna G. Schofield


PARAMOUNT GLOBAL
        Defendant

### NOTICE OF MOTION TO REARGUE

PLEASE TAKE NOTICE THAT, on February 13th 2024, Plaintiff respectfully moves

this Court to reargue, under Rule 500.24, the Defendant's prior motion to Arbitrate and

seeks an Order to vacate the Court's Opinion and Order entered on 2/2/2024 By The

Honorable Judge Lorna Schofield, which compels the Plaintiff and Defendant to arbitrate

and issue a new order denying the prior motion to compel arbitration by Defendant:

Yehudah L. Buchweitz */s/ Yehudah L. Buchweitz*

Jeremy C. Cain

WEIL, GOTSHAL & MANGES LLP 767 Fifth Avenue

New York, NY 10153

Telephone: (212) 310-8000 Facsimile: (212) 310-8007 Yehudah.buchweitz@weil.com

Jeremy.cain@weil.com

***Attorneys for Paramount Global*** Dated: New York, New York June 14, 2023

Application DENIED.  As the Court explained in its February 1, 2024, Opinion and Order, the Ending Forced Arbitration Act ("EFAA") does not apply retroactively, and only applies to claims that accrued on or after March 3, 2022.  *See* Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, § 3 ("This Act . . . shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act.").  The Court also explained this on the May 31, 2023, conference call with the parties.  The events at issue here all took place *before* March 3, 2022.  They are not subject to the EFAA.  The case Plaintiff cites, *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535 (S.D.N.Y. 2023), is distinguishable because the events described there all took place *after* the EFAA was enacted.

As instructed in the February 1, 2024, Opinion and Order, by **April 2, 2024**, and every sixty days therafter, the parties shall file a joint letter on the status of the arbitration.  If the parties have not taken steps toward commencing arbitration by **June 3, 2024**, the matter may be dismissed for failure to prosecute.

The Clerk of Court is respectfully directed to close the motion at Dkt. 34.

Dated: February 15, 2024
    New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

SA-73

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13th 2023, true and correct copies of the foregoing

Notice of Motion to reargue, were electronically filed with the Pro Se office via email,

which will issue an electronic notification of filing to the Defendants.

Dated: New York, New York February 13th 2023


Respectfully submitted,

Sue Costello Plaintiff

120 Quincy Shore Drive Apt 4

Quincy Mass, 02171

/s/ *Sue Costello* 2/13/2024

## ARGUMENT

Plaintiff alleges sexual harassment against the Defendant (See Plaintiff's Complaint). The Federal Arbitration Act (FAA) changed law and ended forced arbitration in ALL sexual harassment and assault disputes. Therefore, the Court is in violation and should not have granted the Defendant's prior motion.

It must be stated for the record that Your Honor told the Plaintiff on a conference call, with the lawyer for Paramount present, and prior to Defendant making it's arbitration motion, that she could not argue Federal Law to oppose the motion. However, the court never issued an order preventing the Plaintiff from making that argument.

Your honor stated that Federal Law doesn't cover this case. Plaintiff took contemporaneous notes of this verbal directive by Your Honor. However, this direction is simply not true or just. The Plaintiff has subsequently learned, since opposing Paramount's motion, of the case of Johnson v. Everyrealm, 1:22-cv-06669- PAE. This case was decided by Judge PAUL ENGELMAYER, who is also a Judge in the Southern District of New York – the same court as this case. Judge Engelmayer decided the case by stating that the language of the of the FAA makes an arbitration invalid "with respect to a case which is filed under Federal, Tribal, or State law and relates to a sexual harassment dispute."

SA-75

With all due respect to Your Honor and this honorable court, The Plaintiff cannot for the life her understand why the Court directed her to not argue in her Federal Case using Federal law when opposing the Defendant's prior motion.  The whole purpose of the Federal Lawsuit is to protect the Plaintiff from being forced to arbitrate. This is especially troubling when, the FAA law is clear that Paramount cannot legally force the Plaintiff to arbitrate.

In addition, there is the Johnson Case in this court that applies directly to this case and the question of whether the Court can compel the Plaintiff to arbitrate when she has alleged sexual harassment against Paramount. It's almost impossible to comprehend how the Plaintiff can be forced by the Court to go to arbitration when a Judge of the same Court ruled under what appears to be the same facts and circumstances that the arbitration clause is invalid.

It is important to also note that Paramount/CBS already has an established past of sexual harassment.  The Company has a past with further framing and abusing women in arbitration i.e. The actress Eliza Dushku was forced into arbitration with CBS and CBS tried to frame her during the arbitration, as the predator asking for sex, as opposed to her being a victim of sexual harassment. By doing this they further sexually harassed her. This is what the Defendants were doing with the Plaintiff by trying to force her to make sexual claims against Les Moonves and framing her as an assault victim looking for a payout, instead of allowing her to move forward with her contract.

SA-76

The framing of Eliza Dushku did not work and instead incriminated Paramount/CBS and they ended up paying her a confidential pay out of 9.5 million dollars and hid the payout from the shareholders, Much like the Defendants are trying to do with the Plaintiff's television deal. https://deadline.com/2018/12/les-moonves-oversaw-eliza-dushku-settlement-bull-michael-weatherly-cbs-1202520620/

 This payout was discovered during CBS's internal investigation, which was leaked to the NY Times. Eliza Dushku broke her NDA and went to Congress to lobby for HR 4445. The Plaintiff's states that it is dead obvious to any rational person that forced arbitration is a legalized from of an NDA and confidential payoffs are legal hush money to cover crimes.

The New York Attorney General was supposedly investigating CBS's internal investigation and Human Rights violations at CBS and they never did https://www.nytimes.com/2018/09/28/business/media/cbs-new-york-prosecutors.html.  The "so-called" internal investigation must come to light, as it will demonstrate the pattern of abuse and/or harassment that Paramount has been aware of and attempted to cover up.

Additionally, the reality that the Court directed Plaintiff to refrain from making a specific legal argument when Plaintiff opposed Defendant's prior motion to compel arbitration, when by all appearances Plaintiff had a valid and compelling argument, show that something is unjust, and begs the question if the Court is being fair. This is especially true being that the Plaintiff is a Pro Se litigant and that the Court by law is supposed to make sure the rights of people who are not lawyers are protected.

SA-77

Finally, here are examples of how the Defendant has sexually harassed the Plaintiff:

- "Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment." The Defendant tried to force the Plaintiff to make false allegations against Les Moonves in order for her television contract to move forward.

- "Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; " The Defendant blocked the Plaintiff from moving forward with her television show when she refused to break the law.

- "Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating hostile or sexually offensive work environment." The Defendant continually sexually harassed the Plaintiff by framing her into their internal investigation and leaked it to the NY Times, which caused Rachel Abrams to meet with and harass the Plaintiff as if she were a sexual assault victim of Les Moonves. The defendant also submitted false documents to the NY Attorney General's office, which led to the Plaintiff being sexually shamed, intimidated and harassed for 3 hours as if she were the Predator extorting the Defendant just like Eliza Dushku. The Plaintiff was framed as sexual victim to advert anyone from seeing what they did with her contract. The same as they did with Eliza Dushku's payout. The Plaintiff was never allowed to enjoy the benefits of her contract.

SA-78

SA-79

**Sue Costello**

suezkadoozie@gmail.com

April 2, 2024

**<u>VIA PRO SE CLINIC</u>**

Honorable Lorna G. Schofield
United States District Court
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, New York 10007

As instructed in the February 1, 2024, Opinion and Order and the Court's Order dated February 15, 2024, Plaintiff shall take steps towards commencing arbitration proceedings by **June 3, 2024.** Plaintiff is the party that brought the claims and so bears responsibility for initiating the arbitration. If Plaintiff fails take steps to commence arbitration proceedings by June 3, 2024, the case may be dismissed for failure to prosecute. So Ordered.

Dated: April 8, 2024
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

Re:  *Sue Costello, v. Paramount Global,* Case No. 1:23-cv-1553-LGS

Dear Judge Schofield:

This letter is in addition to the joint status report filed today by the Defendants pursuant to the Order dated February 1, 2024 (ECF No. 33), which was mutually agreed upon at 4pm on April 1st.

The Plaintiff Sue Costello states for the record, that the Defendants waited until 4pm on April 1st to contact the Plaintiff about any status, yet took charge of the written update by sending a letter for the Plaintiff to sign last minute, without any earlier discussion. It is important to state that this is a repetitive pattern by the Defendants who fraudulently induced and rushed the Plaintiff to sign her contact 2 weeks before the Ronan Farrow article about Les Moonves and sexual assault allegations came out in the New Yorker Magazine. It is also important to note that executives at CBS sold stock right before that article came out.

 The Plaintiff who is Pro Se litigant has repeatedly stated on the record that the Defendants have shown deceitful behavior and asked the judge to protect her, which she is required by law to do, yet nowhere in the Judge's order did it say that the Plaintiff was

SA-80

responsible for filing the arbitration or that the emphasis was on the Plaintiff to contact the Defendant first.

Although these status reports look like the Judge is over seeing the process and being fair to all, the Plaintiff continues to believe as previously stated in her letter to Judge Laura Taylor Swan, that Judge Schofield continues to side with the Defendants by covering for fraud that goes all the way up the judicial latter and is keeping the Plaintiff from getting the justice she deserves.

Some examples are but not limited to, are; the fact that Judge Schofield heard on the preliminary conference call with the parties that the Defendants committed fraud and other crimes and still allowed the motion to compel arbitration to move forward. The Plaintiff argued fraud in opposition of the Motion to Compel Arbitration per the Judge's orders on that conference call. The Judge wrote in her Order to Compel Arbitration that the business relationship between the Plaintiff and the Defendant deteriorated, it did not, the Defendants committed fraud. The Judge then denied the Plaintiff when she filed a request to re argue her fraud motion, which is within her rights by law. The Judge also threatened the Plaintiff in that denial that if there was no movement on the arbitration by June she MAY dismiss the case. Still not revealing to the Plaintiff what the expectations of that movement were and leaving room for the defendants to get the case dismissed.

The Plaintiff does not believe the arbitration nor the Judge's actions, are fair, just or legal, yet has still moved forward with following the Judges orders to Compel Arbitration without the necessary information to do so required by law. The Plaintiff did all of this by herself, while suffering the insurmountable loss of her brother. The Judge and the Defendants however, tried to get the Plaintiff to make a mistake so they could get rid of both the case and the arbitration because the Plaintiff will depose Les Mooonves and subpoena the Defendants Internal Investigation. This coupled with the other proof the Plaintiff has submitted and has in her possession will prove corruption and manipulation of the stock market.

The plaintiff has always been ready and willing to move forward and has shown zero deceitful behavior. The Plaintiff has told the judge that she is in possession of the emails

from the NY AG's office that they subpoenaed as part of their Securities Investigation into CBS that proved that CBS Committed Fraud and that the Plaintiff is innocent.  These emails were shown to the Plaintiff during a meeting with the NY AG'S head of Investor Protection where she was entrapped, roughed up and bribed. The NY AG's office refused release the emails to the Plaintiff until after they concluded their Securities Investigation even though she needed them for her initial filing.

Lastly, the Plaintiff states for the record that she has major concern over conflicts of interest. Everyone involved could be benefiting financially while the Plaintiff get's bullied and tricked out of the money she deserves, not dissimilar to the shareholders in the class action lawsuit against CBS. There are connections between the judicial system and the stock market and the are outlined as follows:

1.  "The Manhattan district attorney's office and the New York City Commission on Human Rights issued subpoenas for any information related to CBS's own investigation, according to a **Securities and Exchange Commission filing** by the network on Friday. The filing said **the New York State attorney general** has also requested information. The network enlisted two law firms in August to investigate the allegations against Mr. Moonves, as well as claims that **executives allowed a culture of harassment to fester"**

**The New York State attorney general's office is conducting a civil inquiry to**

**determine whether CBS broke any laws by harboring a culture of sexual harassment…  The NY TIMES**

2. The CBS board hired Nancy Kestenbaum of Covington & Burling and **Mary Jo White of Debevoise & Plimpton** to conduct its internal investigation. Ms. White led the **Securities and Exchange Commission** during the Obama administration and was previously the United States attorney for the Southern District of New York. Ms. Kestenbaum was also a federal prosecutor with the same district." Here is the full article for your reference. NY times article
https://www.nytimes.com/2018/09/28/business/media/cbs-new-york-prosecutors.html

SA-82

3. Judge Lorna Schofeild became an associate at the law firm of Debevoise & Plimpton LLP in New York City in 1988 and was promoted to partner in 1991. She specialized in complex civil litigation and white -collar criminal defense. On April 25, 2012, President Barack Obama nominated Schofield to serve as a United States District Judge for the United States District Court for the Southern District of New York, to the seat vacated by Judge Shira A. Scheindlin.

Respectfully submitted,

/s/ Sue Costello

SA-83

**Sue Costello**

suezkadoozie@gmail.com

April 9, 2024

**<u>VIA PRO SE CLINIC</u>**

Honorable Lorna G. Schofield

United States District Court

Thurgood Marshall

United States Courthouse

40 Foley Square

New York, New York 10007

    Re:      *Sue Costello, v. Paramount Global,* Case No. 1:23-cv-1553-LGS

Dear Honorable Judge Schofield,

Forgive me if it's because I'm a pro se litigant, but I need some clarification. Why this case being forced into arbitration but still remains a law suit, overseen by you, at the same time? Does this mean that I still have a valid case?

 Also, why does your order say that you "may" dismiss the case.  Can you explain very clearly and specifically what "may dismiss" means.

I'm sure you understand and I appreciate your attention to this.

SA-84

Case 1:23-cv-01553-LGS   Document 40   Filed 04/10/24   Page 2 of 2

Respectfully,

/S/

Sue Costello

Per the Court's Order dated February 1, 2024, the Court granted Defendant's motion to compel arbitration.  In this circumstance, the Court is required to stay the case pending Plaintiff's commencement of arbitration to pursue her claim.  *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015); *accord Behrens v. JPMorgan Chase Bank, N.A.*, No. 21 Civ. 2603, 2024 WL 1090856, at *4 (2d Cir. Mar. 13, 2024).  While the case is stayed, all deadlines before this Court are paused until resolution of the arbitration, with the exception of the required periodic joint status letters. After the arbitration, the prevailing party may then return to the Court to seek confirmation and enforcement of the arbitration award.  If Plaintiff chooses not to pursue her claim in arbitration, then the case in this Court is closed.

In the Court's Order dated February 15, 2024, the Court set a deadline for the commencement of arbitration of June 3, 2024, or pursuant to Federal Rule of Civil Procedure 41(b), "the case may be dismissed for failure to prosecute."

This means that if Plaintiff fails to comply with the Court's orders and to take steps to commence the arbitration by June 3, 2024, the Court will issue an order asking Plaintiff why arbitration was not commenced and why the case should not be dismissed, and Plaintiff would have an opportunity to respond.

Plaintiff is encouraged to request a consultation with the New York Legal Assistance Group Legal Clinic for Pro Se Litigants, either by calling 212.659.6190 and leaving a message or by completing the online intake form as described on their website, https://nylag.org/pro-se-clinic/.

Dated: April 10, 2024
    New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

SA-85

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SUE COSTELLO,

                Plaintiff,                          **23-CV-1553 (LGS) (VF)**

      -against-                              **ORDER**

PARAMOUNT GLOBAL, INC.,

                Defendant.
------------------------------------------------------------------X
**VALERIE FIGUEREDO, United States Magistrate Judge**

At Plaintiff's request, the transcripts from the May 31, 2023 and June 5, 2024

conferences are attached to this order and added to the docket in this case.

- **Exhibit A:** Transcript of May 31, 2023 Remote Teleconference before the

  Honorable Lorna G. Schofield

- **Exhibit B:** Transcript of June 5, 2024 In-Person Conference before the Honorable

  Valerie Figueredo

      **SO ORDERED.**

DATED:     New York, New York
             June 12, 2024

                                       _____
                                       VALERIE FIGUEREDO
                                       United States Magistrate Judge

SA-86

# Exhibit A

N5VQcosC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SUE COSTELLO

                Plaintiff

        v.                              23 Civ. 01553 (LGS)
                                        Remote Teleconference

PARAMOUNT GLOBAL INC.

                Defendant

------------------------------x
                                        New York, N.Y.
                                        May 31, 2023
                                        4:30 p.m.

Before:

                    HON. LORNA G. SCHOFIELD

                                        District Judge

                        APPEARANCES

SUE COSTELLO, Pro Se

WEIL GOTSHAL & MANGES LLP
    Attorney for Defendant YEHUDAH L. BUCHWEITZ

SOUTHERN DISTRICT REPORTERS, P.C.
        (212) 805-0300

N5VQcosC

(The Court and all parties appearing via remote teleconference)

DEPUTY CLERK:  In the matter of 23 Civ. 1553.

Before we begin, I just want to remind everyone listening that recording or rebroadcasting of this proceeding is prohibited.  Violation of this prohibition may result in sanctions.  I'm going to ask the parties to please state your name when you speak each time you speak because we have a court reporter present.

We are here before the Honorable Lorna G. Schofield.

THE COURT:  Good afternoon.  So I understand that you may have been on the phone for awhile, so you may have heard some of the prior conference, but I just want to begin from the beginning again.

First of all, Ms. Costello, I assume you are not a lawyer and that you are representing yourself as a non-lawyer. Is that right?

MS. COSTELLO:  That's correct, your Honor.

THE COURT:  Do you want -- I think I understand the basis of your claim, but why don't you tell me about it.

MS. COSTELLO:  Okay.  In July of 2017 I had a meeting with Leslie Moonves, who is the head of CBS Corporation.  He had originally given me my first two TV deals.  This was my third time around with him, attesting to my talent and my ability.  So I had a meeting with him about doing my TV show.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N5VQcosC

He told me that he wanted to do the TV show. He sent me to the head of casting, which casting sent me to the rest of executives of CBS. They flew me out to CBS to pitch my TV show. I pitched my TV show. There was a lot of back and forth and harassment that went on in between that I'm not sure if you want me to go into right now or if you just want me to keep it broad, but --

THE COURT: Let's keep it at a summary.

MS. COSTELLO: Okay. So then they offered me a TV deal. I negotiated it with the head counsel of CBS Corporation, Jonathan Anschell. That was in June of 2018. Three weeks later, in July, a Rona Barrett article came out about Moonves being -- having sexual assault allegations against him, and then every single day after that, articles kept coming out about him ruining women's careers and paying women off. And so my deal stated very specifically that I am to sent my script -- this is my third deal, so I'm very well versed in how the business goes. Once the deal is closed, you get sent into development. My deal says that I am to send my script to the head of comedy development at CBS Studios in order to get paid under WDA contract, which is my union.

CBS had sent me the initial payment for my script on signing, and then I never heard from anybody. Comedy development never came to me. So I contacted the only person I had a contact for, which was Jonathan Anschell, and I asked him

N5VQcosC

what was going on with my deal, and he said to me, "We have deals with other women.  What do you want?"  And I said, "I want to proceed with my contract, with the terms of my contract.  I want to send my script to the head of comedy development CBS Studios."  He hung up the phone.  He sent me an email that said, "Now that I've made allegations against Les Moonves, I need to send you to our internal investigation."

THE COURT:  Wait.  Wait.  Wait.  Did you make allegations against --

MS. COSTELLO:  None.  None.

THE COURT:  Did you say anything about, "Oh, those things have happened to me" or "I've seen what's happened to other women"?

MS. COSTELLO:  Never. Never. Nothing.  Nothing. Nothing.

THE COURT:  What do you -- so he was just out of nowhere saying, "Now that you've made allegations"?

MS. COSTELLO:  Yes, out of nowhere.

THE COURT:  Okay, go ahead.

MS. COSTELLO:  **And then so the internal investigation contacted me, and I was like, "I don't need to go to the internal investigation.  I have a television deal.  I want to move forward with my television deal."**

So I didn't go to the internal investigation.  I went to the WDA, which is my union.  The head attorney for WDA

contacted Jonathan Anschell and said to hold him to the contract, and he said to send the script to Tom Sherman, but Jonathan Anschell and Tom Sherman were the only two executives at CBS that I had any contact with prior to this.

THE COURT:  Okay.

MS. COSTELLO:  My deal says that I send my script to the head of comedy development.  Jonathan told the WDA to have me send my script to Tom Sherman.  That was not in the lines of the contract.  So then I got an attorney, I hired an attorney. The attorney called Jonathan, and then Jonathan lied to the attorney, then Jonathan lied to me about what the attorney said.

I got rid of the attorney.  Then I went back to Jonathan.  Jonathan -- I have emails -- I have a hundred emails of me asking them to let me proceed -- begging them to let me proceed with my deal.  I have emails from Jonathan lying that I had a deal, I don't have deal, the deal expired.  And this is a pattern of abuse that I can prove that they did time and time again to me.

And then I went to Joe Ianniello, the head CEO, I went to the board of directors, I went to Robert Backish, I went to everybody trying to proceed with my deal.  They ignored me and shut it down.

And then that's when I filed a police report, because when I pitched my show back in the spring, they pushed me out

N5VQcosC

of the room and took my idea.  The reason why I did the deal with them was to protect me from them stealing my idea, and in deal the second paragraph in my signed letter says that I can buy my script back immediately if they pass on it.

So they did not abide by any of the terms of the contract.  And what happened was, so then I filed a police report because I wanted to protect my idea, and because of all the confusion with the #MeToo, I couldn't get anybody to represent me.  Nobody was understanding what was going on until the New York Attorney General's office called me into their office and they showed me the email between Leslie Moonves, Gil Schwartz and Jonathan Anschell saying that they gave me the deal behind me back, and also another email from Leslie Moonves saying, "I feel bad.  Tell them how much I like her."  That's when I knew that they had committed fraud, and that's when I filed my lawsuit

THE COURT:  Okay.  What I would like to do before we get too far afield, I'll hear from the lawyer for the defendant.  But what I would like you to do is just -- I understand you had various arguments about a motion to dismiss.  We won't get into those yet.  Just give me a very short summary that is responsive to what we just heard.

MR. BUCHWEITZ:  Sure, your Honor.

THE COURT:  If you know or have anything.  You may not be in a position yet.

N5VQcosC

MR. BUCHWEITZ:  Yes, your Honor.

So Ms. Costello does in fact have a contract.  She was paid 15 percent at signing.  The next step in the contract was submitting a script, at which point she would receive the next payment.  She was told repeated that she could submit her script, and she would get the next payment, and she never has. It's that simple.

THE COURT:  Okay.  Is the contract terminated now?  Is it still an option for her to submit the script?

MR. BUCHWEITZ:  I think there's a question of whether it's still open; but I told her last year when I spoke to her on the phone, if she submits the script, we'll consider it. And she still didn't.

THE COURT:  Okay.  Let's talk about litigation for a minute.  I don't know how much you are familiar, Ms. Costello, with lawsuits and sort of the various steps in the lawsuits, but as I explained in the other case, there is a very preliminary step that comes first, and there is even a step before the one I discussed in the other case; and, that is, I need to make a determination that you are -- you and your case are properly before me.  And that is something I have to assure myself of before I go any further.  If you should be litigating in state court, for example, or if you should be arbitrating, for example, then with you don't belong before me.  And that's a legal question and that's a legal question I have to answer

N5VQcosC

first.

What the defendant has said here, among other things, is that there was an arbitration provision in your agreement, and that because of this arbitration provision, this lawsuit is required to be arbitrated. And if that's the case, then it is something that I won't and could not adjudicate. It's something that I would have to refer to arbitration. I understand that you are -- you've cited the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, but under the law, that statute doesn't have a retroactive effect. It only applies to claims that accrued on or after March 3, 2022, which is the day that it was actually signed into law. And the events that occurred here happened before March 3, 2022. So that's the question that I have to decide first.

So what I am going to do is I am going to set a schedule for just that motion, so that I can decide that first and see whether we belong in this court. And that is a motion that the defendant writes and submits and files in court. And then you have an opportunity to file a response. I should tell you though that because you're not a lawyer, I am, of course, interested in whatever arguments you want to make, but it's basically a legal question. And so I won't just rely on what the defendant says. I will, of course, do my own research and my own legal analysis to determine what the correct legal

N5VQcosC

answer is, and you can certainly put in your response to assist me doing that or to tell me about the -- the statute that you referenced or whatever else you want to put in it, but I just want to reassure you that it isn't held against you that you are not a lawyer or that you don't have a lawyer in the lawsuit.

And then I typically, but not always, get a reply from the party that filed the motion because they have the burden of proving that they're correct.

So my question for Mr. Buchweitz is, when would you like to file your motion?  I'm limiting it to the motion to compel arbitration.

MR. BUCHWEITZ:  Okay.  And everything else would be reserved, if necessary, for a future date?

THE COURT:  Yes.  Yes.

MR. BUCHWEITZ:  Okay.  Okay.  Two weeks?

THE COURT:  Okay.  Two weeks is fine.

And then, Ms. Costello, how long would you like to put in a response?

MS. COSTELLO:  Two weeks, please.

THE COURT:  All right.

MS. COSTELLO:  Your Honor, may I ask a question?

THE COURT:  Yes, of course.

MS. COSTELLO:  I'm accusing them of fraud.  I can prove that they committed fraud, so that negates the contract,

N5VQcosC

that makes it void.  So how does that --

THE COURT:  What you can do is put in your response that exactly what you just told me; that you're alleging fraud, and you believe that that negates the arbitration provision.

MS. COSTELLO:  Okay.

THE COURT:  And that, of course, is something that I would look into.  And I'm going to schedule a date for a reply brief.  Why don't I schedule it for -- is a week okay for reply, Mr. Buchweitz?

MR. BUCHWEITZ:  Probably.  Just trying to figure out what day that falls on.  I'm sorry.

THE COURT:  Okay, let me --

MR. BUCHWEITZ:  I'm okay.  I got my calendar here.  If you wouldn't mind, I'm away that week.  Can I do Monday of the following week?

THE COURT:  Of course, that's fine.  So why don't we do Tuesday, so you're not working all weekend.

MR. BUCHWEITZ:  Okay.

THE COURT:  We'll do it Tuesday of the following week. So each of the first two submissions is limited to 25 pages, no more than 25 pages, and the reply is limited to 10 pages. Okay?

So I think that is everything we need to discuss right now.  I want to deal with that issue before we deal with anything else because if I am not adjudicating this, then I

SA-97

N5VQcosC

shouldn't be entertaining any other applications or motions.

But I will try and get that decided quickly so we can figure out what step comes next.

Is there anything else, Ms. Costello?  Do you have any questions or anything you want to the ask or raise?

MS. COSTELLO:  Yes, I have a question about, did you tell me what the date was two weeks after the date when my reply is going to be do or will I get that through email?

THE COURT:  What I am going to do is a written order. But let me just look at a calendar so there is no question about this.  Today is 31st.  June 14 would be the date for his motion.  June 28 would be the date for your response.  And July 11 would be the date for the reply.  Why don't we say the 12th for the reply instead because I just noticed the 4th of July weekend is in there.  We'll say July 12 for the reply. And I will put it in a written order.

Ms. Costello, do you have access to pacer so that you see what's on the docket, or by mail?

MS. COSTELLO:  Yes.  Yes.  Both, I get it through email and on the docket.

THE COURT:  Perfect.  I'll put the order on the docket, and you should be able to see it.

All right.  So we are adjourned.  I will let you get off the phone.  There is one more matter.  I am going to get off the phone as well.  (Adjourned)

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                                   :
                                              Docket #23cv1553
 COSTELLO,                                :

                    Plaintiff,            :

   - against -                            :

 PARAMOUNT GLOBAL, INC.,                  : New York, New York
                                            June 5, 2024
                    Defendant.            :

------------------------------------- :


                       PROCEEDINGS BEFORE
                THE HONORABLE VALERIE FIGUEREDO,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          SUE COSTELLO, Pro Se
                        120 Quincy Shore Drive
                        Quincy, Massachusetts 02171

For Defendant:          WEIL, GOTSHAL & MANGES LLP
                        BY:  YEHUDAH BUCHWEITZ, ESQ.
                        767 Fifth Avenue
                        New York, New York 10153
```

Transcription Service: Carole Ludwig, *Transcription Services*
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording; Transcript
produced by transcription service.

SA-99

2

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

3

THE CLERK:  Good morning, Your Honor, this is the matter of Costello v. Paramount Global, Inc., case number 23cv1553.  Plaintiff, can you please state your appearance for the record.

MS. SUE COSTELLO:  Sue Costello.

THE CLERK:  Defense.

MR. YEHUDAH BUCHWEITZ:  Yehudah Buchweitz, Weil Gotshal for Paramount Global.  Good morning.

THE COURT:  Good morning, everyone.  So since Ms. Costello's pro se and this case just recently got assigned to me, I typically like to have cases with pro se plaintiffs or defendants in court so you have an opportunity to talk to me, tell me anything that you'd like to raise.  And so I scheduled the conference for that reason and then also because you had submitted various letters on the docket raising certain issues.  So I just wanted to give you an opportunity to address those.

I will say, because this case just came to me relatively recently from Judge Schofield, I haven't otherwise been involved in the case.  So I'm happy to hear I guess, Ms. Costello, if there's any issues you want to raise or discuss with me.

MS. COSTELLO:  Thank you very much for your

time and thank you for meeting me in person. I really appreciate that because this has been a very long fight, seven years. In July it'll be seven years since I met with (indiscernible) to do my TV show. So here we are, thank you.

First of all, I have to bring to this Court's attention the abuse, just the absolute horrific abuse that I've suffered and the manipulation and the lies and the fact that the defendant has used the press, the New York Attorney General's Office, and now is using the court to sexually harass me.

THE COURT: To? Did you say sexually harass you?

MS. COSTELLO: To sexually harass me. This has been a very complicated case because they're sexually harassing me by trying to force me into looking like somebody who had a sexual situation with Les Moonves. That's why it's so complicated, that's why people had such a hard time figuring out what was going on.

I was brought into the New York AG's Office on April 5, 2022. I never knew what was going on with my deal. I had no idea why they weren't honoring it and why they were blocking me or why they were harassing me like they were until I went into the New York Attorney

5

General's Office and was bullied, harassed, humiliated, and sexually abused for three hours like I was some sort of sexual, like I was trying to extort them for something sexual.  Three hours.

THE COURT:  Can I ask you a question?  Are these allegations in your complaint?

MS. COSTELLO:  Yes, everything's in the complaint.

THE COURT:  Okay.

MS. COSTELLO:  It's in the call, the conference call.  I've said it all along.  I tried to file under H.R. 445 and the judge dissuaded me from filing under, and it's not true, she said that in March 2022 is when the law went into effect.  Well, April 2022 falls under that statute.  I have all the emails right here from the Attorney General's Office that, the way that they framed me in the Attorney General's Office.  They sent me the emails.  They also proved the fraud that the defendant committed fraud with my television contract.

So what they did was they gave me a television contract with the intent to frame me into the Les Moonves sexual allegations.

THE COURT:  And let me just ask, are these emails attached to your complaint?

6

MS. COSTELLO:  No, because they wouldn't give them to me while they were doing their investigation. And I asked Judge Schofield if I could submit them; she denied it.  I asked if I could argue for H.R. 445.  She dissuaded me from it.  I asked if I could reargue my fraud case once I had these, and the judge denied it, which was, it was in my right to reargue, and she didn't let me reargue it.

THE COURT:  Can I just ask a question of Mr. Buchweitz.

MR. BUCHWEITZ:  Yes, Your Honor.

THE COURT:  I'm sorry for mispronouncing --

MR. BUCHWEITZ:  No, you got it right.

THE COURT:  Okay.  Can you just remind me of the procedural postures?

MR. BUCHWEITZ:  Yes.  The complaint was filed in 2023, February 2023.  There was a preliminary conference with Judge Schofield on May 31.  We had done a premotion letter to move to compel arbitration as well as other grounds.  The judge said limit your motion to motion to compel arbitration.  We did so.  It was fully briefed in the summer of 2023.  Ms. Costello had an opportunity to put in all of her arguments in response. And in February of 2024 the order came down compelling

7

arbitration.  Each of the points that have come up in various correspondence, whether the H.R. was retroactive effect, whether there was unconscionability were all well addressed in full in the judge's order in February 2024.

At that point in time, the Court said the case is stayed pending Ms. Costello filing arbitration. There were a number of dates for when a status report would be due.  At each of these points no arbitration was filed, and it's still the status today.  There was supposed to be a status report filed as yesterday or two days ago, Monday, June 3, but Your Honor granted a request from Ms. Costello to extend her time to file the arbitration to July 1, 2024.

Based on the prior orders, you know, the things that Judge Schofield said was that if arbitration was not filed by first it was a date in April, then June 3, the case may be dismissed for failure to prosecute, and the status is as I described it, she has until July 1, 2024 to file arbitration in JAMS this agreement to arbitrate that was entered in 2017.

MS. COSTELLO:  And my argument is that that arbitration clause and the contract are both void because it falls under, first of all, it could be either

SA-105

8

H.R. 445 or a fraud, either one.  I have all the proof of it.  The judge did not let me argue everything the way that I wanted to argue it.  She did not let me reargue the fraud.  She did not let me argue H.R. 445 either.  So those things are lies.  I have the transcript of the call.

On the call the judge put words in my mouth to lead me to sound like I was saying that something sexual happened to me with Les Moonves.  This whole thing has been to frame me into the MeToo movement, and their arbitration move, that's the only move they have.  That was the only move they have was to put me into arbitration so that they can continually harass me. There's proof in the press they did it to Eliza Dushku. They framed her and tried to ruin her career in arbitration.  She broke her NDA through the arbitration because they had done that to her during the MeToo movement.

THE COURT:  So, Ms. Costello, I don't – I'm not trying to – I guess I'm a little restricted in what I can do at the moment given that Judge Schofield already addressed whether you have to go to arbitration.  I can't just undo what she did there.  And it seems like your case here would be stayed, so you wouldn't lose the

9

opportunity to continue litigating here once you finish with the arbitration.

So it seems like it would be in your best interest to just also file for the arbitration and go --

MS. COSTELLO:  Well, I don't feel safe.

THE COURT:  You don't --

MS. COSTELLO:  I do not feel safe going into arbitration with the vicious, horrific, I mean it's been - I don't understand what's going on here.  It's been in the press the way they treat women.  Their internal investigation, I've been harassed by the press, Rachel Abrams, because she got the leak of the internal investigation.  She came to me and started harassing me. They've harassed me, they've abused me.  I don't feel safe.  I would go into arbitration, I would do whatever I needed to do to protect myself from what they did to me with my television deal.  But I do not feel safe. And there's a precedent set with the way that they treat women in arbitration.

THE COURT:  Well, so --

MS. COSTELLO:  That's why I went to the judge.

THE COURT:  And so I hear you on these concerns.  The arbitration would be with JAMS.  It's a completely neutral third party.  It wouldn't just be --

SA-107

10

MS. COSTELLO:  It was neutral when Eliza Dushku was in there as well.

THE COURT:  No, and I understand that, but I guess the problem is there's not much I can do at the moment --

MS. COSTELLO:  Okay.

THE COURT:  -- if you have an order from Judge Schofield --

MS. COSTELLO:  Okay, but my concern is also that Judge Schofield worked for the law firm that did the internal investigation that I want to bring forth in court.  So I have a very big concern about that too, and I want that on the record.  I have a very big concern of how she put words into my mouth during the transcript to lead me to talk about that Les did something sexual to me.  I have huge concerns about the fact that she didn't let me reargue the fraud.  I have huge concerns that she took a year to make a decision on the motion.  And from my understanding those are all bases for me to be able to file a complaint.

So I am not going to be forced into arbitration when I have the right to file under H.R. 445 and fraud and I wasn't allowed to argue this correctly.  So --

THE COURT:  So I guess you've made a few

SA-108

11

points.  I just want to respond to them as best I can.

Presumably, you would've raised the issue with whatever

law firm Judge Schofield worked before.  You raised that

with her?

MS. COSTELLO:  Uh huh.

THE COURT:  Okay.  So typically, you know, it's

up to every judge to decide on what basis to recuse

themselves, so you would've --

MS. COSTELLO:  I only raised it after the fact

- excuse me, I only raised it after the fact when I

realized how unfair she was being to me, and I've spoken

to other people who I've gotten consultations with

attorneys who said that she wasn't following the law,

that she was being unfair, and that she was looking

extremely biased to the defendant.

THE COURT:  Well, so, but, again, on that basis

there's really, again, not much I can do because it's up

to each judge to decide when to recuse themselves if

it's necessary.  So if you raised the issue with her and

she found that there wasn't any basis for a recusal,

that's not something I can --

MS. COSTELLO:  Well, she sent it to you though.

THE COURT:  She sent me the case – she's still

the district judge on the case --

SA-109

12

MS. COSTELLO:  I know, but she sent it to you as soon as I raised the issue.  So I have extreme concern about that too.  I want all this on the record.

THE COURT:  We're, we are – there's a recorder --

MS. COSTELLO:  Good.

THE COURT:  -- and it'll be transcribed --

MS. COSTELLO:  And a transcript that I have here has either been doctored or whoever wrote this transcript was very incompetent.  They wrote Rona Barrett instead of Ronan Farrow.  I want it on the record Ronan Farrow.

THE COURT:  So, again, this conference will be transcribed.  We will order the transcript, it would be put on the docket --

MS. COSTELLO:  Right, but this transcript is not what I said on the call.

THE COURT:  Yes, and --

MS. COSTELLO:  And Rona Barrett is a 92-year-old gossip columnist from the 70's, and Ronan Farrow is the journalist that broke the MeToo story.  So I want that very clear.

THE COURT:  Okay, and so, and, again, the court reporters are, you know, work very hard and they're very

13

diligent, but sometimes names --

MS. COSTELLO:  There's no confusion.  When I say Rona Barrett or I say Ronan Farrell, there is no confusion.

THE COURT:  And I understand that, and you've made it clear that there was a mistake in that transcript.  Do you have the date of the conference just so --

MS. COSTELLO:  Yes, I do.

THE COURT:  -- it's absolutely clear.

MS. COSTELLO:  I have the whole conference.  I have the whole script right here.

THE COURT:  I just need the date --

MS. COSTELLO:  And I have the words that the judge said to me when I was talking.  I also have that she interrupted me when I was trying to talk about the fraud.  There's extreme bias going on right here, and I'm not going to stand for it.  I'm not going to be pushed around.  I'm not.  I want that on the record.

THE COURT:  So, again, all this is on the record.  Just to go back to a few points that you made. It's, again, it sounds like Judge Schofield issued an order compelling arbitration.  I understand you think she has a bias or a conflict --

14

MS. COSTELLO:  I also think it's illegal what she's doing.

THE COURT:  And that's --

MS. COSTELLO:  It's absolutely illegal.  I fall under the H.R. 445 --

THE COURT:  And --

MS. COSTELLO:  The Attorney General sexually harassed me on April 5, 2022.

THE COURT:  And --

MS. COSTELLO:  I have all the emails.  I'll show you exactly how they framed me and how they made it out.  I have emails where Jonathan Ansel (phonetic), Les Moonves, that's how they were planning on how they kept the deal small.  I have every single email.  I have every email that was in the Attorney General's Office, and I have my side of the emails.  So I can prove the framing.  I'm not going to be pushed around, and I'm not going to settle for this transcript with the judge was pushing me to try to say that Les Moonves sexually harassed me.  I'm not doing it.  Because that constitutes the judge sexually harassing me.  Okay?  So that's on the record.  The New York Attorney General sexually harassed me, and then the judge did it.  If you'd like me to read what it says exactly, I'll say it.

15

THE COURT:  No, I mean I don't think you need to read it, but I think what we're losing sight of is what I help you with.  And --

MS. COSTELLO:  I'm not losing sight of anything.  I just want this on record so that I can make sure that when I go after the judge, I have this on the record, and that you're very aware of what I told you. I want to make sure that everybody is very aware of what I told them.  That's what I'm doing here today.

THE COURT:  Okay, and then so, and for those purposes, again, this is going to be transcribed, I'll put it on the record.  You will receive a copy.

MS. COSTELLO:  It needs to be on the docket.

THE COURT:  Yes.

MS. COSTELLO:  This one wasn't on the docket.

THE COURT:  Do you have the date of that conference?

MS. COSTELLO:  Yes, I do.  I have the whole thing right here.

THE COURT:  I just need the date.

MS. COSTELLO:  May 31, 2023 at 4:30 p.m.

THE COURT:  May 31, 2023?

MS. COSTELLO:  Yes.  But I really do want to read what the judge said to me.  I want it on the record

SA-113

16

that, I want it.

THE COURT:  Well, so if that's a transcript from a conference with the judge, I'll go on the docket. If it's not there, I'll make sure it's uploaded --

MS. COSTELLO:  It's not on the docket.  I had to request it.

THE COURT:  Okay, and I --

MS. COSTELLO:  It's another one of my concerns is that this call where I say everything that I said in my claim, everything that I've said I never wavered on my story.  Everything is the same.  I don't know what's going on, why everybody is trying to force me into arbitration when I have a legitimate case to go to court.  I want to go to court.

THE COURT:  And so, okay, a few things.  I will look at the docket and make sure that the transcript from May 31 is on the docket.

MS. COSTELLO:  Thank you.

THE COURT:  The transcript from today will be on the docket.

MS. COSTELLO:  Thank you.

THE COURT:  I understand you want to be in court.  It sounds like Judge Schofield found that there was an agreement that required you to arbitrate.  The

SA-114

17

case isn't going to be dismissed --

MS. COSTELLO:  Yeah, and the agreement was fraudulently induced.  They're the ones – can you ask the defendant these questions?  This is what I want you to ask him so we can clarify on the record.  I just want these questions answered on the record.  Is it customary to pay somebody for a script and then not go after them for what they bought?  I would like the defendant to answer that question.

THE COURT:  But this isn't – this isn't really that type of proceeding, and so this is what I think, if you want these questions answered, you have a venue which is the arbitration with JAMS where you can raise these issues.

MS. COSTELLO:  But I shouldn't be going to arbitration.

THE COURT:  But the judge already ruled that you have to.

MS. COSTELLO:  Right, the judge ruled wrong.

THE COURT:  And I get that --

MS. COSTELLO:  Yes.

THE COURT:  -- and what you can do is you can go to arbitration, and then if you need to appeal her determination once you get a final judgment here --

18

MS. COSTELLO:  But why would I go to arbitration and then appeal her decision?  Why don't I just appeal her decision beforehand?

THE COURT:  I don't think you have a final judgment here to appeal.

MS. COSTELLO:  Just based on the arbitration motion.

THE COURT:  I don't --

MS. COSTELLO:  I thought it wasn't appealable if you went to forced arbitration.

THE COURT:  Actually --

MS. COSTELLO:  It's not.

THE COURT:  -- do you happen to know?

MR. BUCHWEITZ:  Under the FAA the denial of a motion to compel arbitration is appealable, but the grant of a motion to compel arbitration is not.

MS. COSTELLO:  Yes, so I'm not going to go into - that's the only reason.  I want to be very clear, I have been nothing but fair.  This is my third television deal with CBS.  The first two were absolutely fine.  This third one happened when they tried to frame Les Moonves into the MeToo movement.  They blocked my deal. I had to deal with them, and as soon as I wouldn't go along with saying sexual things about Les Moonves, they

19

retaliated against me.  They've used the New York Attorney General's Office, now they're using the court. They've used the press to retaliate against me.  And I don't feel safe going into arbitration, and I'm covered under H.R. 445.  April 25, 2022 is within the statute of H.R. 445.

THE COURT:  Okay.  So I'm not sure – I'm going to try to be as clear as possible, and I'm really not trying to be dismissive in any way.  It's just my, there's not much I can do for you given a ruling that you have to go to arbitration.  And so --

MS. COSTELLO:  Okay, can I just interrupt you for one second?

THE COURT:  Yes --

MS. COSTELLO:  Because I want to be very clear.

THE COURT:  -- no, go ahead.

MS. COSTELLO:  You just told me to go to arbitration and then to appeal it.  I know for a fact that I can't do that.  So you're giving me advice that goes against what the law is.  So --

THE COURT:  Well, I'm not --

MS. COSTELLO:  -- I'm having concerns about that too.  I'm a pro se attorney, litigant.  The court is supposed to be fair.

20

THE COURT:  Yes, I'm not giving you legal advice, and what I indicated, was once you have a final judgment, so you can't appeal a decision right now that you were sent to arbitration, but once everything's completed, you might be able to appeal then.

MS. COSTELLO:  Might.

THE COURT:  Well, I'm not your attorney, so I don't, and I was definitely never an arbitration lawyer, so --

MS. COSTELLO:  Well, but the attorney just, for the defendants just said that I cannot appeal the judgment with the --

THE COURT:  You cannot appeal right now the decision to --

MS. COSTELLO:  I understand that.

THE COURT:  -- compel arbitration, but that's different than once you finish the whole process.  But in any case, I did give you a deadline which, based on the various other deadlines that Judge Schofield had set --

MS. COSTELLO:  Right, and in good faith I have been talking to JAMS.

THE COURT:  Okay, well, that's good.  And so I think it seems like it would be in your – I would

21

encourage you to file whatever you're going to file for arbitration by July 1.  If you need a little it more time, I'm happy to give you more time.

MS. COSTELLO:  I do need a little more time because, as I mentioned, my father and my brother died during this year while I've been going through this.

THE COURT:  All right, I'm really sorry to hear about that --

MS. COSTELLO:  Yeah, well, that's what the defendant has done to me.  They sexually harassed me.  They've harassed me.  They interrupted my career.  They physically robbed me.  I have a police report from when they robbed me, and the court is somehow just siding with them.  And my father and my brother died this year while I've been, right around the time when this conference call happened, and I have the conference call that's not even, it's doctored, it's not even right.  So I do need more time.

THE COURT:  Okay, so, again, I'm happy to give you more time --

MS. COSTELLO:  Thank you.  Till when?

THE COURT:  So today is June 5, and the previous deadline was July 1.  I can give you till the end of July, and that's nearly two full months.

SA-119

22

MS. COSTELLO:  Okay.

THE COURT:  Okay.

MS. COSTELLO:  Thank you, because that's what I requested originally.

THE COURT:  So the last day in July that's a business day is July 31.  So I'll enter an order extending the deadline by July 31.  But absent extraordinary circumstances that deadline can't get extended again.

MS. COSTELLO:  Yes, and I appreciate you meeting with me because I understand that you haven't been part of this, but every time I meet with somebody new, the defendant frames it and then they attack me, and then I have to defend myself.  This has been going on for seven years.  So even if we go into arbitration, the defendant's going to be just as dirty as they've been all along.  So I have to prepare myself completely --

THE COURT:  Okay, and

MS. COSTELLO:  -- to all their dirty tactics.

THE COURT:  And that's why I'm happy to give you more time --

MS. COSTELLO:  Thank you.

THE COURT:  -- to prepare the filing --

SA-120

23

MS. COSTELLO:  Thank you.

THE COURT:  -- for arbitration.  But because, again, there's, given the posture of the case, I would urge you file something by July 31.  Is there anything else?

MS. COSTELLO:  No.  That's it.  I appreciate it, and I'm going to make sure --

THE COURT:  Okay, and I will --

MS. COSTELLO:  The transcripts are both going to go on the docket.

THE COURT:  Yes, I will put the transcript for May 31 on the docket, 2023, and I will put the transcript from today on the docket.

MS. COSTELLO:  Thank you very much.  I really appreciate you meeting with me.

THE COURT:  Okay, no problem.

MS. COSTELLO:  Thank you.

THE COURT:  Thank you so much, everyone.

MR. BUCHWEITZ:  Thank you.

(Whereupon the matter is adjourned.)

SA-121

24

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of COSTELLO v. PARAMOUNT GLOBAL, Docket #23cv1553, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature   ____*Carole Ludwig*__

Carole Ludwig

Date:  June 6, 2024

SA-122

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
SUE COSTELLO,

                          Plaintiff,                          **23-CV-1553 (LGS) (VF)**

          -against-                                           **ORDER**

PARAMOUNT GLOBAL, INC.,

                          Defendant.
-----------------------------------------------------------------X
**VALERIE FIGUEREDO, United States Magistrate Judge**

        Plaintiff is reminded that the Court granted Defendant's motion to compel arbitration on February 1, 2024. See ECF No. 33. The Court stayed this matter and subsequently ordered that Plaintiff commence the arbitration by July 31, 2024. Additionally, as Judge Schofield indicated, see ECF No. 35, this matter may be dismissed for failure to prosecute if an arbitration is not commenced. Plaintiff is given one final extension of time, until August 30, 2024, to commence the arbitration. The parties are directed to provide a status update by September 4, 2024, indicating whether an arbitration proceeding was commenced by the stated deadline.

        **SO ORDERED.**

DATED:      New York, New York
            August 5, 2024

                                                    _____
                                                    VALERIE FIGUEREDO
                                                    United States Magistrate Judge

SA-123

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
SUE COSTELLO,

                      Plaintiff,                **23-CV-1553 (LGS) (VF)**

        -against-                  **<u>ORDER TO SHOW CAUSE</u>**

PARAMOUNT GLOBAL, INC.,

                      Defendant.
-----------------------------------------------------------------X
**VALERIE FIGUEREDO, United States Magistrate Judge**

       Plaintiff Sue Costello, proceeding pro se, commenced this action on February 21, 2023, against Defendant Paramount Global, Inc. On June 14, 2023, Defendant moved to compel arbitration of the claims in the complaint, pursuant to an agreement between the parties. <u>See</u> ECF No. 20. On February 1, 2024, the Court granted the motion to compel arbitration and stayed this case pending conclusion of the arbitration proceeding. <u>See</u> ECF No. 33. Plaintiff sought reargument of the Court's decision, which was denied on February 15, 2024. <u>See</u> ECF Nos. 34-35. On April 8, 2024, the Court entered an order, directing Plaintiff to "take steps towards commencing arbitration proceedings by June 3, 2024." <u>See</u> ECF No. 38. As the Court explained, because Plaintiff was the party asserting claims, Plaintiff is responsible for initiating the arbitration. <u>Id.</u> The Court warned Plaintiff that if she "fails to take steps to commence arbitration proceedings by June 3, 2024, the case may be dismissed for failure to prosecute." <u>Id.</u> On April 10, 2024, in response to a letter submitted by Plaintiff, the Court explained to Plaintiff that if she elected to not pursue her claims in arbitration, "then the case in this Court is closed." <u>See</u> ECF No. 40. Again, the Court warned Plaintiff that if she failed to comply with the Court's order to take steps to commence an arbitration, her case could be dismissed. <u>Id.</u> By letter dated May 28, 2024, Plaintiff requested

SA-124

an extension of her time to commence an arbitration. The Court granted the extension and directed Plaintiff to take steps to commence an arbitration proceeding by July 1, 2024. See ECF No. 49. On August 2, 2024, Defendant submitted a letter informing the Court that Plaintiff had not yet commenced an arbitration. See ECF No. 63. On August 5, 2024, the Court entered an order, informing Plaintiff that she had "one final extension of time, until August 30, 2024, to commence the arbitration." See ECF No. 64. The Court again informed Plaintiff that her case could be dismissed if she did not commence an arbitration by the stated deadline. Id. To date, there has been no indication from Plaintiff that she complied with the Court's February 1, 2024 order requiring her to commence an arbitration proceeding.

Accordingly, it is hereby ordered that Plaintiff shall file a letter by **November 15, 2024**, showing cause why this case should not be dismissed under Federal Rule of Civil Procedure 41(b), for failure to comply with the Court's order to commence an arbitration. Failure to comply with this order may result in a recommendation that the case be dismissed with prejudice.

**SO ORDERED.**

DATED:     New York, New York
           October 9, 2024

_____
VALERIE FIGUEREDO
United States Magistrate Judge

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SUE COSTELLO,

                      Plaintiff,                      **23-CV-1553 (LGS) (VF)**

        -against-                          **REPORT &**
                                                **RECOMMENDATION**

PARAMOUNT GLOBAL, INC.,

                      Defendant.
-----------------------------------------------------------------X
**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO: THE HONORABLE LORNA G. SCHOFIELD, United States District Judge.**

    Plaintiff Sue Costello, proceeding pro se, commenced this action on February 21, 2023, against Defendant Paramount Global, Inc., alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with a business relationship, constructive fraud, fraudulent inducement, malicious intent to cause emotional and financial distress, and discrimination on the basis of sex. See ECF No. 1. For the reasons set forth below, I respectfully recommend that Plaintiff's case be dismissed for failure to prosecute.

**BACKGROUND**[1]

    On June 29, 2018, Plaintiff and Defendant entered into an agreement whereby Plaintiff would deliver a script to CBS for a television series. See, e.g., ECF No. 1 at ¶¶ 51-59. That agreement contained an arbitration clause. See ECF No. 33 at 2; see also ECF No. 1-2 at 15. Plaintiff never delivered a script to CBS, and the relationship deteriorated, such that on February 21, 2023, Plaintiff commenced the instant action. See ECF No. 1. On June 14, 2023, Defendant moved to compel arbitration of Plaintiff's claims, pursuant to an agreement between the parties.

---

[1] A full recitation of the factual background of this case is included in Judge Schofield's opinion and order from February 1, 2024, with which familiarity is presumed. See ECF No. 33.

See ECF Nos. 20-22. On February 1, 2024, the Honorable Lorna G. Schofield granted the motion to compel arbitration and stayed this case pending conclusion of the arbitration proceeding. See ECF No. 33. The Court concluded that the parties had agreed to arbitrate their disputes and that Plaintiff's claims were within the scope of the parties' arbitration agreement. Id. at 4.

Plaintiff sought reargument of the Court's decision, which was denied on February 15, 2024. See ECF Nos. 34-35. In that memorandum endorsement denying reconsideration, Judge Schofield warned Plaintiff that the failure to take steps towards commencing an arbitration by June 3, 2024, could result in dismissal of the case for failure to prosecute. ECF No. 35.

On April 8, 2024, the Court, in response to the parties' status update, again directed Plaintiff to "take steps towards commencing arbitration proceedings by June 3, 2024." See ECF No. 38. As the Court explained, because Plaintiff was the party asserting claims, Plaintiff is responsible for initiating the arbitration. Id. The Court warned Plaintiff that failure to "take[] steps toward commencing arbitration proceedings by June 3, 2024," could result in the case being "dismissed for failure to prosecute." Id.

On April 10, 2024, in response to a letter submitted by Plaintiff, the Court explained to Plaintiff that if she elected not to pursue her claims in arbitration, "then the case in this Court is closed." See ECF No. 40 at 2. Again, the Court warned Plaintiff that if she failed to comply with the Court's order to take steps to commence an arbitration, the case could be dismissed for failure to prosecute under Federal Rule of Civil Procedure 41(b). Id.

The case was referred to the undersigned on April 15, 2024. See ECF No. 42. By letter dated May 28, 2024, Plaintiff requested an extension of time to commence an arbitration. The Court granted the extension and directed Plaintiff to take steps to commence arbitration

2

proceedings by July 1, 2024. See ECF No. 49. At a conference on June 5, 2024, the Court again extended Plaintiff's deadline to commence arbitration, to July 31, 2024. See ECF No. 50; ECF No. 55 at 21. On August 2, 2024, Defendant submitted a letter informing the Court that Plaintiff had not yet commenced arbitration proceedings. See ECF No. 63.

On August 5, 2024, the Court entered an order, informing Plaintiff that she had "one final extension of time, until August 30, 2024, to commence the arbitration." See ECF No. 64. The Court again informed Plaintiff that her case could be dismissed if she did not commence an arbitration by the stated deadline. Id. By letter dated September 4, 2024, Defendant notified the Court that Plaintiff had failed to commence arbitration proceedings. See ECF No. 68. Consequently, on October 9, 2024, the Court issued an order to show cause, directing Plaintiff to show cause why the case should not be dismissed under Rule 41(b) for failure to prosecute given Plaintiff's failure to comply with the Court's order to commence arbitration proceedings. See ECF No. 71.

Plaintiff responded to the order to show cause in a letter filed on November 13, 2024. See ECF No. 72. Plaintiff contends that JAMS has refused to take her case "because crimes have been committed" and JAMS will not arbitrate a case where there is "evidence of criminal conduct."[2] Id. at 2. Plaintiff contends that the Court must "strike the contract language requiring arbitration" and argues that the Court's order compelling arbitration "cannot be complied with because [JAMS] will not participate in the arbitration process." Id. On November 19, 2024, Defendant responded to Plaintiff's letter. See ECF No. 73. Defendant argued that Plaintiff's case

---

[2] In her letter, Plaintiff appears to reference certain correspondence with JAMS, but Plaintiff does not include that correspondence in her submission to the Court.

3

SA-128

should be dismissed because despite multiple extensions, she nonetheless failed to commence arbitration proceedings, as directed by the Court. Id. at 2-3.

To date, there has been no indication from Plaintiff that she complied with the Court's order requiring her to commence arbitration proceedings.

**DISCUSSION**

Federal Rule of Civil Procedure 41(b) provides that, "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). A district court may also dismiss an action sua sponte under Rule 41(b) for failure to prosecute. See Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962); see also Harding v. Goord, 135 F. App'x 488, 488 (2d Cir. 2005) ("Although not explicitly authorized by Rule 41(b), a court may dismiss a claim for failure to prosecute sua sponte."); White v. Westchester Cnty., No. 19 Civ. 03604 (KMK), 2020 WL 7323422, at *1 (S.D.N.Y. Dec. 11, 2020) ("[I]t has long been recognized that a district court has the inherent authority to dismiss for failure to prosecute sua sponte."). In considering whether to dismiss a case pursuant to Rule 41(b), courts examine five factors: "(1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal." Baptiste v. Sommers, 768 F.3d 212, 216 (2d Cir. 2014) (internal quotation marks and citations omitted). Generally, no one factor

4

is "dispositive," id., and the sanction of dismissal should be considered "in light of the record as a whole." United States ex rel. Drake v. Norden Sys., Inc., 375 F.3d 248, 254 (2d Cir. 2004).

While "pro se plaintiffs should be granted special leniency regarding procedural matters[,]" Obot v. Comm'r, 254 F. App'x 57, 58 (2d Cir. 2007) (internal quotation marks and citations omitted), "even pro se litigants must prosecute claims diligently, and dismissal . . . is warranted where the court gives warning." Jean-Felix v. Great Lakes Higher Educ. Corp., No. 21 Civ. 6122 (ALC) (RWL), 2023 WL 3866764, at *1 (S.D.N.Y. May 3, 2023) (internal quotation marks and citations omitted); see also McCord v. City of N.Y., No. 13 Civ. 2008 (AJN), 2014 WL 4392069, at *2 (S.D.N.Y. Sept. 4, 2014) (explaining that Rule 41(b) dismissal is a "harsh remedy" that should be "employ[ed] only when [the district court] is sure of the impotence of lesser sanctions") (alteration in original, internal quotation marks and citations omitted). Unless the dismissal order states otherwise, a dismissal under Rule 41(b) "operates as an adjudication on the merits." Link, 370 U.S. at 630 (citing Fed. R. Civ. P. 41(b)).

Considering the factors set forth above in light of the record as a whole, dismissal with prejudice of Plaintiff's case is appropriate. First, Plaintiff has taken no steps towards commencing arbitration proceedings despite a February 1, 2024 court order directing her to do so. As discussed, the Court concluded that Plaintiff was required to arbitrate her claims against Defendant based on the arbitration provision in the parties' agreement. See ECF No. 33 at 4. The Court considered and rejected Plaintiff's various arguments for why the arbitration clause was unenforceable. Id. at 5-9. Eleven months have passed and despite multiple extensions, Plaintiff has still not commenced arbitration proceedings. As the Second Circuit has explained, even "a delay of a matter of months can potentially warrant dismissal." Yadav v. Brookhaven Nat'l Lab.,

5

SA-130

487 F. App'x 671, 672-73 (2d Cir. 2012) (summary order) (internal quotation marks and citation omitted). Here, Plaintiff's dilatory conduct for nearly a year weighs in favor of dismissal.

Second, Plaintiff was repeatedly warned that her failure to commence arbitration proceedings could lead to dismissal of her case. On February 1, 2024, Plaintiff was informed that her claims had to be arbitrated and that she needed to commence arbitration proceedings. See ECF No. 33 at 4. In the last eleven months, Plaintiff was warned five times that her failure to commence arbitration proceedings could result in dismissal of her case. Plaintiff was warned on February 15 (see ECF No. 35), April 8 (see ECF No. 38), April 10 (see ECF No. 40), August 5 (see ECF No. 64), and October 9 (see ECF No. 71). Each time Plaintiff was alerted to the possibility of dismissal of her case if she did not commence arbitration proceedings. Plaintiff thus received repeated and clear warnings concerning the potential consequence of her failure to abide by the Court's order that she commence arbitration proceedings. The second factor also supports dismissal.

The third factor, too, favors dismissal. Defendant will be prejudiced by further delay. Plaintiff's factual allegations concern conduct that occurred beginning in July 2017 and continuing through 2018. See, e.g., ECF No. 1 at ¶¶ 7-66. As the Second Circuit has recognized, "delay by one party increases the likelihood that evidence in support of the other party's position will be lost and that discovery and trial will be made more difficult." Shannon v. Gen. Elec. Co., 186 F.3d 186, 195 (2d Cir. 1999). Further, the case is stayed in this Court, and there appears to be no likelihood of a resolution for Defendant, because Plaintiff has refused to commence arbitration proceedings. Dhaliwal v. Mallinckrodt PLC, No. 18 Civ. 3146 (VSB), 2020 WL 5236942, at *2 (S.D.N.Y. Sept. 2, 2020) (finding prejudice to defendant where plaintiff refused

6

to commence arbitration and "nearly a year" had passed since the court's order requiring arbitration); see also Shannon, 186 F.3d at 195 (noting that prejudice to a defendant may be "presumed" from "unreasonable delay") (internal quotation marks and citation omitted).

With respect to the fourth factor, the Court has a strong interest in managing its docket and the Court cannot ignore the binding arbitration provision in the parties' agreement. Although Plaintiff asks the Court to "remove the arbitration clause" (see ECF No. 74 at ¶ 7), the Court cannot "bypass arbitration to review [Plaintiff's] claims." Ventoso v. Shihara, No. 19 Civ. 3589 (PAE), 2022 WL 19706, at *3 (S.D.N.Y. Jan 3, 2022) (concluding that dismissal was appropriate where Plaintiff refused to pursue arbitration for two and a half years). Plaintiff has had multiple opportunities to commence arbitration and it is not an efficient use of the Court's resources to permit this case to remain stayed indefinitely. Consequently, the fourth factor also weighs in favor of dismissal.

Finally, even with the deference afforded to Plaintiff given her pro se status, the fifth factor also favors dismissal. Plaintiff has failed to commence arbitration proceedings without any justification. Although Plaintiff claims that JAMS has refused to arbitrate her claims because they concern criminal conduct (see ECF No. 72 at 2, 4; see also ECF No. 74), a review of Plaintiff's complaint undermines her contention. Plaintiff asserts seven causes of action in her complaint, all of them civil and, at bottom, all stem from an agreement Plaintiff signed with Defendant on June 29, 2018, by which Defendant is alleged to have purchased Plaintiff's script for a television series. See ECF No. 1 at ¶¶ 48-58. Plaintiff appears to allege that Defendant stole her "intellectual property" (see, e.g., id. at ¶¶ 31, 53, 93), but although she reported that "theft" to the police (see id. at ¶ 72), copyright or trademark infringement is a civil claim that can be

7

SA-132

arbitrated. See Kamakazi Music Corp. v. Robbins Music Corp., No. 80 Civ. 2877 (RWS), 1980 WL 1159, at *3 (S.D.N.Y. June 5, 1980) (concluding that both copyright and trademark infringement claims are subject to arbitration "when provided for by agreement"); see also Yash Raj Films (USA) Inc. v. Dishant.com LLC, No. 8 Civ. 2715 (ENV) (RML), 2009 WL 4891764, at *9 (E.D.N.Y. Dec. 15, 2009) (stating that "copyright infringement and trademark infringement are torts").

Moreover, Plaintiff's sex-discrimination claim in count seven of the complaint is also civil, and although Plaintiff discusses the #MeToo movement throughout her complaint, she also alleges that she "never made any sexual allegations against Les Moonves." ECF No. 1 at ¶ 5; see also id. at ¶ 3, 63, 65, 87. It is thus not apparent to the undersigned how JAMS could have concluded, as Plaintiff claims, that the allegations raised in the complaint filed in this Court raise criminal claims that cannot be subject to arbitration. Regardless, Plaintiff was compelled by court order to commence arbitration and was warned in five orders that her failure to comply with that order could result in complete dismissal of her case. See ECF Nos. 35, 38, 40, 64, 71. Given Plaintiff's steadfast refusal to commence arbitration in the face of clear warnings, the Court is not aware of a lesser remedy that would be effective to convince Plaintiff to comply with the Court's order to commence arbitration. See Dhaliwal, 2020 WL 5236942, at *2 (concluding that lesser remedy, such as monetary sanctions, would not be adequate to compel arbitration where plaintiff refused to comply with court order to commence arbitration).

In short, all of the factors weigh in favor of dismissal given Plaintiff's failure to commence arbitration and the Court's repeated warnings that her failure to do so would result in dismissal. See Dixon v. Wells Fargo Bank, N.A., No. 21-CV-10 (JPC), 2022 U.S. Dist. LEXIS

8

SA-133

127148, at *2-3 (S.D.N.Y. July 18, 2022) (dismissing case for failure to prosecute where pro se plaintiff had not commenced arbitration in the nine-month period after being compelled to do so, and was warned twice "that failure to comply would result in the case being dismissed without prejudice").

SA-134

**CONCLUSION**

For the reasons discussed herein, I respectfully recommend that Plaintiff's case be dismissed with prejudice under Federal Rule of Civil Procedure 41(b) for failure to prosecute. I further recommend that the dismissal not be construed to foreclose Plaintiff's right to pursue arbitration of her claims, should she attempt to commence arbitration in the future.

**SO ORDERED.**

DATED:   New York, New York
January 14, 2025

_____
VALERIE FIGUEREDO
United States Magistrate Judge

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Lorna G. Schofield. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
SUE COSTELLO,                                               :
                                                            :
                                Plaintiff,      :           23 Civ. 1553
                                                            :
            -against-                           :           **OPINION AND ORDER**
                                                            :
PARAMOUNT GLOBAL, INC.,                         :
                                                            :
                                Defendant.      :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

WHEREAS, in a Report and Recommendation (the "Report"), dated January 14, 2025,

Magistrate Judge Valerie Figueredo recommended that this case be dismissed with prejudice in its

entirety for failure to prosecute.

WHEREAS, the recommendation in the Report is based on a finding that Plaintiff had

failed to commence arbitration proceedings, despite a February 1, 2024, court order to do so and

despite Plaintiff's repeatedly being warned that a failure to commence arbitration would result in a

dismissal of her case for failure to prosecute.

WHEREAS, the recommendation in the Report also was based on an application of

Federal Rule of Civil Procedure 41(b), which states that a court may dismiss an action if a

plaintiff fails "to prosecute or to comply with . . . a court order."  The Report applies the relevant

factors to recommend that dismissal of the action is warranted: (1) Plaintiff has failed to comply

with court orders to commence arbitration, despite her being granted multiple extensions to do so,

(2) Plaintiff has been warned explicitly five times that dismissal may occur, (3) Defendant will be

prejudiced by further delay, (4) the courts will be unduly burdened by further delay and (5)

dismissal and not a lesser sanction is appropriate because Plaintiff's non-compliance with court

orders is not justified.  *See Baptiste v. Sommers*, 768 F.3d 212, 216 (2d Cir. 2014) (listing factors); *accord Lopez v. 3662 Broadway Rest. Corp.*, No. 19 Civ. 975, 2023 WL 3847141, at *2 (S.D.N.Y. June 6, 2023).

WHEREAS, Plaintiff, proceeding pro se, timely filed several letters in response to the Report, all of which are construed as objections to the Report.  Defendant responded to Plaintiff's objections.

**Legal Principles**

WHEREAS, a reviewing court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3); *accord* 28 U.S.C. § 636(b)(1).  Even when exercising de novo review, "[t]he district court need not, however, specifically articulate its reasons for rejecting a party's objections or for adopting a magistrate judge's report and recommendation in its entirety."  *Morris v. Local 804, Int'l Bhd. of Teamsters*, 167 F. App'x 230, 232 (2d Cir. 2006) (summary order)[1]; *accord Bulgari v. Bulgari*, No. 22 Civ. 5072, 2024 WL 4345580, at *2 (S.D.N.Y. Sept. 30, 2024).  "When a party makes only conclusory or general objections, or simply reiterates the original arguments made below, a court will review the report strictly for clear error."  *Espada v. Lee*, No. 13 Civ. 8408, 2016 WL 6810858, at *2 (S.D.N.Y. Nov. 16, 2016); *accord TCA Television Corp. v. McCollum*, No. 15 Civ. 4325, 2018 WL 2932724, at *2 (S.D.N.Y. June 12, 2018).  Similarly, where no specific written objection is made, "the district court can adopt the report without making a de novo determination."  *United States*

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

2

*v. Male Juv.*, 121 F.3d 34, 38 (2d Cir. 1997); *accord Shulman v. Chaitman LLP*, 392 F. Supp. 3d 340, 345 (S.D.N.Y. 2019) ("A district court evaluating a magistrate judge's report may adopt those portions of the report to which no specific written objection is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law.").

WHEREAS, it is well established that "pro se submissions are reviewed with special solicitude and must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Barnes v. City of New York*, 68 F.4th 123, 127 (2d Cir. 2023). "[P]ro se status does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006); *accord McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, No. 22 Civ. 1138, 2023 WL 5211054, at *5 (S.D.N.Y. Aug. 13, 2023).

**<u>Discussion</u>**

WHEREAS, the Report is thorough and well-reasoned. It is adopted in its entirety, and the objections are overruled.

WHEREAS, Plaintiff makes several objections (the "Objections") to the Report, the majority of which pertain to the merits of her underlying claims and attempt to relitigate the order compelling arbitration. The Objections also include allegations of bias and prejudice against Plaintiff by the Court. The Objections do not dispute that Plaintiff has not commenced arbitration but argue instead that doing so was impossible because JAMS refused to arbitrate the matter due to Plaintiff's allegations of criminal conduct. The Objections also argue that a case undergoing arbitration cannot be dismissed. As described below, the Report correctly weighs

3

each factor in support of its recommendation to dismiss the case. The Objections are not to the contrary.

WHEREAS, as to the first factor, the duration of Plaintiff's failure to comply, Plaintiff was first ordered to commence arbitration on February 1, 2024. Although Plaintiff was granted several extensions of time to commence arbitration, she has still not commenced the arbitration over a year later. The Objections do not dispute that Plaintiff has not commenced arbitration nor that she was ordered to do so on February 1, 2024. Instead, the Objections argue that arbitration was impossible to commence, which is discussed below in connection with the fifth factor. "There is no absolute measure by which to determine whether the delay is significant. Rather, the determination is case-specific: significant delay can range from weeks to years depending upon the circumstances." *Abarca v. Chapter 4 Corp.*, No. 18 Civ. 11206, 2019 WL 13221420, at *1 (S.D.N.Y. Mar. 21, 2019) (dismissing case after plaintiff failed to appear at conferences or otherwise respond over a six-week period). Here, Plaintiff's months-long delay weighs in favor of dismissal. Courts have found delays of similar lengths to weigh in favor of dismissal in various contexts, including plaintiffs' failures to initiate arbitration, to respond to discovery, to appear at conferences or to otherwise take action to advance a case. *See Yadav v. Brookhaven Nat'l Lab'y*, 487 F. App'x 671, 672-73 (2d Cir. 2012) (summary order) (affirming dismissal after three months' delay in responding to discovery requests); *accord Davis v. Lowe's Home Centers, LLC*, No. 23 Civ.5613, 2024 WL 1513681, at *2 (S.D.N.Y. Apr. 8, 2024) (holding that delay of six months warranted dismissal where plaintiff failed to appear at a conference and respond to court's orders to show cause); *Ventoso v. Shihara*, No. 19 Civ. 3589, 2022 WL 19706, at *3 (S.D.N.Y. Jan 3, 2022) (concluding that dismissal was appropriate where plaintiff refused to pursue arbitration for two and a half years); *see also Barnes v. Stop & Shop Supermarket Co.*,

4

SA-139

No. 19 Civ. 431, 2020 WL 3100191, at *2 (S.D.N.Y. June 11, 2020) (finding that, in the Second Circuit, delays of five months or less have resulted in dismissal, and holding that delay of five months in filing briefing and pretrial order warranted dismissal).

WHEREAS, the second factor, whether Plaintiff was on notice of the possibility of dismissal, also weighs in favor of dismissal. As the Report explains, after the February 1, 2024, order required her to commence arbitration, Plaintiff was warned five times that failure to do so would result in dismissal of this case. The Objections do not dispute that Plaintiff was provided notice of the likelihood of dismissal. The orders "provide[d] clear guidance on how [Plaintiff] could avoid dismissal." *Baptiste*, 768 F.3d at 218. As a result, Plaintiff was on notice that continued non-compliance could result in the dismissal of her case.

WHEREAS, the third factor, whether Defendant is likely to be prejudiced by further delay in the proceedings, weighs in favor of dismissal. Plaintiff has not complied with the Court's orders for over a year. Further delay would prejudice Defendant. *See Seabrook v. Janssen Pharms. Inc.*, No. 20 Civ. 2005, 2022 WL 3718277, at *2 (S.D.N.Y. Aug. 29, 2022) (presuming prejudice to defendants after eight months of delay). The Objections argue that the case should have been resolved prior to the order compelling arbitration and that Plaintiff has remained willing to resolve the case. The Objections likewise argue that the order compelling arbitration was decided wrongly. This objection is beside the point, as Plaintiff is obligated to comply with Court orders regardless of Plaintiff's disagreement with those orders. "[I]t is a well-established basic proposition that all orders and judgments of courts must be complied with promptly" and that "[a]n order issued by a court must be obeyed, even if it is later shown to be erroneous." *United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010); *accord United States v. Ventura*, 96 F.4th 496, 504 (2d Cir. 2024) (Lohier, J., concurring). After the denial of Plaintiff's

5

request for re-argument of the order compelling arbitration, she was obligated to apply promptly with that order pending appeal. *See Maness v. Meyers*, 419 U.S. 449, 458 (1975) ("If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, [s]he must comply promptly with the order pending appeal."); *accord Lewis v. Newburgh Hous. Auth.*, No. 11 Civ. 3194, 2024 WL 1007880, at *2 (S.D.N.Y. Mar. 8, 2024). The Objections do not argue that Plaintiff's delay has not caused prejudice to Defendant. The Report's recommendation regarding this factor is adopted.

WHEREAS, the Report found that the fourth factor, balancing the Court's interest in managing its docket with Plaintiff's interest in receiving a fair chance to be heard, weighs in favor of dismissal. The Objections argue that Plaintiff has not had a fair chance to be heard on her claims. As the Report explains, the Court cannot "bypass arbitration to review [Plaintiff's] claims." *Ventoso*, 2022 WL 19706, at *3. Plaintiff had an opportunity to oppose the enforcement of the arbitration clause and did so. The Court considered and rejected each of Plaintiff's arguments in opposition to arbitration in the February 1, 2024, opinion and order compelling arbitration. Plaintiff reiterated her arguments against arbitration in her motion for re-argument, which the Court again considered and rejected. The dismissal of this case will not prevent Plaintiff from pursuing arbitration of her claims. Because this case must be arbitrated and Plaintiff has not commenced arbitration despite being given ample opportunity to do so, this factor weighs in favor of dismissing the case and not leaving it stayed on the Court's docket indefinitely.

WHEREAS, the fifth factor, whether the Court has adequately considered a sanction less drastic than dismissal, weighs in favor of dismissal. "A lesser sanction is unlikely to persuade Plaintiff to participate as [s]he has already been informed that [her] failure to participate may

6

SA-141

lead to the dismissal of [her] action, but [s]he has not responded." *Abarca*, 2019 WL 13221420, at *2. As the Report explains, Plaintiff has failed to commence arbitration proceedings without any justification. Plaintiff argues that JAMS has refused to arbitrate her claims due to the claims' concerning criminal conduct, but none of Plaintiff's claims are criminal in nature or are otherwise not arbitrable -- as has been explained in the Court's prior opinions and in the Report. The Objections state that correspondence with JAMS is attached regarding their inability to conduct the arbitration, but no such attachments are included in the letters on the docket.

WHEREAS, the Objections argue that a court cannot dismiss a case in which the parties are arbitrating the claims. The Supreme Court recently held that under the Federal Arbitration Act (the "FAA") a court must stay, and not dismiss, a case pending arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024). That decision is based on the purpose and text of § 3 of the FAA, which states that a court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. The Supreme Court explained that staying a case pending arbitration comports with the "supervisory role that the FAA envisions for the courts," including to enforce any eventual arbitration award. *Smith*, 601 U.S. at 478. The Court here properly stayed the action in the opinion and order compelling arbitration. The prohibition on dismissal of cases pending arbitration is inapplicable in cases like this one where there is no arbitration pending and the reason for dismissal is a failure to prosecute. *Id.* at 476 n.2 ("That is not to say that the court is barred from dismissing the suit if there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration.").

7

SA-142

**<u>Conclusion</u>**

For the foregoing reasons, the Report's recommendation is **ADOPTED** in full.  The Court certifies, under 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal.  *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

The Clerk of Court is respectfully directed to terminate this case.

Dated: March 12, 2025
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

8

STATE OF NEW YORK    )                     **AFFIDAVIT OF SERVICE**
                              )    ss.:     **BY OVERNIGHT EXPRESS**
COUNTY OF NEW YORK   )                     **MAIL**

I, Tyrone Heath, 2179 Washington Avenue, Apt. 19, Bronx, New York 10457, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

**On September 19, 2025**

deponent served the within: **Supplemental Appendix**

**upon:**

Sue Costello
*Appellant Pro Se*
120 Quincy Shore Drive
Apartment 4
Qunicy, MA 02171

the address(es) designated by said attorney(s) for that purpose by depositing **1** true copy(ies) of same, enclosed in a postpaid properly addressed wrapper in a Post Office Official Overnight Express Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York.

**Sworn to before me on September 19, 2025**

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2026     **Job# 384606**